Tristan G. Pelayes, Esq. (SBN: 206696)
Jacob P. Menicucci, Esq. (SBN: 305237)
WAGNER & PELAYES, LLP
1325 Spruce Street, Suite 200
Riverside, California 92507
Telephone:   (951) 686-4800
Fax:             (951) 686-4801
tgp@wagner-pelayes.com
jpm@wagner-pelayes.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN SOARES, TIFFANY SOARES, ALISSA VARNEDOE, JAYDA MACCASKIE AS MOTHER AND NATURAL GUARDIAN FOR MINOR CHILDREN "J.V." AND "S.V.," CHILDREN OF DECEDENT, AND SUCCESSORS OF INTEREST, HEIRS. | CASE NO.: 2:17-cv-00924-RGK-AS |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S MONELL CLAIM** |
| Plaintiffs, | *[Filed concurrently with Plaintiffs' Statement of Genuine Disputes in Opposition and Declarations of Jacob P. Menicucci, Robert Fonzi and Tom Yu]* |
| vs. | |
| COUNTY OF LOS ANGELES, SHERIFF JIM MCDONNELL, CAPTAIN JACK EWELL, SERGEANT SEAN BURKE, DEPUTY ANTHONY GEISBAUER, DEPUTY JUAN RODRIQUEZ, DEPUTY EDSON SALAZAR, DEPUTY DONALD MCNAMARA, DEPUTY STEVEN PRATT, DEPUTY IAN STADE, DEPUTY DANIEL WELLE, DEPUTY WHEELER, COMMANDER PATRICK MAXWELL, and DOES 1-10 | **DATE:**   April 16, 2018<br>**TIME:**    9:00 a.m.<br>**CTRM:**  850, 8th Floor |
| | *Honorable R. Gary Klausner* |
| Defendants. | |

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

Plaintiffs, DAWN SOARES, TIFFANY SOARES, ALISSA VARNEDOE, and "J.V." and "S.V." minors by and through their guardian ad litem, JAYDA MACCASKIE, hereby submit their Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' *Monell* Claim.

Dated:      March 26, 2018          WAGNER & PELAYES, LLP


                                    */s/ Jacob P. Menicucci*
                                    TRISTAN G. PELAYES, ESQ.
                                    JACOB P. MENICUCCI, ESQ.
                                    Attorneys for Plaintiffs

ii

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES........................................ 1

I.  INTRODUCTION .................................................................................. 1

II. STATEMENT OF FACTS...................................................................... 3

III. STANDARD OF REVIEW ...................................................................... 7

IV. ARGMENT............................................................................................. 8

    A. First Path-Practice of Custom ............................................... 10

    B. Second Path – Failure to Train and Failure to Supervise ..................... 14

V.  CONCLUSION ...................................................................................... 20

iii

1

# TABLE OF AUTHORITIES

2

3

__Cases__:

*Anderson v. Warner*,
   451 F.3d 1063, 1070 (9th Cir. 2006) ........................................................... 9, 14

*Baker v. McCollan*,
   443 U.S. 137, 144 n.3 (1979) ...................................................................... 8

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*,
   520 U.S. 397, 403 (1997) ............................................................................ 9, 15

*Blankenhorn v. City of Orange,*
   485 F.3d 463, 484 (9th Cir. 2007) .............................................................. 14

*Burke v. City of Alameda*,
   586 F.3d 725, 734 (9th Cir. 2009) .............................................................. 9

*Castro v. City of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) ..................................................................... 9

*Celotex Corp. v. Catrett*
   477 U.S. 317, 323 (1986) ............................................................................. 7, 8

*City of Canton v. Harris*,
   489 U.S. 378, 387-89, 390 (1989) .......................................................... 9, 15, 16

*City of St. Louis v. Praprotnik*,
   485. U.S. 112, 127 (1988) ........................................................................... 13

*Clouthier v. Cnty. of Contra Costa*,
   591 F.3d 1232, 1250 (9th. Cir. 2010) ........................................................ 13

*Connick v. Thompson*,
   563 U.S. 51, 58, 62, 63, 64 (2011) .......................................................... 15, 16

*Davis v. City of Ellensburg*,
   869 F.2d, 1230, 1235 (1989) ....................................................................... 15

*Dougherty v. City of Covina*
   654 F.3d 892, 900 (9th Cir. 2011) .............................................................. 14

*Garcia v. City of Imperial*,
   No. 08cv2357 BTM (PCL), 2010 WL 3911457,
   *2 (S.D. Cal. Oct. 4, 2010) ........................................................................ 11

*Gibson v. City of Washoe*,
   290 F.3d 1175, 1185, 1186, 1194 (9th Cir. 2002) ................................. 8, 9, 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

*Graham v. Connor,*
   490 U.S. 386, 393-94 (1989)................................................................. 8

*Grandstaff v. City of Borger, Tex.,*
   767 F.2d 161, 171 (5th Cir. 1985) .................................................... 11

*Hammond v. County of Madera,*
   859 F.2d 797, 802-03 (9th Cir. 1988) ................................................ 11

*Larez v. City of Los Angeles,*
   946 F.2d 630, 646 (9th Cir. 1991) ............................................... 9, 11

*McRorie v. Shimoda,*
   795 F.2d 780, 784 (9th Cir. 1986) ............................................. 11, 12

*Narayan v. EGL, Inc.*
   616 F.3d 895, 899 (9th Cir. 2010) ....................................................... 8

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*
   210 F.3d 1099, 1102-03 (9th Cir. 2000) ............................................ 8

*Peterson v. City of Fort Worth Texas,*
   588 F.3d 838, 848 (5th Cir. 2009) .............................................. 11, 13

*Russo v. City of Cincinnati,*
   953 F.2d 1036, 1047 (1992)................................................................ 18

*Ulrich v. City & Cty. of San Francisco,*
   308 F.3d 968, 984 (9th Cir. 2002) ..................................................... 10

*Waggy v. Spokane Cty.,*
   594 F.3d 707, 713 (9th Cir. 2010) ..................................................... 10

*Young v. County of Los Angeles*
   655 F.3d 1156, 1158-59 (9th Cir. 2011) ............................................ 8


**Statutes:**

42 U.S.C. § 1983...........................................................ii, 3, 8, 9, 10, 13, 14, 15, 18

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## INTRODUCTION

Defendants move for Summary Judgment in its favor on Plaintiffs' claims under *Monell*. Plaintiffs' claims stem from the death of Decedent Leroy Varnedoe who was gassed and burned to death while in his home after Los Angeles Sheriff's Department Deputies threw a highly flammable gas grenade into his home.[1]

Decedent never stood a chance, as the flames from the highly flammable gas grenade which was housed in a handmade container quickly engulfed the house, because it was used improperly and ignited a piece of furniture (a couch). There was no plan to handle the foreseeable fire and as a result, Decedent died a horrific death, suffering from thermal burns to more than 80% of his body and severe smoke inhalation.

The container device that was used by deputies to burn the Decedent was never tested in a manner consistent with industry standards or at all, and no one from the Sheriff's Department knows who manufactured it (although there is deposition testimony that it was "homemade" and referred to as a "Relic"). No one knows where it came from, when it was introduced into the SEB arsenal, or if it had ever been tested prior to being allowed to be used by SEB.

This device is a heavy metal tube-like canister with a screw top, a handle on its side (for ease of tossing into a location) with holes in the container. The chemical gas grenade was placed into the canister and activated within the metal canister immediately prior to deployment into the house. The holes in the metal canister allow the gases and flames from the pyrotechnic-type chemical grenade to escape and saturate the area with chemical agents.

---

[1] The gas grenade was <u>not</u> intended for indoor use as the manufacturer states it is designed for outside use for riot control.

Additionally, all manufacturer's warning labels on the gas grenades themselves (which SEB members utilized to place into the metal canister) were ignored and/or unknown to those involved in the incident, including several commanding officers with many years of experience as well as the Sheriff's Department's designated person most knowledgeable.[2]

The individual officers ignored the warning labels despite the fact that on the gas devices deployed, the warning labels stated the gas grenades were not to be used indoors because of a high probability of starting a fire.

The commanding officer on scene, the officer who developed the gas plan, the incident commander who authorized the gas plan, and the person designated by the Sheriff's department as the person most knowledgeable regarding the use of chemical munitions also was uninformed on the warning and its proper use.

Los Angeles County failed to reasonably train its deputies in the use of highly flammable and dangerous chemical munitions. This includes the failure to read the warning label, the failure to heed its warning and use the device outside and to use a homemade container to hold the gas grenade which had never been tested.

Also signaling the County's liability, substantial evidence shows the Sheriff's Department ratified its deputies conduct that deprived Plaintiffs of their constitutional rights.  The Los Angeles County Sheriff's Department failed in both its responsibility and duty to properly investigate the severe events leading to the incident that resulted in Decedent's death.

The Sheriff's Department failed to properly investigate and to perform a department executive review of the circumstances that resulted in Decedent's death.  Although many of the involved defendants testified that they are aware of a

---

[2]These individuals stated they never read the gas label for how it was to be used or not used.

Department Executive Review process, no one, (including commanding officers or anyone that was involved in authorizing the chemical munition plans, created, supervising, or executing the plan) was involved in any Department Executive Review.  The Department's failure to conduct a review falls below the standard for acceptable leadership and supervisory concepts that are commonly recognized in the law enforcement community.  Additionally, the County continues to ratify the unconstitutional actions by continuing to implement the dangerous tactics and same devices that killed the Decedent and will undoubtedly kill others.

Plaintiffs can and have produced sufficient evidence to establish a *Monell* claim under 42 U.S.C. § 1983 against Defendant County of Los Angeles. Accordingly, Plaintiffs' respectfully request that the Court deny Defendant's Motion for Summary Judgment on Plaintiffs' *Monell* claim.

## II.
## STATEMENT OF FACTS

On February 5, 2015 at 9:00 a.m. Deputy Welle allegedly directed a surveillance on the property located at 45335 Gadsden Ave, Lancaster, California. (Plaintiffs' Statement of Undisputed Material Facts (hereinafter "PF") 1). Defendant Welle claims to have had information from various sources that the Decedent Varnedoe had active warrants and possessed firearms.  (PF 2). Defendant Welle passed on information from an unreliable confidential source and hearsay from a bail bond agent to the Special Enforcement Bureau ("SEB").  (PF 3).  This unreliable information far exaggerated and distorted the Decedent's status as an armed and dangerous individual. In fact, the original source of the information was the person who had put up funds for Decedent's bail and wanted to see him taken into custody immediately, so she would not lose his money. (PF 4-5, 7).  Defendant Deputy Welle, never bothered to talk to this "informant" until after the Decedent had been killed by SEB members. (PF 6).

/ /

3

At 5:45 p.m. various LASD deputies responded and surrounded the residence and aided by air support used loud speakers to order the occupants to exit the house. (PF 8).  Three women and a child exited. (PF 9).  All three informed the police that Decedent was sleeping inside the residence and further informed LASD that Decedent was passed out and described him as being no danger or in an agitated state, contrary to the information provided by Defendant Deputy Welle. (PF 10).

At all times throughout this entire event the Decedent was never seen nor observed by any law enforcement personnel. (PF 11).  There is no evidence to show Decedent ever made any threats to anyone including law enforcement during this SWAT operation. (PF 12).  There is no evidence to suggest that the Decedent engaged in any aggressive actions towards anyone, including law enforcement. (PF 13).  Moreover, there is no evidence to suggest that the Decedent barricaded himself inside the house. (PF 14).  The Decedent was sleeping as described by the female witnesses. (PF 15).  The only contact SEB had with the Decedent occurred after the house was burned down.  Only then did LASD make contact with a deceased Varnedoe when his naked, burnt body was located. Varnedoe was unarmed.  (PF 16).

Defendant Captain Ewell, a high-ranking Captain in the Los Angeles County Sheriff's Department, along with Commander Patrick Maxwell determined that the Sheriff's Department SWAT/SEB Team should be deployed to effect entry into the residence. (PF 17).  Defendant Sheriff McDonnell was notified, and presumably approved, the plan developed by Defendants, to throw fourteen (14) canisters of gas and a gas bomb into the house where Decedent was residing to "smoke" Decedent out from inside residence. (PF 18, 35-36 (See Declaration of Expert Tom Yu)).

/ /

4

The LASD SWAT team or SEB surrounded the house where Decedent was staying. SEB sent a robot into the house. (PF 19). The robot did not detect the presence of the Decedent in the house because it did not have the capability to see on top of furniture, such as a bed or a couch. (PF 20).

Although Defendants were informed that Decedent might be mentally impaired or intoxicated, they received no indication that Decedent was a threat to himself or anyone else during this operation. (PF 21). Decedent did not communicate with Defendants. The Defendants never provided a phone or mechanism by which the Decedent could have communicated with law enforcement.

The on-scene leader Patrick Maxwell decided to approve a hot gas grenade manufactured specifically for riot control purposes, to be used exclusively outdoors be placed into a metal canister (euphemistically and misleadingly, called a "burn-safe device") and be thrown inside the house. (PF 22). The metal canister ("burn-safe") device ignited the couch in the front living room where Decedent was residing. The interior of the living room was visible to Defendants through a large window that faced out onto the street. Furniture, including two couches and other flammable items were also clearly visible. (PF 23).

In total, over 14 types of chemical agents were thrown into the house which was apparently 1100 sq. ft. (PF 24). This is well in excess of permissible industry standards, especially since no one had communicated with the Decedent and they had no idea if he was incapacitated or not. Further, some of these chemical grenades were specifically manufactured to be used exclusively outdoors and were so labeled. (PF 25).

The "gas plan" was initiated by LASD at 11:00 p.m. on February 5, 2015. Massive amounts of gas were fired into the residence. (PF 26). Defendant Deputy Geisbauer tossed a "burn-safe" gas canister. Deputy Salazar deployed a tomahawk

5

gas grenade thrown through the southwest bedroom window and the bathroom window.  Deputy Salazar fired other rounds into the attic.  Deputy McNamara fired three additional rounds into the attic.  Defendant Deputy Rodriguez deployed a tomahawk through the window of the door on the north side of the residence. During this outrageous and unwarranted gas attack, Defendant Sergeant Sean Burke supervised and directed the attack.

Defendants Deputy Pratt, Deputy Stade and Deputy Wheeler assisted the other named defendants in the tactical operations and carrying out the gas attack of the residence.

The reasoning of the on-scene Defendants for deploying the fourteen canisters of tear gas in the residence was that they had allegedly previously employed the gassing in the same manner and it had been effective "smoking out" people who had been hiding inside a building where they deployed this type of firebomb. (PF 27).  Thus, based on Defendant County's practice, and written or unwritten policy, Defendants ordered the incendiary gas canister to be thrown inside the residence, near multiple obvious fire hazards, with no immediate means available to extinguish the bomb or fires it might set inside the residence.  This was done while being reasonably aware that at least one person, not believed to be armed or threatening since there was no communication with him, was inside the residence recalcitrant to law enforcement commands to exit the residence, possibly impaired or under the influence, and likely to die should a fire be set inside the residence.

Any visual observation into the living room would have disclosed the obvious fire hazards noted herein.

/ /
/ /
/ /

6

No one attempted to prevent the hot gas from igniting a fire.  No steps were taken in the placement of the hot gas to reduce or eliminate the possibility of a fire being set by the device's ignition. There was no fire suppression plan in place.[3] (PF 28).

By the time the Fire Department arrived and had the fire controlled, about an hour later, Decedent was burned to death and had suffered severe smoke inhalation.  (PF 29).  The Sheriff's Department claims Decedent was hiding in a crawlspace above the kitchen, according to the location of his body.  (PF 30).  No weapon was found near the Decedent's body.  Nor can anyone provide facts that the Decedent had been hiding in an attic.  (PF 31).

Varnedoe's death was horrific and wholly unnecessary.  Varnedoe's death is directly attributed to the actions of the Defendants whereby an excessive and unreasonable "gassing method" was deployed.  Defendants used massive and excessive amounts of cold and hot gas with untested faulty equipment.  Varnedoe died from smoke-inhalation, burns to his body, and ingestion of chemicals.

Although Defendants contend they possessed an arrest warrant, the extreme amount of gas in combination with the use of a dangerous hot gas canisters known to start fires when in contact with carpet and furniture was a departure from accepted law enforcement use of these chemicals.  Defendants knew or should have had knowledge of the dangerous consequences of their actions.

### III.
### STANDARD OF REVIEW

The moving party in a motion for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett* 477 U.S. 317, 323 (1986).  The evidence of the non-moving party is

---

[3]The fire plan was to use the garden hose at the residence next to the subject residence.

7

assumed to be true and all justifiable inferences are to be drawn in their favor. *Young v. County of Los Angeles* 655 F.3d 1156, 1158-59 (9th Cir. 2011); *Narayan v. EGL, Inc.* 616 F.3d 895, 899 (9th Cir. 2010). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. *See Celotext Corp.*, *supra*, 477 U.S. at 323. If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

As established below, there are disputed material facts as to whether (A) the County ratified the deputies' unconstitutional actions and (B) the County failed to reasonably train its deputies in the proper and reasonable use of force, and specifically, in the deployment of chemical munitions and responding to incapacitated barricaded suspects. Because both these material facts give rise to *Monell* liability, Defendants' Motion for Summary Judgment on Plaintiff's *Monell* claim should be denied.

## IV.
## ARGUMENT

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of the rights, privileges, or immunities secured by the Constitution or the laws of the United States. *See* 42 U.S.C. § 1983. It does not create substantive rights, but rather provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

A municipality may be liable under 42 U.S.C. § 1983 "when the municipality inflicts an injury[.]" *Gibson v. City of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), overruled on other grounds by *Castro v. City of Los Angeles*, 833

8

1   F.3d 1060 (9th Cir. 2016).  There are at least two paths that "can lead to the

2   conclusion that a municipality has inflicted a constitutional injury."  *Gibson*, *supra*,

3   290 F.3d at 1185.  "First, a plaintiff can show that a municipality itself violated

4   someone's rights or that it directed its employee to do so."  *Id.*  "Alternatively, in

5   limited situations, a plaintiff can demonstrate that a municipality is responsible for

6   a constitutional tort committed by its employee, even though it did not direct the

7   employee to commit the tort."  *Id*.

8        Under the first path, a plaintiff seeking to impose liability under *Monell*

9   must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."

10  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  To prevail

11  under this approach, a plaintiff must show: "(1) that he possessed a constitutional

12  right of which he was deprived; (2) that [the municipality] had a policy; (3) that the

13  policy amounts to deliberate indifference to [plaintiff's] constitutional right; and

14  (4) that the policy is the moving force behind the constitutional violation."

15  *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) (internal quotation

16  marks omitted); *see Burke v. City of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009).

17  Also important, evidence that an authorized policymaker on police matters made or

18  ratified a decision that deprived plaintiffs of their constitutional rights suffices for

19  official liability.  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

20       Under the second path, "a plaintiff need not allege that the municipality

21  itself violated someone's constitutional rights or directed one of its employees to

22  do so."  *Gibson*, 290 F.3d at 1186 (citing *City of Canton v. Harris*, 489 U.S. 378,

23  387-89 (1989).  Rather, "a plaintiff can allege that through its <u>omissions</u> the

24  municipality is responsible for a constitutional violation committed by one of its

25  employees, even though the municipality's policies were facially constitutional

26  [and] the municipality did not direct the employee to take the unconstitutional

27  action[.]"  *Id.*  (emphasis in original); *see Waggy v. Spokane Cty.*, 594 F.3d 707,

28

9

1   713 (9th Cir. 2010) (noting that for purposes of *Monell* liability, "a policy can be
2   one of action or inaction" and in order to state a claim based on inaction, "a
3   plaintiff can allege that through its omissions the municipality is responsible for a
4   constitutional violation committed by one of its employees").

5       Here, Plaintiffs assert *Monell* liability under both paths by asserting the
6   County (1) ratified the individual deputies' malicious and blatant excessive force;
7   and (2) failed to train its deputies in the proper use of deadly force in that it failed
8   to provide any training for the deployment and use of smoke grenades and burn
9   safe devices.  The County also failed to train its deputies in responding to a
10  situation with a non-cooperative suspect.  For these reasons, the Motion for
11  Summary Judgment should be denied.

12      **A. <u>First Path-Practice of Custom</u>**

13      A plaintiff can support a *Monell* claim under the first path by showing one or
14  more of the following: (1) "a longstanding practice or custom which constitutes the
15  standard operating procedure of the local government entity[;]" (2) "that the
16  decision-making official was, as a matter of state law, a final policymaking
17  authority whose edicts or acts may fairly be said to represent official policy in the
18  area of decision[;]" or (3) "that an official with final policymaking authority either
19  delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v.*
20  *City & Cty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002).  Here, officials
21  with final policymaking authority for the County of Los Angeles Sheriff's
22  Department ratified the individual defendants' severe constitutional violations.
23  The County of Los Angeles' failure to conduct any review or investigation into the
24  horrific events on February 5, 2015 along with the fact that the County continues to
25  allow the use of the deadly device illustrates that it continues to ratify its deputies
26  gross unconstitutional actions.

27      *Monell* is shown when plaintiff demonstrates evidence that an authorized
28  policymaker on police matters "made or ratified a decision that deprived plaintiffs

10

of their constitutional rights." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir. 1991). A jury can properly find such policy or custom from the failure of the policy maker to take remedial steps after the violations. *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) (custom inferred from failure to reprimand or discharge); *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) ("subsequent acceptance of dangerous recklessness by policymaker tends to prove his preexisting disposition *and policy*.") (emphasis added). The Ninth Circuit Court of Appeals has frequently found municipal liability on the basis of ratification when officials adopted and approved of the acts of others who caused the constitutional violation. *See, e.g., Hammond v. County of Madera*, 859 F.2d 797, 802-03 (9th Cir. 1988) (board, which was responsible for approving transfers of rights-of-way, accepted and approved of transfer documents that resulted in deprivation of constitutional rights); *Larez v. City of Los Angeles*, 946 F.2d 630, 645-48 (9th Cir. 1991) (individual filed a complaint with the LAPD alleging excessive force was used against him in a search, LAPD investigated it, but none of the complaints were sustained, thereby ratifying the investigation and search). "Extreme factual situations" also support a finding of ratification as a result of a policymaker's failure to discipline." *Garcia v. City of Imperial*, No. 08cv2357 BTM (PCL), 2010 WL 3911457, *2 (S.D. Cal. Oct. 4, 2010) (citing *Peterson v. City of Fort Worth Texas*, 588 F.3d 838, 848 (5th Cir. 2009)). For example, in *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), a case in which police officers "poured their gunfire" at a truck and an innocent bystander, the Fifth Circuit held, based on the fact that no discharges or reprimands followed an "episode of such dangerous recklessness," that "the jury was entitled to conclude that it was accepted as the way things are done and have done in the City of Borger." *Id*. at 171.

/ /

11

Here, the County's failure to take any review action after the gross and severe reckless actions of its deputies killed the Decedent illustrates its approval and ratification of the individual deputies' actions. A review would have exposed the multiple gaffes and total lack of facts to justify this deadly force.  After the incident, no debriefing was conducted.  (PF 60).  To date, the Sheriff's Department still uses the flammable gas grenades with the relic "burn safe" device both indoors and outdoors.  In fact, testimony shows that after this incident there has been no changes to the way defendants use gas grenades or respond to recalcitrant suspects. (PF 62).  Despite the death from this incident, no Department Executive Review (DER) of the incident was performed.  (PF 61)  Many members of the Sheriff's Department stated that they had no desire to investigate what actually caused the fire.  Captain Ewell testified that one of the reasons no follow up investigation into the incident occurred was because they "were an extremely busy team." Commander Maxwell testified that it was not "his job" to know what caused the fire despite the fact that he was the one who approved the gas plan.  Additionally, Decedent's death did not trigger any type of equipment review into the use of the grenades or the burn safe device (which isn't safe).  By not performing a DER after this fatal incident, shows the Sheriff's Department fell below the standard of acceptable leadership, management, and supervisory management that is recognized in the law enforcement community.  (PF 60-63).  The Department's refusal to conduct a review is itself a ratification of the unlawful actions of its deputies.  *See McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986).

The primary arson investigator, Tania Owen, submitted an official report involving her investigation and indicated that she was not aware of the lab results that revealed "No recognizable ignitable liquid residues were detected in items three, four, and five" which was from the evidence collected at the scene.  (PF 63). Subsequently, Investigator Owen admitted under oath that she had not completed

the investigation as of her deposition dated February 28, 2018, several years later.[4]
(PF 64).  Additionally, Investigator Owen never took any photographs, conducted
interviews, nor did she inspect the device used to deploy the chemical agent. (PF
65).

The County of Los Angeles's ratification of the unconstitutional conduct of
its deputies must result in the municipality being held liable to Plaintiffs.  A
municipality will be liable under § 1983 when it "ratified a subordinate's
unconstitutional decision or action and the basis for it." *Clouthier v. Cnty. of
Contra Costa*, 591 F.3d 1232, 1250 (9th. Cir. 2010).  Specifically, for ratification,
"when a subordinate's decision is subject to review by the municipality's
authorized policymakers, they have retained the authority to measure the official's
conduct for conformance with *their* policies.  If the authorized policymakers
approve a subordinate's decision and the basis for it, their ratification would be
chargeable to the municipality because their decision is final." *City of St. Louis v.
Praprotnik*, 485. U.S. 112, 127 (1988).  By allowing the continued use of the
highly flammable and dangerous smoke grenade and burn safe devices and by not
conducting any type of review into the incident after the severe and horrific death
of Decedent, such conduct is one of the "extreme factual situations" that supports a
finding of ratification as a result of a policymaker's failure to discipline." *See
Peterson v. City of Forth Worth Texas*, 588 F.3d 838, 848 (5th Cir. 2009).

Therefore, by virtue of the evidence presented, Plaintiffs can establish a
prima facie case that Defendant County of Los Angeles ratified the excessive force
of its deputies.  Consequently, Defendants' Motion for Summary Judgment for
*Monell* should be denied.

/ /

/ /

---

[4]Defendants do not want to complete the report with this case pending.

13

**B. <u>Second Path – Failure to Train and Failure to Supervise</u>**

Despite the overwhelming evidence that the County ratified Defendant's conduct, Plaintiffs have a stronger case for *Monell* liability under the failure to train theory.  A plaintiff proceeding under this path must show that: (1) "a County employee violated [the plaintiff's] rights;" (2) "the County had customs or policies that amount to deliberate indifference;" and (3) "these policies were the moving force behind the employee's violation of the plaintiff's constitutional rights." *Gibson*, 290 F.3d at 1194; *see Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006).  Defendants' Motion for Summary Judgment only challenges Plaintiffs' ability to prove the second and third prongs of this test.

In this case the County failed (and is still failing) to reasonably train its deputies in the proper and reasonable use of force (deployment of chemical munitions).  The specific areas the County clearly failed to reasonably train its deputies include deployment of chemical agents into residences; the proper and reasonable deployment of flash bang grenades; the proper and reasonable apprehension of barricaded suspects; and in responding to a potentially impaired and /or intoxicated subject.  "Failure to train may amount to a policy of deliberate indifference, if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Dougherty v. City of Covina* 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted).

Likewise, a claim based on failure to supervise "may amount to a policy of deliberate indifference" if it is sufficiently inadequate. *Id.* at 900.  In order for plaintiff to prevail on a "failure to train [claim], he must show (1) he was deprived of a constitutional right, (2) the [County] had a training policy that amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact; and (3) his constitutional injury would have been avoided had the [County] properly trained those officers." *Blankenhorn v. City of Orange,* 485 F.3d 463, 484 (9th Cir. 2007).  The standard

14

1  for inadequate supervision is the same as the standard for inadequate training.  *See*

2  *Davis v. City of Ellensburg*, 869 F.2d, 1230, 1235 (1989).

3       In most cases involving a failure to train, "[a] pattern of similar

4  constitutional violations by untrained employees is ordinarily necessary to

5  demonstrate deliberate indifference for purposes of failure to train."  *Connick v.*

6  *Thompson*, 563 U.S. 51, 62 (2011).  However, there are some circumstances where

7  a pattern of similar violations is not necessary to show deliberate indifference.  *Id.*

8  at 63.  This range of circumstances includes situations where "the unconstitutional

9  consequences of failing to train could be so patently obvious that a [municipality]

10  could be liable under § 1983 without proof of a pre-existing pattern of violations."

11  *Id*. at 64.  In discussing potential examples of single incidents which may be

12  sufficient in the failure-to-train context, the court in *City of Canton* posed the

13  hypothetical example of a city "that arms its police force with firearms and deploys

14  the armed officers into the public to capture fleeing felons without training the

15  officers in the constitutional limitations on the use of deadly force."  489 U.S. 390,

16  no. 10.

17       The *Canton* court reasoned that a municipality's decision not to train its

18  officers about constitutional limits on the use of deadly force amounted to

19  deliberate indifference "[g]iven the known frequency with which police attempt to

20  arrest fleeing felons and the 'predictability that an officer lacking specific tools to

21  handle that situation will violate citizens' rights.'"  *Connick, supra*, 563 U.S. at 63-

22  64 (quoting *Bryan Cty., supra*, at 409).

23       The purpose of single-incident liability is that in some instances, the

24  unconstitutional consequences of failing to train or supervise will be patently

25  obvious that the city or county could be liable under § 1983 without proof of a pre-

26  existing pattern of violations.  *Id.* at 64.  Accordingly, a plaintiff can establish

27  municipal liability under *Monell* under the single-incident liability theory when it

28

is established that the municipal actor disregarded an obvious consequence of his failure to train or supervise. *Id.* at 58.

Here, evidence overwhelmingly suggests that the County failed to properly train its deputies with respect to the proper deployment and use of chemical munitions, eventually resulting in the tragic death in this case. The Defendants who used that the failed canister device (RELIC) had never been tested in a manner consistent with several industry standards for this type of indoor situation. (PF 44, 51). Additionally, all manufacturer's warning labels were ignored and/or unknown to many using the products, including commanding officers with many years of experience and the Sheriff's Department's designated person most knowledgeable. (PF 25, 40-41, 52, 54-56). This is especially troubling because of the severe danger posed by the improper use of chemical munitions, including smoke and gas grenades. Like *Canton* where police were armed with firearms without training, here too, County of Los Angeles deputies were armed (and still are armed) with highly flammable smoke and gas grenades without sufficient training. The only training conducted with these highly flammable devices was done under different circumstances; outside and/or on concrete rather than inside on carpets and furniture. This danger is multiplied by department officials and deputies (including supervising officers) who have all willingly turned a blind eye to manufacturer's warnings contained on the grenade that specifically states the device is to be used <u>only</u> outdoors.

John Kapeles (person most knowledgeable from Safariland/Defense Technologies) states that the use of chemical munitions; specifically, the gas canisters designed for outdoor use (#1072 and #1082) were not intended to be used indoors under any conditions. (PF 53). Additionally, the warning labels were clear that the specific gas canisters were not to be used indoors because they had a high probability of starting a fire. (PF 53-55). Individuals within the Sheriff's

16

Department have testified that all manufacturer's warning labels were either unknown and/or were ignored.  (Maxwell—incident commander who authorized the gas plan, Young—designated as Sheriff's Department's person most knowledgeable, Lieutenant Giandomenico—commanding officer on scene, Stade—who developed the gas plan, Geisbauer—person who deployed the RELIC)-all knew nothing. (PF 52, 55).  No one from the Sheriff's Department has seen and/or was familiar with a form labeled Special Enforcement Bureau Chemical Agents, including Maxwell, incident commander who authorized the gas plan, Young, PMK, Stade, person who developed the gas plan and in 14 years had never seen the form and Deputy Geisbauer, person who deployed the RELIC. Lieutenant Giandomenico, a commanding officer on scene testified that he had seen the form, but disagrees with it even though it is a form used by the Los Angeles County Sheriff's Department Special Enforcement Bureau and was produced by the County of Los Angeles during discovery.  (PF 56).  Additionally, many of the involved deputies had never seen and/or was familiar with a form titled Chemical Agents Instructor Handbook—Sample Deployment Worksheet even though it is an industry standard to use the worksheet before deploying gas. (PF 57).  Had the worksheet been used by the deputies and commanding officers on scene, the catastrophic fire that killed Decedent would likely have been prevented.

There existed a culture within the Los Angeles Sheriff's Department of inbred training that obviously resulted in the unfortunate death of Decedent.  Based on the evidence, the policies, training, and practices have been passed on for many years within the Sheriff's Department Specialized Enforcement Bureau or SEB without analysis or review.  The practices and training within SEB ignored law enforcement standards as well as manufacturer's warnings and labels on how the products were intended to be used.  The inbred practices and training ultimately

resulted in poor training, which led to poor decision making on this case. This was all foreseeable.

The County's failure to test and train in the use, quantity and construction of gas grenades and of a properly tested burn safe device shows *Monell* liability. No one from the Sheriff's Department is able to identify what or how the failed device (RELIC) was tested to ensure that it was safe. Several commanding officers and members from the Sheriff's Department have trained with the failed device; however, the training was conducted at their county training facility, in an outside environment and/or inside a building with concrete floors and walls (PF 46). No one from the Sheriff's Department, including the person most knowledgeable (PMK Deputy Young), is able to testify that the failed device, (RELIC) was ever tested and/or used in training with the intent to deploy it in an environment encompassing carpet or furniture (PF 47). The commanding officers and members never read nor were aware of the manufacturer's warnings pertaining to the use of riot control chemical agents; specifically, the Def Tech / Safariland model #1072, #1082 and/or Spede Heat Continuous Discharge 555. (PF 48).

Plaintiff's expert witness Robert Fonzi, 32-year veteran with the San Bernardino County Sheriff's Department and San Diego Police Department who retired as Undersheriff from the San Bernardino County Sheriff's Department, opines that the County of Los Angeles failed to reasonably train its deputies in the proper use of force with these devices. "[I]n the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1047 (1992). "Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself." *Id.* Particularly in this case, expert testimony categorically affirms a finding of *Monell* liability under the

failure to train theory.  Fonzi states the County of Los Angeles failed to train its deputies properly in the deployment of chemical munitions.  Specifically, in deployment of chemical munitions, the County of Los Angeles failed to train its deputies in how to deploy chemical agents into a residence, the proper and reasonable deployment of flash bang grenades, the proper and reasonable apprehension of suspects, and in responding to a potentially mentally impaired and/or intoxicated subject.  Furthermore, the practices and training with SEB ignored law enforcement standards as well as manufacturer's warning labels. Fonzi further states that because there existed with the Sheriff's Department a culture of inbred training, those inbred practices and training ultimately resulted in substandard training (PF 39, 42).  Fonzi opines that Decedent's death was the proximate result of the County of Los Angeles' failure to train their employees in this vital and highly dangerous areas of law enforcement.  (PF 38).

Based on evidence from the County's own deputies, the involved deputies lacked proper training, were in fact poorly trained, and their knowledge of industry standards was unacceptable (PF 58).  Expert Fonzi highlights the staggering amount of inbred training that occurred with SEB (PF 39, 42).  Several of the involved defendants testified that they had <u>never</u> received any formal chemical agents or munitions training outside the department.  None of the involved defendants were certified chemical agents/munitions instructors with respect to use and deployment.  The only exception was Captain Ewell, who had been to the FBI Instructor's course in the 1980s or 30 years earlier.  As a result of the County of Los Angeles' failure to reasonably and property train its employees on the use of these weapons, Decedent's constitutional rights were violated when he was tragically killed.

/ /

/ /

19

# V.
## CONCLUSION

Based upon the foregoing and in the Separate Statement of Uncontroverted Facts, Plaintiffs respectfully request that this court deny Defendants' Motion for Partial Summary Judgment in its entirety.

Dated:    March 26, 2018        WAGNER & PELAYES, LLP

                                   */s/ Jacob P. Menicucci*
                                    TRISTAN G. PELAYES, ESQ.
                                    JACOB P. MENICUCCI, ESQ.
                                    Attorneys for Plaintiffs