Tristan G. Pelayes, Esq. (SBN: 206696)
Jacob P. Menicucci, Esq. (SBN: 305237)
WAGNER & PELAYES, LLP
1325 Spruce Street, Suite 200
Riverside, California 92507
Telephone:   (951) 686-4800
Fax:             (951) 686-4801
tgp@wagner-pelayes.com
jpm@wagner-pelayes.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN SOARES, TIFFANY SOARES, ALISSA VARNEDOE, JAYDA MACCASKIE AS MOTHER AND NATURAL GUARDIAN FOR MINOR CHILDREN "J.V." AND "S.V.," CHILDREN OF DECEDENT, AND SUCCESSORS OF INTEREST, HEIRS.<br><br>                    Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, SHERIFF JIM MCDONNELL, CAPTAIN JACK EWELL, SERGEANT SEAN BURKE, DEPUTY ANTHONY GEISBAUER, DEPUTY JUAN RODRIQUEZ, DEPUTY EDSON SALAZAR, DEPUTY DONALD MCNAMARA, DEPUTY STEVEN PRATT, DEPUTY IAN | **Case No.: 2:17-cv-00924-RGK-AS**<br><br>*Honorable R. Gary Klausner*<br>*Courtroom 850*<br><br>**DECLARATION OF ROBERT FONZI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S MONELL CLAIM**<br><br>*[Filed concurrently with Opposition to Partial Summary Judgment, Statement of Genuine Disputes and Declaration of Jacob P. Menicucci and Tom Yu]*<br><br>Date:  April 16, 2018<br>Time: 9:00 a.m.<br>Ctrm:  850, 8th Floor |

1

STADE, DEPUTY DANIEL WELLE,  )
DEPUTY WHEELER, COMMANDER )
PATRICK MAXWELL, and DOES 1- )
10                                             )
                                                  )
                    Defendants.        )
                                                  )
                                                  )
                                                  )
_____ )

I, ROBERT FONZI, declare as follows:

1.      That I am Plaintiffs' retained expert in the area of police procedures.  I have personal knowledge of the facts set forth herein and if called to testify could do so competently thereon.

2.      This declaration is in support of Plaintiffs' opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' *Monell* Claims.

3.      I have personal knowledge of the facts set forth herein and if called to testify, could do so competently thereon based upon my personal knowledge.

4.      I am retired as Undersheriff from the San Bernardino County Sheriff's Department.  As Undersheriff, I was responsible for all administrative and operational commands within the Sheriff's Department while directing day to day operations.  In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events.  My administrative duties included, but were not limited to: directing, planning, coordinating, and managing all functions within the Sheriff's Department.

5.      Prior to my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department.  As the Assistant Sheriff, I was responsible for all support operations within the organization.  Administrative duties included: directing, planning, coordinating, and managing all functions within a major area of assigned responsibility for the Sheriff's Department.

6.     Prior to my position as Assistant Sheriff, I was a Deputy Chief with the San Bernardino County Sheriff's Department with responsibilities over several bureaus that included Administrative Services, Court Security, Training Division, Detentions and Corrections.

7.     Prior to my promotion to Deputy Chief, I was the commanding officer for the Sheriff's Employee Resources Division, which provides a broad range of services for the Sheriff's Department.  Under my command, this unit conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

8.     In my assignment as commanding officer for the West Valley Detention Center prior to my Deputy Chief position, I was responsible for various issues involving personnel matters, disciplinary actions and policies and procedures in adherence with applicable state and federal laws.

9.     I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department).  My responsibilities included station operations, personnel management, criminal investigations, use of force training, and management of support staff.  As the Chief of Police, I served on a number of community projects, committees, and participated in city events.

10.     I am a 32 year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department.  I have several years of patrol experience in the Ontario, San Bernardino, and San Diego Areas.  My experience includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator and corrections.

11.     I am most recognized in the area of peace officer training.  With over 19 years of experience, I have trained approximately 10,000 law enforcement

officers from all over the country.  My expertise is extensive in the use and police procedures.  I have testified as an expert in numerous civil and criminal trials in both state and federal court  That attached hereto as exhibit 1 to my declaration is a true and correct copy of my cv which provides greater detail as to my background to provide a basis for the opinions that I offer in this declaration.

12.     I have read the materials provided to me with respect to the February 6 incident involving a number of members from the Los Angeles County Sheriff's Department and the Decedent Leroy Varnedoe, including deposition transcripts and documents produced through discovery.  As a result of my careful review and study into the incident, I am prepared to offer preliminary expert opinions concerning police procedures; specifically, the use and deployment method of chemical agents, policies, practices and training that resulted in the use of excessive force and subsequent ratification.  That attached hereto as Exhibit 2 is a true and correct copy of the expert report I have authored for this case which outlines my opinions and provides the basis for the opinions in this declaration.

13.     Based on my review of the depositions and written discovery in this case, it is my opinion, as determined by standard police practices and training, which includes P.O.S.T., that the Los Angeles Sheriff's Department and members of the Special Enforcement Bureau (SEB) did not follow standard practices and training involving the arrest of decedent Leroy Varnedoe.

14.     The Decedent's death was the proximate result of the Los Angeles County Sheriff's Department's failure to reasonably train their deputies in the proper and reasonable use of force (deployment of chemical munitions).  The force included deploying chemical agents into residence, the proper and reasonable deployment of flash bang grenades, the proper and reasonable apprehension of barricaded subjects, and in responding to a potentially mentally impaired and/or intoxicated subject.

4

15.     It is very clear from the investigation, statements, and deposition testimony that there existed a culture within the Los Angeles Sheriff's Department of inbred training that obviously resulted in the unfortunate death of Varnedoe. Based on the deposition testimony of several deputies, the policies, training and practices have been passed on for many years within the Sheriff's Department Specialized Enforcement Bureau (SEB).  The practices and training within SEB ignored industry standards as well as manufacturer's warnings and labels.  In this case, the deployment of gas designed to be used outdoors for riot control due to potential flammability issues was used inside a small residence which resulted in the fire and death of the decedent.  The manufacturer's warning for the gas indicated the product was to be used outdoors but, incredibly, no one had read the label. The inbred practices and training ultimately resulted in poor training, practices, and decisions while using a homemade canister, a device to hold the gas grenade, but the canister failed to contain it and the fire resulted.  The deposition testimony of several commanding officers substantiated a significant failure in leadership and supervision.

16.     There has been deposition testimony that indicates the failed canister device has been in service (use) for many years and is safe.  However, the following issues are most alarming:

> No one from the Sheriff's Department, including the person most knowledgeable (designated PMK Deputy Young) is able to identify when, how, or who introduced the homemade canister device into service.

> It's also alarming that no one from the Sheriff's Department is able to identify when, how, or if the failed device was tested to ensure that it was safe.

DECLARATION OF ROBERT FONZI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MONELL CLAIM

> ➤ Several commanding officers from the Sheriff's Department have all testified that they do not know when, how, or who, introduced the cannister device into service.

> ➤ Several commanding officers and members from the Sheriff's Department SEB have all testified that they have trained with the failed canister device; however, the training was conducted at their county training facility, in an outside environment and/or inside a building with concrete floors and walls and not inside a residence with flammable items such as chairs and couches.

> ➤ No one from the Sheriff's Department, including the person most knowledgeable (PMK Deputy Young), is able to  testify that the failed canister device was ever tested and/or used in training with the intent to deploy it in an environment encompassing carpet or furniture with this type of gas which was specifically manufactured not to be used indoors.

> ➤ Several commanding officers and members from the Sheriff's Department SEB have all testified that they never read nor were aware of the manufacturer's warnings pertaining to the use of riot control chemical agents; specifically the agents used in this incident: the Def Tech / Safariland model #1072, #1082 and/or the Spede Heat Continuous Discharge 555.

17.     The failures listed demonstrate a lack of indifference and are strong indications that the leadership and supervision within the Los Angeles Sheriff's Department; specifically, the Specialized Enforcement Bureau, failed in its responsibility to provide policies and training that is consistent with industry standards.

6

18.     Based on my review of the depositions and written discovery, it is my opinion, as determined by standard police practices and training, that it appears the Los Angeles County Sheriff's Department failed to properly manage, supervise, and train its deputies with respect to the proper deployment and use of chemical munitions and the proper way to deploy these agents without causing undue harm, which was foreseeable.

19.     There has been deposition testimony that strongly indicates that the failed device was never tested in a manner consistent with several industry standards.  Additionally, all manufacturer's warning labels for the gas grenades were ignored and/or unknown to many that testified on behalf of the Sheriff's Department, including several commanding officers with several years of experience and the Sheriff's Department's designated person most knowledgeable.

20.     Notably, there has been deposition testimony by John Kapeles (person most knowledgeable from Defense Technologies/Safariland who manufactured the gas grenades) that the use of chemical munitions; specifically, the gas canisters designed for outdoor use (#1072 and #1082) were not intended to be used indoors under any conditions.  Additionally, all the warning labels were clear that the specific gas grenades were not to be used indoors because they had high probability of starting a fire.  Despite this, officials with the Sheriff's Department have testified that all manufacturer's warning labels were either unknown and/or were ignored.  In fact, Defendants used the gas grenades indoors despite the explicit warnings that they not be used indoors.

21.     There has been deposition testimony that indicates that no one from the Sheriff's Department had seen and/or was familiar with a form labeled Special Enforcement Bureau Chemical Agents, which specifically warns not to use some of these grenades in the canister that was ultimately used in this case and failed. There also has been deposition testimony that has indicated that many of the

involved Defendants from the Sheriff's Department had never seen and/or was familiar with a form titled Chemical Agents Instructor Handbook—Sample Deployment Worksheet. The only exception was Captain Ewell, who indicated he had gone through the FBI instructor's course for Chemical munitions back in the 1980's. However, Captain Ewell states he believes the worksheet is of no value, which is a failure in leadership and not consistent with established standards. Attached hereto as Exhibits 3 and 4 are these documents.

22. Based on the deposition testimony, it is clear that the involved Defendants lack proper training, were poorly trained, and their knowledge of industry standards is unacceptable. One factor that is important to mention is the amount of inbred training that occurred with SEB. Several of the involved defendants testified that they had never received any formal chemical agents or munitions training outside the department. None of the involved defendants were certified chemical agents/munitions instructors with respect to use and deployment except for Captain Ewell, who had attended the FBI instructor's course in the 1980's.

23. Based on my review of the deposition testimony and written discovery, it is my opinion, as determined by standard police practices, that it appears that the Los Angeles County Sheriff's Department failed in both its responsibility and duty to properly investigate the allegations alleged by the incident that resulted in the death of Decedent.

24. There has been deposition testimony that strongly indicates organizational failure to properly investigate and to perform a Department Executive Review (DER) of the circumstances that resulted in Decedent's death. The following issues reflect the concerns related to the investigation and the department executive review:

➤ The primary arson investigator, Tania Owen, who submitted an official report involving her investigation indicated that she was <u>not aware of the lab results</u> that revealed "No recognizable ignitable liquid residues were detected in items three, four and five," which was from the evidence collected at the scene.  Subsequently, Investigator Owen admitted under oath that she had not completed her investigations as of her deposition dated February 28, 2018, several years later.  In fact, those results had come back from the lab in 2015 and specifically revealed no recognizable ignitable liquid in those items.  Additionally, Investigator Owen never took any photographs, conducted interviews, nor did she inspect the canister device used to deploy the chemical grenade.

➤ There has been deposition testimony that strongly indicates an organizational failure to perform a Department Executive Review (DER) of the incident resulting in a death.  Although many of the involved defendants testified that they are aware of a DER process, no one that provided deposition testimony (including commanding officers or anyone that was involved in authorizing the chemical munition plans, created, supervised or executed the plan) was involved in a comprehensive review and analysis.  If such a department review was never performed, it would certainly fall well below all acceptable leadership, management, and supervisory concepts that are commonly recognized in the law enforcement community.

➤ It appears from the reports and testimony that no review was performed because several of the involved defendants testified to their lack of knowledge and that no changes to the way they conduct business has been revised.  Therefore, it is a reasonable assumption that a Department Executive Review was never performed.  If such a review was

performed, it has not been disclosed and the findings would be of interest to all concerned parties.

25.     Based on my review of the listed materials and my experience, it's difficult to imagine how such a lack of leadership, management and supervisory accountability, was such a departure from recognized standards, and was allowed and/or is acceptable by the Los Angeles County Sheriff's Department.

These are my current opinions and I reserve the right to modify, supplement, or change my opinions upon new evidence that may be presented to me in the future.

I declare under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this **23rd** day of March 2018, 2016 in Yucaipa, California, United States of America.


_____

ROBERT FONZI, Declarant

10

# EXHIBIT 1

**RJF & Associates, Inc.**
*Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA. 92399
951-312-9679

## *Robert J. Fonzi*
*Undersheriff (retired)*

Curriculum Vitae

### BIOGRAPHY        (summary)

I am a thirty-two-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department with several years of patrol experience in the Ontario, San Bernardino, and San Diego areas. My experience includes patrol, criminal investigations, internal affairs, civil liabilities, jail operations/management, and personnel management with special emphasis on training.

My expertise lies in the use of force, police procedures, and jail operations/management. I am most recognized in the area of training, with over twenty-five years of experience while training approximately 10,000 law enforcement officers throughout the country. I have qualified and testified as an expert in over three hundred (300) civil, criminal, and civil service trials in both state and federal courts. I have provided deposition testimony in over three hundred (300) related matters in the above related fields.

Based on my training, knowledge, and experience, I was recognized as an expert by the San Bernardino County Sheriff's Department's and primary Use of Force Instructor. My formal education includes an Associate of Arts degree in Criminal Justice and completion of a bachelor's degree program in Vocational Education, Training and Curriculum Design.

I was directly responsible for all use of force training, advanced officer training, in-service, correctional officer training, and FTO (Field Training Officer) programs for the San Bernardino County Sheriff's Training Division for several years. I also served as the training coordinator and supervisor for the Sheriff's K-9 program.

### SPECIALIZED TRAINING

- Certified instructor - firearms
- Certified instructor - defensive tactics and weaponless defense
- Certified instructor - impact weapons
- Certified instructor - shooting survival techniques
- Certified instructor - crowd control and tactical formations
- Certified instructor - chemical agents
- Certified instructor - electronic control devices (ECD)
- Certified instructor - lateral vascular neck restraint
- Certified instructor - law enforcement incident command system

68

## CAREER OVERVIEW

Undersheriff, San Bernardino County Sheriff's Department (Retired January 24, 2014)

32 years of Law Enforcement experience

25 years of community college teaching experience

California Community College Teaching Credential

## FORMAL EDUCATION

F.B.I. National Academy, Class #215, December 5, 2003, Quantico, VA

Command College Class #34, November 2003
California Commission on Peace Officers Standards & Training

Bachelor's degree equivalent (completed BA degree program, degree pending) Southern Illinois University, Carbondale, IL - Vocational Education, Training Development, and Curriculum Design.

Associate of Arts Degree, (1986), Administration of Justice, Crafton Hills Community College, Yucaipa, CA

## CALIFORNIA PEACE OFFICER STANDARDS AND TRAINING

| | |
|---|---|
| Deputy Sheriff | 1982 Basic Certificate |
| Senior Deputy | 1987 Intermediate Certificate |
| Sergeant | 1990 Advanced Certificate |
| Sergeant | 1992 Supervisory Certificate |
| Lieutenant | 1999 Management Certificate |

## ASSIGNMENTS, RESPONSIBILITIES, AND EXPERIENCE

**Undersheriff**
March 2012 – January 2014

The County of San Bernardino is the largest county in the continental United States covering approximately 20,000 square miles with a population exceeding 2,000,000. The Sheriff's Department has 41 stations and divisions, including nine county and 14 contract city patrol operations. The Sheriff's department has approximately 3,500 employees and has an annual budget exceeding $450,000,000.

69

As Undersheriff, I was second in command of the Department and assumed the duties of the Sheriff in his absence. I was responsible for all administrative, operational and legislative concerns within the Sheriff's Department while directing daily operations including budgetary and personnel matters. In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. My administrative duties included directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included directing and supervising executive and command staff. Coordinated and commanded personnel in the management of administrative support services and criminal operations. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Attended and participated in statewide committees. Developed and directed the implementation of policy and procedure changes resulting from changes in legislation, procedures, or departmental philosophy. Represented the Sheriff's Department in liaison with other governmental agencies and community groups and participated in related law enforcement organizations.

Administrative duties included supervising, planning, coordinating, budgeting, and managing all functions within the Sheriff's Department.

- Supervised Human Resources activities for the department including hiring and disciplinary actions.
- Directed department operations through subordinate management and supervisory staff. Assisted with policy direction and formulation; reviewed decisions on all complex or politically sensitive issues.
- Represented the Sheriff by making presentations to civic groups, conventions, and legislative committees for the purpose of promoting goodwill on behalf of the department.
- Maintained a liaison between staff, other law enforcement agencies, judges, District Attorneys, and defense attorneys to insure optimal success in crime prevention and enforcement.
- Wrote comprehensive reports and letters to obtain support and provide information for drafting legislation at the state and local level.
- Supervised the preparation of the annual budget; recommended and reviewed proposed changes with the Sheriff; determined staffing needs and priorities.
- Assisted in the direction of the Office of Public Safety and County Fire Warden's Office.
- Reviewed and recommended the investigative path to be followed regarding major criminal activity.
- Reviewed department objectives and effectiveness of all organizational divisions within the Sheriff's Department; suggested and/or directed changes to improve efficiency.

**Support Operations – Assistant Sheriff**
January 2011 - March 2012

The Assistant Sheriff's position is the administrative command responsible for Support Operations.  As an Assistant Sheriff, I acted on behalf of the Sheriff in his absence. Administrative duties included directing and supervising subordinate personnel responsible for the management of four major correctional facilities within San Bernardino County.  Coordinated and commanded subordinate personnel in the management of administrative support services and the Frank Bland Regional Training Center. Supervised subordinate personnel responsible for staff development, budget, fiscal matters, personnel, and payroll.

**Detentions and Corrections Bureau - Sheriff's Deputy Chief**
January 2010 – January 2011

As the Bureau Chief, I was responsible for subordinate personnel within four large jail facilities.  The Detention and Corrections Bureau is the largest division within the San Bernardino County Sheriff's Department.  The Bureau is comprised of more than 1,100 dedicated professional staff that includes both safety and civilian employees. Additionally, the department has five Type-I jails capable of holding 288 arrestees, four court holding facilities and four lock-up facilities.

The Bureau provides services to over 6,000 felony and misdemeanant inmates on a daily basis who are incarcerated.  These services include food, hygiene, recreation, medical, dental, mental health, religious, and other support services.  The magnitude of these services provided is significant.  As an example, the Food Services Division produces and serves over 7,350,000 meals each year while Medical Services provide health care in excess of 6,400 inmates monthly.

The Transportation Unit transports over 500 inmates daily throughout the county and travels an average of 1,000,000 miles per year, transporting nearly 300,000 inmates throughout San Bernardino County and the State of California.  Additionally, the United States Marshall transports approximately 13,000 federal inmates from the facility to numerous prisons and court facilities throughout the state.

**Administrative Services Bureau – Sheriff's Deputy Chief**
January 2009 – January 2010

As the Bureau Chief, I was responsible for subordinate personnel over three major divisions, which included the following units:  Training, Aviation, Emergency Operations, Volunteer Forces, and Employee Resources.  The Training Center (which includes the Basic Academy, Advanced Officer, EVOC and Range/Use of Force Units) provides both basic and continuing professional education to law enforcement officers from agencies throughout the County of San Bernardino and Southern California.

The Emergency Operations Division provides operational, logistical, and management support services to field operations during large-scale emergencies. These support services are provided by two units within Emergency Operations; Aviation and Volunteer Forces. The Aviation Unit provides patrol, rescue, and fire operation capabilities. Volunteer Forces provides search and rescue, evacuation, disaster planning, emergency management and Department Operations Center coordination. Volunteer Forces also coordinates all law enforcement mutual aid resources in Mutual Aid Region VI on behalf of the Sheriff.

**Employee Resources Division – Sheriff's Captain**
April 2006 – January 2009

As the commanding officer, I was responsible for all employment/labor issues, grievances, background investigations, hiring, and payroll. The Employee Resources Unit provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, and was responsible for the department's payroll and benefits. Additionally, I coordinated hiring and provided a variety of services to department personnel through the Sheriff's Employee Assistance Team (SEAT).

Several categories of business applicants were also required to go through the background process in addition to employment background investigations. Additionally, county residents who want to carry a concealed weapon (CCW) were also required to apply through Employee Resources and pass a background investigation.

**West Valley Detention Center – Sheriff's Captain**
December 2003 – April 2006

As the commanding officer, I was responsible for the largest correctional facility in San Bernardino County with approximately 640 employees. This included the assignment to the West Valley Detention Center as part of the command staff. My direct responsibilities included facility operations and training for the correctional facility. Additional responsibilities included supervision of all correctional staff, personnel matters, grievances, citizen complaints, administrative investigation, use of force, and training.

**Chief of Police for City of Yucaipa – Sheriff's Captain**
May 2000 – December 2003

I served as the Chief of Police for the City of Yucaipa, a contract city with the Sheriff's Department. As the commanding officer, I was responsible for all law enforcement for the unincorporated areas in the county and the City of Yucaipa. This included commanding the Yucaipa Sheriff/Police Station. This dual operation is responsible for law enforcement in the unincorporated areas of Mentone, Forest Falls, Angelus Oaks, and Barton Flats. Additionally, this station serves as the law enforcement agency for the City of Yucaipa.

**Lieutenant -** Yucaipa Sheriff and Police Station in the City of Yucaipa
March 1997 – May 2000

I served as the second in command responsible for all law enforcement for the City of Yucaipa. Additional responsibilities included administrative investigations, use of force, personnel matters, and citizen complaints.

**Lieutenant -** West Valley Detention Center
March 1996 – March 1997

I was responsible for jail operations, management, training, administrative investigations, use of force, personnel matters, and grievances.

**Highland Police Station – Sheriff's Sergeant**
October 1995 – March 1996

I served as a watch commander and patrol supervisor for patrol operations. My duties included watch commander assigned to the Highland Police Station for uniformed patrol personnel. My responsibilities included supervision of all patrol functions, personnel matters, use of force investigations, traffic, training, and administrative duties.

**Advanced Officer/Correctional & Field Training Officer Unit – Sheriff's Sergeant**
October 1990 – October 1995

I supervised the following programs - Basic Academy, Firearms Training Center, Advanced Officer Training, Sheriff's Canine, Correctional Training Officers and Field Training Officers. While assigned to the Training Division, I was responsible for advance, correctional, and field training officer programs. The advance officer training unit provided continuing professional training courses to both safety and reserve employees of the Sheriff's Department, state and federal law enforcement agencies, and California Department of Corrections.

**Firearms Training Center/Use of Force Training Unit – Sheriff's Sergeant**

While assigned to the training division for over 5 years, I developed and supervised the Use of Force Training Unit. The unit was responsible for all use of force training, which included: firearms, defensive tactics, weaponless defense, police baton, chemical agents, electronic devices, and police canine. During this assignment my direct responsibilities included the training and qualification of department personnel in areas concerning the use of force. Training and qualification required proficiency and competency in the taxonomy of educational objectives relating to training issues involving the use of force.

I was also responsible for the supervision, coordination, management, and curriculum design of all firearms, defensive tactics, weaponless defense, police baton, and canine training for the San Bernardino Sheriff's Department. The training facilitated approximately 2000 officers and included basic academy, advance officers, reserve officers, in-service personnel, military, and civilians. The assignment required the direct supervision of eight full-time instructors and staff support that carried out the responsibilities of the Firearms Training Center/Use of Force Training Unit.

73

**Canine Coordinator – Sheriff's Sergeant**

My experience includes being assigned as the Department's canine coordinator for approximately five years. I was responsible for the supervision and management of all canine training and budget issues. The supervision required quarterly evaluation and recertification of approximately ten K-9 Handlers and police canines.

**Tactical Analysis Training Committee – Sheriff's Sergeant**

My experience includes being assigned as a committee member to the Tactical Analysis Training Committee that reviews and evaluates critical incidents involving the use of force. The committee evaluates an officer's actions and reactions against known standards in an effort to improve training offered by the San Bernardino Sheriff's Department.

**San Bernardino Valley College - Program Coordinator – Sheriff's Sergeant**

Responsibilities included coordinating the Extended Basic Law Enforcement Academy at San Bernardino Valley College. The position required direct supervision and coordination of training and student learning during the ten-month program. Additionally, I was responsible for teaching all use of force training within the program. The training included firearms, defensive tactics, weaponless defense, police baton, chemical agents, crowd control/tactical formations, and legal issues concerning the use of force.

**Riverside Community College/Ben Clark Training Center**

My experience includes staff instructor for RCC at the Ben Clark Training Center with assignments teaching firearms, defensive tactics, police baton, use of force, and other related patrol procedures.

**Corporal/Detective** – Yucaipa Sheriff's Station
July 1988 – July 1990

I served as Field Training Officer, patrol supervisor, and detective performing criminal investigations.

**Deputy Sheriff -** Professional Standards Division
July 1987 – July 1988

My responsibilities included Civil Liabilities and Internal Affairs.

**Deputy Sheriff –** Sheriff's Central Station, San Bernardino
October 1981 – July 1987

Performed a full range of law enforcement duties including, corrections, county and statewide prisoner transport, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

74

**Police Officer** San Diego Police Department, Western Division
October 1982 – April 1983

Performed a full range of law enforcement duties including, patrol, criminal investigations, preparation of reports, court testimony, suspect and victim interviews.

**Sheriff's Academy**
July1981 – October 1981

Entered the San Bernardino County Sheriff's Department Basic Law Enforcement Academy, Class of 66, and was elected class president/sergeant.

## TEACHING CREDENTIALS & INSTRUCTOR CERTIFICATES

- Community College Teaching Credential - State of California
- Black Belt - International Association of Kung Fu San Soo Self Defense
- Certified Instructor - F.B.I. Defensive Tactics and Weaponless Defense
- Certified Instructor - F.B.I. Police Baton
- Certified Instructor - Impact Weapons
- Certified Instructor - Verbal Judo/Tactical Communication
- Certified Instructor - F.B.I. Firearms Training
- Certified Instructor - Survival Shooting Techniques
- Certified Instructor - Crowd Control Tactics and Field Formations
- Certified Instructor - Lateral Vascular Neck Restraint
- Certified Instructor - Oleoresin Capsicum
- Certified Instructor - Realistic Assault Confrontations
- Certified Instructor - Chemical Agents
- Certified Instructor - Electronic Device/Taser
- Certified Instructor - ASP/Expandable Baton
- Certified Master Instructor to certify instructors in Defensive Tactics and Weaponless
- Defense, Police Baton and PR-24

75

- Certified Instructor - Controlled Force

## PROFESSIONAL ORGANIZATION AFFILIATIONS

| | |
|---|---|
| N.A.C.P. | National Association of Chiefs of Police |
| I.A.C.P. | International Associates of Chiefs of Police |
| C.S.S.A. | California State Sheriff's Association |
| F.B.I.N.A. | FBI National Academy Associates |
| A.C.A. | American Correctional Association |
| A.J.A. | American Jails Association |
| S.E.B.A. | San Bernardino Safety Employee's Benefit Association |
| A.S.L.E.T. | American Society of Law Enforcement Trainers<br>Appointed as "Regional Director of Western States" |
| F.A.T.S. | Firearms Training System<br>Appointed to National Training Advisory Board |
| P.O.R.A.C. | Police Officers' Research Association of California |
| C.P.O.A. | California Police Officer's Association |
| I.A.L.E.F.I. | International Association Law Enforcement Firearms Instructor |
| Kiwanis | Yucaipa/Calimesa Club |
| Footprinters | Chapter #67, past president |

## CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING AND CORRECTIONS STANDARD AUTHORITY COMMITTEE APPOINTMENTS

2016 – Subject matter expert
       Use of Force
       San Diego

2012 - Subject matter expert
       Crowd Management and Civil Disobedience Guideline Review
       Sacramento

2011 - C.S.A.
   Adult Titles 24 and 15 Regulations Revision Administrative Workgroup
   Sacramento

1998 - Continuing Professional Training Steering Committee (CPT)
   P.O.S.T. Training
   Sacramento

1997 - Subject matter expert (QNA)
   Controlling Violent Subjects Tele-course
   San Diego

1997 - Subject matter expert
   Vehicle Pullover techniques
   San Diego

1995 - Subject matter expert
   Officer Safety & Field Tactics
   San Luis Obispo

1994 - Subject matter expert
   Illegal Possession of Firearms Tele-course
   San Diego

1994 - Subject matter expert
   Chemical Agents - Training Requirements
   San Diego

1993 - Subject matter expert
   Chemical Agents - Oleoresin Capsicum
   Ontario

1993 - Subject matter expert
   Use of Force Training issues
   Costa Mesa

1992 - Subject matter expert
   Defensive Tactics and Weaponless Defense training issues
   San Diego

1992 - Subject matter expert
   Uniform Canine training and evaluation standards

1992 - Subject matter expert
   Uniform Canine training and evaluation standards
   City of Orange

## CONTINUED PROFESSIONAL LAW ENFORCEMENT TRAINING

| | |
|---|---|
| 1981 | Jail Operations |
| 1981 | Traffic Accident Investigations |
| 1983 | Correctional Officers Update |
| 1983 | Institutional Staff Series I |
| 1984 | Correctional Officers Update |
| 1984 | H & S 11550 (Under the Influence) |
| 1984 | Gang Investigations |
| 1986 | Officer Safety/Field Tactics |
| 1986 | Correctional Officers Update |
| 1986 | IR 3000 Breath Alcohol Analysis |
| 1986 | Drug Influence - 11550 H & S |
| 1986 | Patrol Officer - Vehicle Stops |
| 1986 | Patrol Officer - Auto Theft |
| 1986 | Patrol Officer - Search Warrants |
| 1986 | Patrol Officer - Crimes Against Property |
| 1986 | Patrol Officer - Interview and Interrogation |
| 1986 | Patrol Officer - Collection of Evidence |
| 1987 | Controlled Substance Influence |
| 1987 | 11550 - Under the Influence |
| 1988 | Patrol Officer - Civil Liabilities |
| 1988 | Realistic Assailant Control |
| 1988 | Police Civil Liability |
| 1988 | Patrol Officer - Domestic Violence |

78

1988   Legal Update Regarding Discovery, Personnel and Liability

1988   Principles of Shooting - Semi-Auto Transition

1989   Legislative Update

1989   Criminal Investigator's Course

1990   Driver Awareness Instructor

1990   Developmentally Disabled and Mentally Ill

1990   Peer Support Counseling Training

1990   Missing Persons

1991   Use of Force Issues

1991   Street Survival - The Tactical Edge

1991   Street Survival - The Win Seminar

1991   Exotic Weapons

1991   Police Supervision

1991   Lethal Force Management for Police

1992   Fifth ASLET International Training Seminar

1992   Supervisor's Training - Mobile Field Force

1992   Realistic Assault Confrontation

1993   CopClass "93" Use of Force & Liability

1993   Simunitions Instructor Development Course

1993   C.P.O.A. - Use of force Update

1994   C.P.O.A. - Use of Force - The Rodney King Incident

1994   C.P.O.A. - Officer Involved Shootings

1994   Assertive Supervision

1994   Lateral Vascular Neck Restraint system - update

1995   Eighth ASLET International Training Seminar, Anchorage, Alaska

| | |
|---|---|
| 1995 | ASP Baton Instructor's Course |
| 1996 | Use of Force Update - First Trimester |
| 1996 | Ninth ASLET International Training Seminar, Grapevine, Texas |
| 1996 | Use of Force Update - Second Trimester |
| 1996 | Search Manager's Course |
| 1996 | Use of Force Update - Third Trimester |
| 1996 | P.O.S.T. Manager's Course |
| 1997 | Use of Force Update - First Trimester |
| 1997 | STC Correctional Facility Pre-Inspection Training. |
| 1997 | Use of Force Update - Second Trimester |
| 1997 | ASLET Use-of-Force Seminar |
| 1997 | Sexual Harassment / Gender Bias |
| 1997 | Use of Force Update - Third Trimester |
| 1997 | L.E.I.C.S. Train the Trainer |
| 1998 | Use of Force Update - Jan |
| 1998 | Use of Force Update - April |
| 1998 | CPT Steering Committee Training |
| 1998 | Use of Force Update - July |
| 1998 | Firearms / Deadly Force / Use of Force Symposium |
| 1998 | Use of Force Update - Oct |
| 1999 | Cycle of Violence |
| 1999 | Civil Rights - Color of Law FBI |
| 1999 | Use of Force - February |
| 1999 | Controlled Force |
| 1999 | Advanced Police Management |

| 1999 | The Challenges of Ethical Leadership |
| 1999 | Use of Force Update - June |
| 1999 | Use of Force Update - August |
| 2000 | Use of Force Update - February |
| 2000 | Supervisor Development Course |
| 2000 | Use of Force Update - June |
| 2000 | Use of Force Update - October |
| 2001 | Role of the Police Chief |
| 2001 | Use of Force Update - February |
| 2001 | Executive Leadership Symposium |
| 2001 | Executive Law Enforcement Ethics Symposium |
| 2001 | Executive Development Training |
| 2001 | Management and Investigations of Hostile Work Environment |
| 2001 | Use of Force Update - June |
| 2001 | Leadership Development Training |
| 2001 | Responses to School Violence |
| 2001 | Leadership Development - Target Excellence |
| 2001 | Use of Force Update - October |
| 2002 | Executive Leadership Symposium |
| 2002 | Use of Force Update - February |
| 2002 | Faith & Justice Summit |
| 2002 | Use of Force Update - June |
| 2002 | Use of force Update - October |
| 2003 | Use of Force Update - February |
| 2003 | Racial Profiling - March |

2003   Use of Force Update - September

2004   Use of Force Update - February

2004   Use of Force Update - June

2004   Use of Force Update - June

2004   C.S.S.A. - Correctional Facilities Administrator Seminar

2005   Use of force Update - February

2005   Employment Law

2005   Use of Force Update - June

2005   Southern California Jail Managers Association Training (Orn Co.)

2005   Use of Force Update - October

2005   C.S.S.A. Correctional Facilities Administrator Seminar

2006   Use of Force Update – February

2006   Use of Force Update – May

2006   Use of Force Update – September

2007   Use of Force Update – February

2007   Traumas in Law Enforcement – C.O.P.S.

2007   AELE Lethal and Less Lethal Force

2007   Employment & Labor Law Conference

2007   ICS 300 /400 Training Course

2007   Terrorism Early Warning Group Conference

2008   Use of force Update – February

2008   Use of force Update - May

2008   Use of force Update - September

2008   Use of force Update – January

2009   Use of force Update – May

| 2010 | A.J.A. National Conference – Portland Oregon |
| 2010 | First Aid and CPR update – August |
| 2010 | Succession Planning |
| 2011 | Use of force update - January |
| 2011 | Corrections legal updated with Carrie Hill, Esq |
| 2011 | Taser use of force update seminar |
| 2011 | Taser (ECD X-26/X2) instructor certification |
| 2011 | Use of Force, ECD's, and ICDS |
| 2012 | CSSA Second in commands conference |
| 2012 | Use of force update - June |

## ACCOMPLISHMENTS    (summary)

While assigned to the Training Division, I took the initiative to research and review an alternate chemical agent for department use. The research included the review of various products and delivery systems. I wrote the proposal and made numerous presentations for the approval and authorization to implement pepper spray for the San Bernardino County Sheriff's Department. The proposal included cost analysis for purchasing and training approximately 2000 department personnel. The training program has proven to be one of the most effective in the state of California.

I have demonstrated my management skills in the supervision of the Department's Use of Force Training program. The program required a working knowledge of the materials along with staff assignments of personnel to appropriate positions. The scheduling included approximately 2000 sworn personnel and off site training to various locations within the county. The County of San Bernardino is approximately 22,000 square miles. The scheduling and logistics experienced many problems and conflicts. I was able to resolve many of the problems and issues with appropriate solutions.

I have confronted personnel matters that have resulted in written reprimands and work performance contracts. Additionally, I have developed and administered work performance contracts to individuals who failed to meet the primary proficiency requirements and essential job functions for a deputy sheriff.

I have received numerous requests to lecture on various topics which include: use of force training, chemical agents, and crowd control. Additionally, I have given several proposals to the Office of the Sheriff and the Executive Staff of the San Bernardino County Sheriff's Department. The proposals include Use of Force Training Program, Hobble Restraint, ASP Baton, Cap-Stun, and Canine Operations Manual.

83

I have demonstrated the ability to provide expert witness testimony in numerous civil litigations involving the San Bernardino County Sheriff's Department and Law Enforcement agencies throughout the State of California. My testimony has earned expert recognition in both state and federal court relating specifically to police procedures and the use of force.

I have participated on several P.O.S.T. committees due to my experience, training, and ability to interact with various agencies on a number of issues.

**Rev: 9/18/16**

## Expert Testimony

| Case: | Court / Hearing / Deposition |
|---|---|
| **2011** | |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | U.S. District Court – Los Angeles |
| Bernat vs. California City<br>Not available | U.S. District Court - Fresno |
| Rivera vs. City of Santa Ana<br>Not available | U.S. District Court – Santa Ana |
| A.K.C. vs. City of Santa Ana<br>SACV-09-01153 CJC (ANx) | Deposition |
| Radwan vs. County of Orange<br>Not available | U.S. District Court – Santa Ana |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | U.S. District Court – Los Angeles |
| AKC vs. City Santa Ana<br>SACV-09-01153 CJC (ANx) | U.S. District Court – Santa Ana |
| Allen vs. County of Riverside<br>RIC 498184 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Hachett vs. City of Calexico<br>Not available | Deposition |
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | Deposition |
| Rodriguez vs. City of Lon Beach<br>SACV10-00271DOC (ANx) | Deposition |
| Nava vs. City of Santa Clara<br>Not available | U.S. District Court – San Jose |

| | |
|---|---|
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | U.S. District Court – Los Angeles |
| Williams vs. County of Los Angeles<br>CV08-7958JVS (FMOx) | Deposition |
| Patino vs. L.A. Unified School Police<br>BC430225 | State Superior Court – Los Angeles |
| Rodriguez vs. City of Long Beach<br>SACV10-00271DOC (ANx) | U.S. District Court – Santa Ana |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | Deposition |
| Johnston/Codd vs. County of Riverside<br>CV 10-08101 RSWL (JEMx) | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | Deposition |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court – Los Angeles |

**2012**

| | |
|---|---|
| Debellis vs. Abdulla<br>CIVBS 900069 | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | State Superior Court – Indio |
| Contreras vs. City of San Jose<br>CV-10-00953 RMW | Deposition |
| Mirzaeyan vs., City of Glendale<br>CV11-01747VBF (JCx) | Deposition |
| Samatua vs. City of San Bernardino<br>CIVDS917832 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Day vs. People of the State<br>Not available | State Superior Court – San Bernardino |
| Bowen vs. County of Riverside<br>RIC516303 | Deposition |
| Briones vs. City of San Bernardino<br>Not available | Deposition |

86

| | |
|---|---|
| Arredondo vs. Co. of Santa Barbra<br>1370977 | Deposition |
| Mirzeayan vs. City of Glendale<br>CV11-01747VBF (JCx) | U.S. District Court -- Los Angeles |
| Williams vs. People of the State<br>Not available | State Superior Court – Victorville |
| Riley vs. County of Orange<br>SACV11-00773 JST (ANx) | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | Deposition |
| Del Castillo vs. City of Santa Ana<br>30-2010-00383134 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | Deposition |
| Grobeson vs. City of Los Angeles<br>BC 150151 | Deposition |

**2013**

| | |
|---|---|
| Nida vs. City of Downey<br>CV12-01382 SJO (JEMx) | Deposition |
| Manni vs. City of San Diego<br>11cv0435 W (DHB) | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | Deposition |
| R.Z. vs. City of Long Beach<br>SACV-1100536 AG (RNBx)<br>c/w CV11-06379 AG (RNBx) | U.S. District Court – Santa Ana |
| Lucas vs. City of Visalia<br>09-CV-01015-AWI-JLT | Deposition |
| Muswasua vs. COR<br>RIC 1113335 | State Superior Court – Riverside |
| Chiaese vs. County of Riverside<br>RIC 10012874 | Deposition |
| Rosenthal vs. County of Riverside<br>RIC 523816 | State Superior Court - Murrieta |
| Velasquez vs. City of Santa Clara<br>5:11-CV-03588 PSG | Deposition |

87

Johnson vs. County of Sonoma                    Deposition
CV 11-5811-CRB

**2014**
MH vs. County of Alameda                        Deposition
C11-2868 JST (MEJ)
Chiease vs. County of Riverside                 State Superior Court - Temecula
RIC 10012874

Ledezma vs. City of Riverside                   U.S. District Court – Riverside
ED CV 12-01524 VAP (SP)

Ramirez vs. City of Alhambra                    State Superior Court – Pasadena
GC046887

Nelson vs. County of Riverside                  Deposition
RIC 10011174

Williams vs. City of Pasadena                   State Superior Court - Los Angeles
BC477905

McDade vs. City of Pasadena                     Deposition
CV12-02892 DMG (JCGx)

Velasquez vs. City Santa Clara                  U.S. District Court - San Jose
5:11-CV-03588 PSG

Krechman vs. County of Riverside                U.S. District Court - Los Angeles
CV10-08705 ODW (DTBx)

Bosch vs. County of Riverside                   Deposition
EDCV 13-02352-SVW (FFMx)

Solorzano vs. City of Fontana                   State Superior Court - San Bernardino
CIVDS 909991

Howard vs. County of Riverside                  U.S. District Court – Riverside
ED CV 12-00700 VAP(OPX)

Rendon vs. City of Indio                        U.S. District Court – Riverside
ED CV 13-00667 VAP (OPx)

Kahsay vs. City of San Diego                    Deposition
37-2013-00031271-CU-PA-CTL

Katz vs. County of Riverside                    State Superior Court - Riverside
RIV 1213947

Rivera vs. City of Azusa                        Deposition
2:13-CV-01510-DMG (VBKx)

Kahsay vs. City of San Diego                    State Superior Court - San Diego
37-2013-00031271-CU-PA-CTL

88

Ford vs. City of Beaumont
AI #13-13

Binding Arbitration Hearing

Coronado vs. CHP
CV11-03560 DMG (JCx)

Deposition

Guinn vs. County of San Bernardino
DA-2014-0212-06-G1713

Deposition for Civil Service Hearing

Cordero vs. Hemet
EDCV 10-01935-JAK-PJW

Deposition

RZ vs. COR
13-01251 FMO (DTBX)

Deposition

Compton vs. COR
CV 10-07490 BRO (DTBx)

Deposition

Gomez vs. People of the State
Not available

State Superior Court – San Bernardino

**2015**
Bondaug vs. City of Santa Clara
Case No. 1-12-CV-238152

Deposition

Nelson vs. City of Riverside
Case No. EDCV13-01665

U.S. District Court – Riverside

Bondaug vs. City of Santa Clara
Case No. 1-12-CV-238152

State Superior Court – San Jose

Doe (Clinton) vs. PathPoint
CASE NO. PC052205

Deposition

Rivera vs. City of Oakland
Not available

Arbitration Hearing

Larson vs. City of Glendale
EC055649

State Superior Court – Burbank

Henriquez vs. City of Bell
2:14-CV-00196-GW (SSx)

Deposition

Salib vs. City of Riverside
ED CV 13-1682 MWF (OPx)

Deposition

Dunbar vs. City of Riverside
EDCV 13-00847 JGB (SPx)

Deposition

Salib vs. City of Riverside
ED CV 13-1682 MWF (OPx)

U.S. District Court - Los Angeles

89

| | |
|---|---|
| Morguita-Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | Deposition |
| C. Williams vs. City of Colton<br>No. 14-CV-01426 | Deposition |
| Moradian vs. City of Glendale<br>Case No. CV 14-01178 GW (VBKX) | Deposition |
| Morguita-Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | U.S. District Court - Fresno |
| Moradian vs. City of Glendale<br>Case No. CV 14-01178 GW (VBKX | U.S. District Court – Los Angeles |
| Van Audenhove vs. COR<br>CASE NO. EDCV 14-00944 FMO (Ex) | Deposition |
| Thomas vs. City of Fullerton<br>No. 30-2012-00581299 | Deposition |
| W. Espinoza vs. County of Riverside<br>CASE NO. EDCV 14-00085-JGB (SPx) | U.S. District Court – Los Angeles |
| Cicineli vs. City of Fullerton | Arbitration Hearing |
| Ferdinand vs. City of Los Angeles<br>NO. CV-14-7056FMO (JPRx) | Deposition |
| Rodriguez vs. City of Los Angeles<br>NO. CV11-01135 DMG (JEMx) | Deposition |
| Wolfe vs. City of Fullerton | Arbitration Hearing |
| People vs. Lang | State Superior Court - Banning |
| James vs. Granger (DOJ BOF)<br>CASE NO: 1:13-CV-00983-AWI-SKO | Deposition |
| Jordan vs. City of Hawthorne<br>Case No. CV14-07554 ODW (JPRx) | Deposition |

**2016**

| | |
|---|---|
| Stanfill vs. City of Indio | Administrative Appeals Hearing |
| Aguilar vs. City of Azusa<br>Case No: 2:14-CV-09183-GW (JPRx) | Deposition |
| Dolak vs. Torrance<br>Case No. CV 14 07463 BRO-MRW | Deposition |

90

| | |
|---|---|
| Alarcon vs. City of Calexico | Administrative Hearing - Arbitration |
| Hoffman vs. County of Los Angeles<br>CASE NO.: CV 15-03724 FMO (ASx) | Deposition |
| Dolak vs. Torrance<br>Case No. CV 14 07463 BRO-MRW | U.S. District Court – Los Angeles |
| N.W. / Woods vs. City of Long Beach<br>Case No. EDCV14-01569-VAP (SP) | Deposition |
| Easley vs. City of Riverside<br>Case No. EDCV14-0117 THJ (SPx) | U.S. District Court – Los Angeles |
| Perez vs. Diaz, Nelson, USA<br>Case No. 3:13-cv-01417 – WQH (BGS) | Deposition |
| Jackson vs. County of San Bernardino<br>Case No.: 5:13-CV-01650-JGB-DTB | Deposition |
| Jones vs, County of San Bernardino<br>Case No.: 5:15-cv-00080-DTB | U.S. District Court – Riverside |
| NW Woods vs. City of Long Beach<br>Case No.: EDCV 14-01569-VAP (SPx) | U.S. District Court – Los Angeles |
| Chang vs. County of Santa Clara<br>Case No.: 15-CV-02502 RMW (NC) | Deposition |
| Palmer vs. City of Santa Monica<br>Case No. 15-CV-06183 | Deposition |
| Jackson vs. County of San Bernardino<br>Case No. 5:13-CV-01650-JGB-DTB | U.S. District Court – Riverside |
| Wyatt vs. County of Riverside<br>Case No. 5:15-cv-586-CBM - FFM | Deposition |
| Del Real vs. City of Long Beach<br>Case No.: CV14-02831 MWF | Deposition |
| Cobb vs. City of San Diego<br>Case No. 3:13-cv-01353-BEN(JMA) | US District Court – San Diego |
| Del Real vs. City of Long, et al.<br>Case No.: CV14-02831 MWF | U.S. District Court – Los Angeles |
| Dorsey vs. City of San Diego, et al<br>Case No. 15-cv-1441-L-vs- (WVG) | Deposition |
| Palmer vs. City of Santa Monica<br>Case No. 15-CV-06183 | U.S. District Court – Los Angeles |

91

Herrera vs. City of Ontario, et al.                    Deposition
Case No. EDCV 15- 1370 JGB (SPx)

Scott vs. City of San Diego                            Deposition
Case No.: 37-2015-00001940-CU-OE-CTL

Arellano vs. City of Santa Ana, et al.                 Deposition
Case No. SACV14-1886 N S (DFMx)
(consolidated with SACV15-0432)

Ramos vs. City of Fullerton                            Arbitration Hearing
No case reference

Lopez vs. City of Santa Clara                          Deposition
Case No. CV13-3870 CRB (PR)

Herrera, et al., vs. City of Ontario                   U.S. District Court – Riverside
Case No. EDCV 15- 1370 JGB (SPx)

Lopez vs. City of Santa Clara, et al.                  U.S. District Court –San Francisco
Case No.: CV13-3870 CRB (NJV)

Wyatt vs. County of Riverside, et al.                  U.S. District Court – Los Angeles
Case No: 15-cv-586-CMB (FFMx)

Kirsch vs. County of Santa Barbara                     Civil Service Commission

Maurer vs. People of the State                         Superior Court – West Covina

Torres vs. County of San Bernardino                    Deposition
Case No.: CV 16-00992 PA (DTB)

**2017**
Donaldson vs. USA                                      Deposition
Case No. 15cv0908-BAS-KSC

Scott vs. City of San Diego                            State Superior Court – San Diego
Case No. 37-2015-00001940-CU-OE-CTL

Oppenheimer vs. City of La Habra                       Deposition
Case No: 8:16-CV-00018-JVS-DFM

Hoffman vs. County of Los Angeles                      U.S. District Court – Los Angeles
Case No.: CV 15-03724 FMO (ASx)

Monica vs. City of Santa Clara, et al.                 U.S. District Court – San Jose
Case No.: 5:15-CV-04857 BFL

Arias vs. COLA                                         U.S. District Court – Los Angeles
Case NO.: 2-15-cv-02170 AB (ASx)

People vs. Downy                                       State Superior Court – San Bernardino

92

| | |
|---|---|
| Ketron v. City of Santa Monica<br>Case No. 2:16-CV-01478 MWF (PJWx) | Deposition |
| Oppenheimer vs. City of La Habra, et al.<br>Case No.: 8:16-CV-00018-JVS-DFM | U.S. District Court – Santa Ana |
| Garcia v. City of Santa Clara<br>Case No.: CV10-02424 SI (pr) | Deposition |
| Centeno vs. City of Fresno, et al.<br>Case NO. 1:16-CV-00653-DAD-SAB | Deposition |
| Avila vs. Co. of Madera & State of Ca.<br>Case No. 1:15-cv-00996 JAM-EPG | Deposition |
| Finger vs. County of Riverside, et al.<br>Case No: 14-cv-01585 JGB (KKx) | U.S. District Court – Riverside |
| Moody vs. County of San Bernardino | Civil Service Commission |
| Garcia v. City of Santa Clara<br>Case No.: CV10-02424 SI (pr) | U.S. District Court – San Francisco |
| Holmes vs. County of Orange<br>Case No.: 8:16-CV-00867-JLS-JCG | Deposition |
| Sandra Salazar vs. COSB<br>Case No.: 5:16-CV-01103-JFW-KK | Deposition |
| Curtin v. County of Orange<br>Case No.: 8:16-cv-00591-SVW-PLA | Deposition |
| Alexis Yancy, et al. v. State of Ca (CHP)<br>Case No. 15-cv-0580 JM (PCL) | Deposition |
| Curtin v. County of Orange<br>Case No.: 8:16-cv-00591-SVW-PLA | U.S. District Court – Los Angeles |
| Grant vs. County of Orange<br>Case No.: 30-2015-00786861 | Deposition |
| Wyman vs. County of Orange<br>Case No.: CV-15-0152-3 AG (KESx) | U.S. District Court – Santa Ana |
| Grant vs. County of Orange<br>CASE NO: 30-2015-00786861 | State Superior Court – Santa Ana |
| Saycon vs. City of Long Beach, et al.<br>Case No. 2:16-cv-05614 | Deposition |
| Cook vs. City of San Diego<br>Case No. 37-2015- 00022471-CU-OE-CTL | Deposition |

Donaldson vs. USA, et al.                    U.S. District Court – San Diego
Case NO. 15cv0908-BAS-KSC

Conan vs. City of Fontana                    U.S. District Court – Riverside
Case No.:  EDCV 16-1261-KK

Foster vs. County of San Bernardino          Civil Service Hearing
Case No.: DA-2016-0608-06-C9497

Miguel & Chavez, et al. vs. USA              Deposition
D. AZ. Case No. CV-15-592-TUC-DCB

Bridges & Moore vs. COLA                     Deposition
Case No.: TC028303

Bridges & Moore vs. COLA                     State Superior Court – Long Beach
Case No.: TC028303

Herrera vs. City of Ontario, et al.          Deposition
Case No.: 5:17-cv-82 SP

**2018**

Yancy vs. State of California (CHP)  U.S.   District Court – San Diego
Case No. 15-cv-0580 JM (PCL)

Tucker vs. County of Riverside               Deposition
Case NO.: 5:16-CV-02275-JGB (DTBx)

**Note:** There may be some discrepancy in the number of cases contained within this list. The list is only as accurate as records and memory can reflect. There may be other cases not identified, which is due to errors in record keeping.

Rev: 03/01/18

94

**RJF & Associates, Inc.**
**Robert Fonzi**
*Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA. 92399
951-312-9679

## Fee Schedule Agreement

*Case Review, Consultation, & Retainer*          $6000.00
>This fee is charged upon initiating a case file with the agreement/retainer for consulting. It includes the preliminary case assessment, research materials, fixed office expenses and operating costs. Fees are applied to all activities and professional services performed, i.e., case review, analysis, research, trial preparation, production of exhibits, site visits, and court testimony. (NON-REFUNDABLE)

*Case Review and Preparation*          $300.00
>This fee is the hourly rate applied to all professional services associated with case review, analysis, research, trial preparation, production of exhibits, site visits, and is applied to the retainer fee as worked is performed.

*Deposition Fee / Court Testimony   (30 day or more notice)*      $2000.00
>This basic fee applies to all hearings and/or court appearances and is in compliance with the Federal and State rules governing "expert witnesses". There is a 4-hour minimum with each hour following to be billed at a rate of five hundred ($500) dollars an hour and any part of an hour will be billed as a whole.

*Deposition Fee / Court Testimony   (Less than 30-day notice)*      $3000.00
>There is a four-hour minimum with each hour following to be billed at a rate of seven hundred fifty ($750.00) dollars an hour and any part of an hour will be billed as 1 hour.

*Travel time for Deposition, Trial Testimony and/or standby time: Portal to Portal*
>Local cost for Southern California. Out of state or extended travel will be billed based on time and travel arrangements.

|  |  |
|---|---|
| *Half Day* | $1000.00 |
| *Full Day* | $2000.00 |

*Travel Expenses*                              Direct cost billing
>All travel related expenses, including transportation, insurance, and lodging will be billed at actual cost. Meals and incidentals will be billed on a daily basis at $100 per day.

*Statement of Account*                              Interest
>Itemized billings (Statement of Professional Services) will be prepared and submitted on a periodic basis consistent with the activities of the account. Payment is due upon receipt of the billing (within 30 days). Late charges may be assessed on overdue accounts.

**Rev: 01/04/18**

# EXHIBIT 2

**Robert Fonzi & Associates**
**RJF & Associates, Inc.**
*Training and Consulting*
robert.fonzi@yahoo.com

**P.O. Box 1154, Yucaipa, CA  92399**
**951-312-9679**

**March 12, 2018**

Wagner & Pelayes, LLP
1325 Spruce Street, Suite 200
Riverside, CA  92507

Attention:  Tristan Pelayes
Re: *__Soares vs. County of Los Angeles, et al.__*
Case No. 2:17-cv-00924 RGK-AS

Dear Mr. Pelayes,

In accordance with the Federal Rules of Civil Procedure 26(a) (1) (B), this report sets forth my preliminary opinions with respect to the police procedures; specifically, the issues outlined in the complaint listed below:

- Plaintiffs allege Defendants grossly violated the training and standards involved in making reasonable searches and seizures of subjects, and especially in using the tomahawk safe burn in the manner described herein, which also violated standard training, and manufacturer guidelines concerning the use of the massive gassing. These violations by Defendants caused Decedent's death.

- Plaintiffs further allege that Decedent's death was the proximate result of Defendant County's failure to reasonably train their peace officers in the proper and reasonable use of force, effecting entries into residences, the proper and reasonable deployment, the proper and reasonable apprehension of barricaded subjects, and in responding to mentally impaired or intoxicated subjects.

- Plaintiffs further allege that these substantial failures reflect Defendant County's policies implicitly ratifying and/or authorizing the use of excessive force, unreasonable seizures, unreasonable uses of the chemical munitions, and the failure to render medical care or provide for medical care to subjects placed in emergency medical jeopardy by its peace officer employees.

It is my understanding that additional discovery materials may still be pending.  I reserve the right to obtain additional discovery that may assist in my further evaluation of this matter. Additionally, I reserve the right to add, change and/or delete any of my opinions based on additional discovery, at which time a supplemental report may be submitted.  I will make myself available for deposition upon reasonable request by plaintiff(s), prior to the discovery cut-off date at a mutually agreeable date and time.

1

I. **Summary of Qualifications:**

I am retired as Undersheriff from the San Bernardino County Sheriff's Department. As Undersheriff, I was responsible for all administrative and operational commands within the Sheriff's Department while directing day to day operations. In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. Administrative duties included but were not limited to: directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included: directing and supervising subordinate executive and command staff. Coordinated and commanded subordinate personnel in the management of administrative support services and criminal operations. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Developed, directed and implemented policy and procedural changes resulting from legislative changes, procedures, or departmental philosophy. Attended and participated in statewide committees. Represented the Sheriff's Department in liaison with other law enforcement organizations, government agencies and community groups.

Prior to my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department. As the Assistant Sheriff, I was responsible for all support operations within the organization. Administrative duties included: directing, planning, coordinating, and managing all functions within a major area of assigned responsibility for the Sheriff's Department.

Prior to my position as Assistant Sheriff, I was a Deputy Chief with the San Bernardino County Sheriff's Department with responsibilities over several bureaus that included Administrative Services, Court Security, Training Division, Detentions and Corrections.

Prior to my promotion to Deputy Chief, I was the commanding officer for the Sheriff's Employee Resources Division, which provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

In my assignment as commanding officer for the West Valley Detention Center prior to my Deputy Chief position, I was responsible for various issues involving personnel matters, disciplinary actions and policies and procedures in adherence with applicable state and federal laws.

I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department). My responsibilities included station operations, personnel management, criminal investigations, use of force training, and management of support staff. As the Chief of Police, I served on a number of community projects, committees, and participated in city events.

I am a 32 year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department. I have several years of patrol experience in the Ontario, San Bernardino, and San Diego areas. My experience includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator and corrections.

I am most recognized in the area of peace officer training. With over 19 years of experience, I have trained approximately 10,000 law enforcement officers from all over the country. My expertise is extensive in the use of force and police procedures. I have testified as an expert witness in numerous civil and criminal trials in both state and federal court.

I have read the materials provided to me with respect to the February 6 incident involving a number of members from the Los Angeles County Sheriff's Department and the Decedent Leroy Gerano Varnedoe (hereinafter referred to as Varnedoe). As a result of my careful review and study into the incident, I am prepared to offer preliminary expert opinions concerning police procedures; specifically, the issues outlined in the complaint that resulted in this litigation; specifically, the use and deployment method of chemical agents, policies, practices and training that resulted in the use of excessive force.

**II.**  **Curriculum Vitae and Court Testimony:**  I have attached my curriculum vitae, which outlines my training, knowledge, and experience. Additionally, I have attached a list of court testimony within the past five years.

**III.**  **Compensation:**  A copy of my fee schedule, which outlines my compensation for professional services, is attached.

**V.**  **Materials Reviewed:**  As of this writing, I have reviewed the following reports and documents:

1. Complaint
2. Defendants 26a
3. Soares Discovery Part 1
4. Soares Discovery Part 2
5. Soares Discovery Part 3
6. Soares Initial Disclosure Rule 26
7. Audio Interviews
8. Deposition - Amanda Smith
9. Deposition - Anica Smith
10. Deposition - Amanda Riley
11. Deposition with exhibits - Commander Maxwell
12. Deposition - Dawn Soares
13. Deposition - Dep. Geisbauer
14. Deposition - Dep. Stade
15. Deposition - Dep. Welle
16. Deposition - Dep. Young (PMK)
17. Deposition - Giandomenico
18. Deposition - Lt. Giandomenico
19. Deposition - MD Gutstadt (coroner)

3

20. Deposition – Pltif. Jaylyn Vanedoe
21. Deposition – Pltif. Samara Vanedoe
22. Deposition - Alissa Varnedoe
23. Deposition - Tiffany Soares
24. Deposition - Capt. Ewell
25. Deposition - Jayda MacCaskie
26. Deposition - John Kapeles
27. Deposition - Tania Owen
28. BurnSafe test video
29. LASD test videos (3)
30. SWAT Packet
31. BurnSafe Instructions V1
32. Antelope agreement 4-28-15 (consent decree)
33. Complaint DOJ
34. U.S. Department of Justice Investigation
35. Statement of Intent
36. Defendants Supplemental Disclosures Per Rule 26
37. Rule 26 Initial Disclosure
38. Soares Initial Disclosure Rule 26 served 10-17-17
39. County of LA's response to RTP #2
40. Def. County of Los Angeles Responses to RFP#1
41. Team Activation Tracking System (Response to RFP#1 produced on 1-10-18)
42. CAI Book 2017
43. CS Riot control gas
44. TomaHawk website
45. SEB Photos & Scene Photos
46. Applicable policies and procedures
47. Applicable P.O.S.T Training

Note:  I am informed and believe that I have received all Disclosures and Discovery Responses produced in this case, as well as all deposition transcripts that have been completed prior to the date of this report.  The foregoing list underscores those records to which I devoted substantial consideration.  In the event that any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.

VI.   **Summary of Opinions:**  The following opinions are based on my review of the above listed materials in addition to my training, knowledge, and experience.  I am prepared to testify and/or explain my opinions regarding the police procedures giving rise to this litigation.

I do not intend to offer my opinions as to the ultimate issues in this action, though I reserve the right to offer opinions based on my areas of expertise even if such opinions embrace the ultimate issues in the incident.

**Right to amend:**  I reserve the right to amend these opinions based upon additional testimony and/or discovery documents.

4

*Police practices and procedures* are the applications of training that involves a variety of topics related to police response(s), communication, resources, use of force, and tactics based on the totality of the circumstances. The application of police practices and procedures may vary depending on the information known or unknown by the officer(s) at the time of the incident. Additionally, the decision as to the appropriate police practices and/or procedures also depend on the time constraints, the risks presented by a suspect(s), public, and the tools available to the officer(s).

**Please note:** The following opinions are only a summary of my review and assessment. The basis for the opinions and supporting statements, reports and/or training will be further discussed and identified later in this report.

**It is important to clearly understand that at the beginning of this report, I have made no credibility determinations with respect to any of the parties involved while expressing any of my opinions. Where there are differences in the events offered by any of the parties and/or witnesses, I do not opine as to factual issues as the trier of fact regarding who is the more credible and/or believable. The resolution of any such conflicts is obviously the responsibility of a jury and/or the trier of facts to decide.**

1.  Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that the defendant's (Los Angeles County Sheriff's Department and members of the Special Enforcement Bureau or SEB) did not follow standard practices and training involving the arrest of the Leroy Gerano Varnedoe.

    Based on the statements and deposition testimony, it is clear that Varnedoe was considered to be armed and dangerous. However, I have not been provided any evidence, thus far, that would indicate and/or support the fact that the named defendants considered other safer tactical plan/options before creating the situation resulting in what they (members of SEB and others) considered to be a barricaded suspect.

    For example, a safe and commonly utilized tactical plan would have been to use an undercover surveillance team, along with uniform personnel, to arrest Varnedoe away from the residence and in a location that would have minimized the possibility of him barricading himself inside a building. The Los Angeles County Sheriff's Department, with all its resources, has many specialized teams that perform this type of tactical operation on a routine basis. The specialized team is referred to as a *takedown* team, specializing in undercover surveillance with uniformed personnel assigned to initiate a vehicle stop and/or contact with the suspect (target). The tactical plan involves following (surveilling) the suspect or target to a location that minimizes the threat to the officers, suspect(s), and the public.

    Based on the investigation, statements, and deposition testimony thus far, the evidence provided has indicated the fact that Varnedoe was never seen nor heard from during the entire incident. Additionally, Varnedoe never made a verbal threat of

violence, physical threats of violence, and never fired a weapon at anyone at the location, including any Deputy Sheriff on scene. Another tactical consideration would have been to wait Varnedoe out.

The reports and statements have indicated that deputies only waited approximately five to six hours before deploying chemical agents into the residence. I have not been provided any evidence, thus far, that would indicate that the situation had escalated, and/or the threat assessment changed. The only information provided was that the **Avatar tactical robot**[1] had been deployed and that they believed Varnedoe had climbed into the attic. There has been deposition testimony indicating a deputy saw smoke coming from the attic leading deputies to believe Varnedoe was smoking methamphetamines; however, the deputy who witnessed this cannot be named or identified.

Additionally, equally troubling is the fact that several commanding officers (Commander, Captain and a Lieutenant) were on scene and ultimately approved and authorized the **chemical munitions plan**[2] (gas plan) resulting in a house fire and causing the death of the Leroy Gerano Varnedoe. The decision and use of chemical agents will be discussed further in this report.

The named Defendants failed to follow **P.O.S.T.**[3] (Peace Officers Standards and Training) and industry standards pursuant to law enforcement training. The named Defendants' individual and collective actions were directly connected to the unconstitutional arrest and failure to train and supervise. The deliberate actions of the named Defendants reflect a deliberate indifference to the constitutional rights of the Decedent (Leroy Gerano Varnedoe).

The Decedent's (Leroy Gerano Varnedoe) death was the proximate result of the named Defendant's failure to reasonably train their deputies in the proper and reasonable use of force (deployment of chemical munitions). The force included deploying chemical agents into residence, the proper and reasonable deployment of flash bang grenades, the proper and reasonable apprehension of barricaded subjects, and in responding to a potentially mentally impaired and/or intoxicated subject.

**This opinion will be further supported with specific deposition testimony later in this report.**

---

[1] **AVATAR tactical robot:** robot that is radio controlled, equipped with a two-way audio, and a non-recording camera.

[2] **Chemical munitions plan:** a comprehensive tactical plan designed to safely introduce chemical agents (substance whose toxic properties are used to incapacitate a person/suspect) into a specified location. The munitions have a variety of deployment methods and chemical substances or properties, i.e. CS, CN, and/or OC.

[3] **P.O.S.T or California Peace Officer Standards and Training** is the statewide governmental agency that establishes training guideline, standards, and mandates for all police officers in the state of California.

6

2.  Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that it appears the named Defendants engaged in the use of excessive force. The chemical munitions plan (gas plan) and decision to deploy chemical agents into the residence while using a ***BurnSafe device***[4] in the manner described herein, violated standard training and manufacturer guidelines concerning the use of a ***hot gas canister***[5]. As a result, the pyrotechnic devices subsequently ignited and engulfed the residence into flames that resulted in the death of the Decedent (Leroy Gerano Varnedoe).

Based on the investigation, statements and deposition testimony thus far, the evidence has indicated and supported the fact that the Defendants' intentions were to use the gas to smoke Varnedoe out of the residence. Although Defendants contend that they possessed a valid warrant authorizing a search warrant and seizure (arrest) of Varnedoe, the extreme amount of chemical munitions (gas), in combination with the use of dangerous hot gas canisters, referred to as the "RELIC" (identified and marked as exhibit 3 in both Commander Maxwell's and Deputy Young's deposition testimony), was a significant departure from acceptable law enforcement use of these chemicals agents. The Defendants knew, or should have known, that it had a high probability to start a fire when in contact with carpet and furniture. The Defendants knew, and/or should have known, of the dangerous consequences of their actions.

It is very clear from the investigation, statements, and deposition testimony that there existed a culture within the Los Angeles Sheriff's Department of inbred training that obviously resulted in the unfortunate death of Varnedoe. Based on the deposition testimony of several deputies, the policies, training and practices have been passed on for many years within the Sheriff's Department Specialized Enforcement Bureau or SEB. The practices and training within SEB ignored industries standards as well as manufactures' warnings and labels. The inbred practices and training ultimately resulted in poor training, practices, and decisions while using a device ("RELIC") that failed. The deposition testimony of several commanding officers substantiated a significant failure in leadership and supervision.

There has been deposition testimony that indicates the failed device ("RELIC") has been in service (use) for many years and is a safe. However, the following issues are most alarming:

---

[4] **BurnSafe device** is essentially a double walled container designed to contain the flames inside the inner chamber thereby reducing the probability of starting a fire. The BurnSafe allows the introduction of significant amounts of pyrotechnic non-lethal chemical agent into the target, which increases the probability of a successful resolution.

[5] **Hot gas canister:** pyrotechnic activation of solid chemicals which are dispersed as an aerosol. Hot Gas is deployed via a hot gas deployment device, such as a Burn Safe or Tomahawk. The Burn Safe allows for the introduction of a significant amount of pyrotechnic non-lethal chemical agent into the target space, while the Tomahawk is smaller and is designed to be easily tossed by hand into a specific location from behind cover. There is an internal spark in the protective case, but there is no external spark. The spark burns inside the case, just the gas comes out. The heat remains inside the deployment device. However, there is a small possibility that if the device lands on material which can be easily ignited, it could start a fire.

- No one from the Sheriff's Department, including the person most knowledgeable (designated PMK Deputy Young), is able to identify when, how, or who, introduced the device known as the "RELIC" (identified and mark as exhibit 3 to both Commander Maxwell's and Deputy Young's deposition testimony) into service.

- It's also alarming that no one from the Sheriff's Department is able to identify what or how the failed device (RELIC) was tested to ensure that it was safe.

- Several commanding officers from the Sheriff's Department have all testified that they do not know when, how, or who, introduced the device known as the "RELIC" (identified and mark as exhibit 3 to both Commander Maxwell's and Deputy Young's deposition testimony) into service.

- Several commanding officers and members from the Sheriff's Department SEB have all testified that they have trained with the failed device (RELIC); however, the training was conducted at their county training facility, in an outside environment and/or inside a building with concrete floors and walls.

- No one from the Sheriff's Department, including the person most knowledgeable (PMK Deputy Young), is able to testify that the failed device, (RELIC), (identified and mark as exhibit 3 to both Commander Maxwell's and Deputy Young's deposition testimony) was ever tested and/or used in training with the intent to deploy it in an environment encompassing carpet or furniture.

- Several commanding officers and members from the Sheriff's Department SEB have all testified that they never read nor were aware of the manufacture's warnings pertaining to the use of riot control chemical agents; specifically, the Def Tech / Safariland model #1072, #1082 and/or Spede Heat Continuous Discharge 555.

The failures listed above are strong indications that the leadership and supervision within the Los Angeles Sheriff's Department; specifically, the Specialized Enforcement Bureau or SEB, failed in its responsibility to provide policies and training that is consistent with industry standards.

**This opinion will further be supported with specific deposition testimony later in this report.**

3. Based on my review of the listed materials it is my opinion, as determined by standard police practices and training, that it appears the Los Angeles County Sheriff's Department failed to properly manage, supervise, and train its deputies with respect to the proper deployment and use chemical munitions.

8

There has been deposition testimony that strongly indicates that the failed device (RELIC) was never tested in a manner consistent with several industry standards. Additionally, all manufacture's warning labels were ignored and/or unknown to many that testified on behalf of the Sheriff's Department, including several commanding officers with many years of experience and the Sheriff's Department's designated person most knowledgeable (PMK Deputy Young).

Deposition testimony regarding the following issues is very alarming:

- There has been deposition testimony specific to policy 5-06/110.65 Special Weapons Team and the purpose is to save lives, which includes the lives of suspects (deposition testimony of Commander Maxwell exhibit 1-1 and PMK Deputy Young exhibit 1). Unfortunately, due to the reckless deployment of the (RELIC) and a gas canister designed for outdoor use, the decedent was burned to death (Medical Examiner Gutstadt postmortem examination report: On February 18, 2015).

- There has been deposition testimony by John Kapeles (person most knowledge or PMK from Defense Technologies / Safariland) that the use of chemical munitions; specifically, the gas canisters designed for outdoor use (#1072 and #1082) were not intended to be used indoors under any conditions. Additionally, all the warning labels were clear that the specific gas canisters were not to be used indoors because they had a high probability of starting a fire.

- There has been deposition testimony that all manufacture's warning labels were either unknown and/or were ignored. The following deposition testimony and exhibits were reviewed and taken into consideration, which includes but not limited to the deposition testimony of **Commander Maxwell**, incident commander who authorized the gas plan, exhibits 2, 4, 5, or 1-9; **Deputy Young**, designated as Sheriff's Department's person most knowledgeable, exhibits 2, 4, 5, or 6; **Lieutenant Giandomenico,** commanding officer on scene, exhibits 2, 4, 6, disagrees with 1-9, even though it is a LASD SEB form, and 22; **Deputy Stade,** who developed gas plan, exhibits 2, 9, 10, 11, 12, 13, 14, 15, or 16; and **Deputy Geisbauer,** person who deployed the "RELIC", exhibits 1-9, 2, 4, 6, and 17.

- There has been deposition testimony that indicated the only fire plan in place for was a fire extinguisher located a distance away inside one of the S.W.A.T. vehicles. Rather than obtaining the fire extinguisher, pursuant to the fire plan, which was an insufficient plan, Deputy Geisbauer sought to retrieve a garden hose. Unfortunately, Deputy Geidbauer's decision failed and was insignificant to battle the fire that engulfed the residence and burned Varnedoe to death.

- There has been deposition testimony that indicates that no one from the Sheriff's Department had seen and/or was familiar with a form labeled Special Enforcement Bureau Chemical Agents; deposition testimony of **Commander Maxwell**, incident commander who authorized the gas plan, exhibit 1-9; **Deputy Young**, designated as Sheriff's Department's person most knowledgeable, exhibit 1 page 9; **Deputy Stade,** who developed gas plan and in 14 years had never seen form, exhibit 13; **Deputy Geisbauer**, person who deployed the (RELIC), exhibit1-9.  **Lieutenant Giandomenico**, commanding officer on scene, exhibit 1-9, testified that he had seen the form; however, disagrees with it even though it's a form from the Los Angeles County Sheriff's Department Special Enforcement Bureau and was produced by the County of Los Angeles during discovery.

- There has been deposition testimony that has indicated that many of the involved Defendants from the Sheriff's Department had never seen and/or was familiar with a form titled Chemical Agents Instructor Handbook – Sample Deployment Worksheet.  **Commander Maxwell**, incident commander who authorized the gas plan, exhibit 5; **Deputy Young**, designated as Sheriff's Department's person most knowledgeable, exhibit 5; and **Deputy Stade**, who developed gas plan, exhibit 15.

  The only exception was **Captain Ewell**, who indicated that he had gone through the FBI instructor's course for Chemical munitions back in the 1980's and was familiar with the worksheet.  Captain Ewell testified that he basically ignored the worksheet and that it serves no real purpose.  Captain Ewell indicated that there are too many variables and factors to consider; therefore, the worksheet is of no value.  While I agree that that there are always different contributing factors and variables to take into consideration, the worksheet is of value because it establishes a baseline.  Once a baseline is established, the contributing factors and variables may be taken into consideration.  For Captain Ewell to ignore its value, and to discount it altogether, is a failure in leadership and not consistent with establishes standards.

- Based on the deposition testimony, it is clear that the involved Defendants lack proper training, were poorly trained, and their knowledge of industry standards is unacceptable.  One factor that is important to mention is the amount of inbred training that occurred with SEB.  Several of the involved defendants testified that they had never received any formal chemical agents or munitions training outside the department.  None of the involved defendants were certified chemical agents/munitions instructors with respect to use and deployment.  The only exception was Captain Ewell, who had been to the FBI instructor's course in the 1980's.

**This opinion will be further supported with specific deposition testimony later in this report.**

**4.** Based on my review of the listed materials it is my opinion, as determined by standard police practices, it appears that the Los Angeles County Sheriff's Department failed in both its responsibility and duty to properly investigate the allegations alleged by the incident that resulted in the death of Leroy Gerano Varnedoe

There has been deposition testimony that strongly indicates organizational failure to properly investigate and to perform a department executive review (DER) of the circumstances that resulted in the death of Leroy Gerano Varnedoe. The following issues reflect the concerns related to the investigation and the department executive review:

- .The primary arson investigator, Tania Owen, who submitted an official report involving her investigation indicated that she was not aware of the lab results that revealed "No recognizable ignitable liquid residues were detected in items three, four and five," which was from the evidence collected at the scene.

  Subsequently, Investigator Owen admitted under oath that she had not completed her investigations as of her deposition dated February 28, 2018, several years later. Deposition page 45, **Q.** Okay. So, this incident that happened in 2015, is it now 2018, and your investigation is still not completed, true? **A.** Yes.

  Additionally, Investigator Owen never took any photographs, conducted interviews, nor did she inspect the device (RELIC) used to deploy the chemical agent.

- There has been deposition testimony strongly indicates an organizational failure to perform a Department Executive Review (DER) of the incident resulting in a death. Although many of the involved defendants testified that they are aware of a Department Executive Review process, no one that provided deposition testimony *(including commanding officers or anyone that was involved in authorizing the chemical munition plans, created, supervised or executed the plan)* was involved in a comprehensive review and analysis. If such a department review was never performed, it would certainly fall well below all acceptable leadership, management, and supervisory concepts that are commonly recognized in the law enforcement community.

  It appears from the reports and testimony that no review was performed because several of the involved defendants testified to their lack of knowledge and that no changes to the way they conduct business has been revised. Therefore, it is a reasonable assumption that a Department Executive Review was never performed. If such a review was performed, it has not been disclosed and the findings would be of interest to all concerned parties.

11

**This opinion will be further supported with specific deposition testimony later in this report.**

Note:  None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  Rather, my opinions involve the consistency of the officers' actions with standard police practices.

**VII.    Basis for Opinions:**

Note:  Any fact summary is provided for convenience and does not necessarily itemize every single fact relied upon by this expert in the formation of my opinions-conclusions in this matter:  it is based on my review of the aforementioned records-materials.  I do not contend to have direct personal knowledge of the incident facts.

1.  It is important to clearly understand that at the beginning of this report, I have made no credibility determinations with respect to any of the parties involved while expressing any of my opinions.  Where there are differences in the events offered by the involved parties and/or witnesses, I do not opine as to factual issues as the trier of fact regarding who is the more credible and/or believable.  The resolution of any such conflicts is obviously the responsibility of a jury and/or the trier of facts to decide.

Additionally, it must be stated that the Plaintiffs who are listed in the complaint, have specifically alleged that the named Defendants grossly violated standard law enforcement training and standards, especially in using the Tomahawk BurnSafe in the manner described.  The manner in which the BurnSafe device was deployed, also violated the manufacturer's guidelines concerning it use.  Plaintiffs further allege that the Decedent's (Leroy Gerano Varnedoe) death was the proximate result of County's (Defendant) failure to reasonably train their deputy sheriffs in the proper and reasonable use of force, effecting entries into residences, the proper and reasonable deployment of flash bang grenades, the proper and reasonable apprehension of barricaded subjects, and in responding to mentally impaired or intoxicated subjects.

There appears to be discrepancies in facts presented although, uncontested facts support the Plaintiff's allegations. If taking into consideration the allegations of the named defendants to be true, this incident is a case of unreasonable and excessive force that resulted in the death of the Decedent's (Leroy Gerano Varnedoe).

By virtue of standard law enforcement procedures and P.O.S.T. Training, the named defendants, should have known how to appropriately handle this situation in accordance with proper procedures.  As a result of the gross violation of standard law enforcement procedures and training, it resulted in a death that was preventable.  The actions by the defendants were deliberately indifferent to the health and safety of Decedent (Leroy Gerano Varnedoe), as well as, his constitutional rights.

*"Peace officers are given a special position of trust by their authority to use force on others. When dealing with arrested persons under their care and custody, it is particularly important that officers use only an appropriate and necessary amount of force. Unreasonable force is punishable by law"* (POST Learning Domain # 31: "Custody," Chapter 2, page 3.  Emphasis added).

"Inhumane or Oppressive treatment: *Any officer who willfully, inhumanely treats or oppresses any prisoner under his/her care or custody is guilty of an infraction."* (California Penal Code section 147 and P.O.S.T. Learning Domain # 31: "Custody," Chapter 2, page 14).

If the Plaintiff's allegations are found to be true, the circumstances involving the Decedent's (Leroy Gerano Varnedoe) arrest would be determined to be excessive and unreasonable. The actions of the named defendants were determined to be so far below the established professional standards, they would be viewed as intentional, reckless and dangerous.

As such, the defendants' actions would be constituted as unreasonable with excessive force that demonstrates a deliberate indifference to the health and safety of the Decedent (Leroy Gerano Varnedoe). The reports and statements reflect an inaccurate and misleading report that falls far below the professional standard as specified by P.O.S.T. and industry standards.

*Based on my review of the listed materials and my experience, it's difficult to imagine how such a lack of leadership, management and supervisory accountability, was such a departure from recognized standards, and was allowed and/or is acceptable by the Los Angeles County Sheriff's Department.*

**The following deposition testimony and statements were taken into consideration and support the basis for the above listed opinions.**

2. **The deposition testimony of John Kapeles (designated as person most knowledgeable from Def Tech / Safariland) taken on February 26, 2018)**

P4
Q. Okay. John, you're the person most knowledgeable from Safariland?
A. Yes, I am.

P6
A. Yeah. I'm the category and engineering director for the Defense Technology product line, which is the product line that make the grenades. I've been with Safariland 16 years. I originally headed up the research and development group and then moved on to manage the Defense Technology category, and that's the position I hold today.

P7
Q. Okay. All right. So if I ask you if you're familiar with the 1082 gas grenade and the -- what's the other one? 1070- let's see. Is it 1072 or – the 1072 grenade, are familiar with those?
A Yes, I am.

Q. Okay. Were those designed by Def Tech?
A. Yeah, they are both grenades that are produced today by Safariland, the Safariland Group under the brand name Defense Technology.

13

Q. Okay. All right. In February 2015, were those grenades the size -- designed to be used indoors or outdoors?
A. Outdoors.
Q. Exclusively outdoors?
A. Yes.

P8
Q. Okay. Did you give -- did Safariland, to your knowledge, give permission to any law enforcement agency to change the purpose for which it was intended?
4 A. No, we don't grant permission to a law enforcement –

P9
Q. Okay. Did Safariland ever advise any law enforcement agency that, if these grenades were used in conjunction with a burn-safe device, a canister, or a lantern, that Safariland would endorse such a use?
A. No, we did not.
Q. Are you familiar with the burn-safe device --
A. Yes, I am.

Q. Okay. And did Safariland ever do any research concerning burn-safe devices in conjunction with the 1082 or the 1072 grenade?
A. Yes. We've done some testing to evaluate the products use with the BurnSafe devices. It was in conjunction with a request by the BurnSafe manufacturer. They wanted to start -- they wanted Safariland to start selling their product and incorporate it into our product line, and so as part of that, we evaluated the grenades in those products.

Q. What year was that?
A. That was in 2014, I believe. Yes, 2014.
Q. The year 2014, what company contacted you to test the BurnSafe device?
25 A. It was the Covina-Thomas Company.

P10
A. No. The only products that we tested and were provided to us by Covina-Thomas were those that were made by them.
Q. Okay. And you indicated that this happened in 2014; correct?
19 A. Yes.

P11
Q. Okay. Now, after 2014 did Safariland approve of a business relationship with that company?
A. No, we did not.
Q. Why not?
22 A. We determined that we didn't want to move forward with the business relationship as far as selling the BurnSafe devices. We felt that there was just too much liability potential there.

14

P12
A. We tested several grenades in each one of the devices that were provided to us, did some videotaping of the results and then also attached some thermocouples so that we could measure the temperature on the devices, and that information is some of what has been produced.
Q. Okay. And based on that testing then, the company decided not to move forward with that relationship?
A. That's correct.

P12 / 13
A. There was nothing really from the results that we tested. We never saw any concerning behavior with the tests that we did. However, about that same time, we had learned of some reported flare-ups with -- with the grenade in a similar lantern device. I believe it was the Los Angeles Sheriff that was testing it, and that had been reported to us, and so that concerned us.

P16 *(exhibit 023 emailed 8-4-14 conformed that LASD knew of flares ups caused by Spede-Heat grenades)*
A. Yeah, apparently they had tested one of our Spede-Heat grenades with one of the BurnSafe units and they saw a flame up. And so they wanted to switch to the Riot Control grenade because, when they tested that, they did not see the flame-up. And so they'd asked us to replace the Spede-Heat grenades with Riot Control grenades.

P17
Q. The Spede-Heat grenade meaning the 1072?
A. Yes.
Q. Okay. So the sheriff's department was notifying you guys that the 1072 grenade caused flames when used with the BurnSafe?
A. Yes. I think that's alluded to in this message.
Q. Okay. And the burn safe meaning a lantern of some sort?
A. Yes, I believe it was the lantern --

P19
Q Did Safariland endorse the use of any type of lantern device with its 1082 and 1072 grenades?
19 A. No, we did not.

P20
A. In a dynamic situation, we can't control where it's going to be thrown, you know, the conditions where it's thrown, is there extremely flammable or extremely hazardous conditions where it's used. A lot of these things can affect the outcome of when a grenade is deployed, particularly indoors, and so we can't endorse the use of a product like that where we can't control all these factors.

Q. The testing on the Lantern device itself, who conducted that test specifically?
A. It was my engineering group.

15

P21

Q. Okay. Specifically as to the Lantern, even though it had undergone all this testing by you, I guess my question is why the product wasn't endorsed by your company?

A. Well, as I said before, we judged that there were too many concerns with that we couldn't control the way it might be used. And so recognizing the potential liability, we just decided it wasn't something we wanted to go forward with.

P24 - P25

Q. Okay. Okay. If somebody from the Sheriff's Department were to testify that something to the effect of, "Look, we understand your warnings, and we understand that it's designed to be used outdoors, but if you use it indoors with a lantern device, then Safariland would approve of that," would that be a correct statement?

A. No.

Q. I'm sorry John, what was your answer?

A. No, Safariland would not approve of it.

Q. Why?

A. As I said before, it's not our device, and we're not in the position to approve or disapprove of what they use. We can only advise on the use of our product, which we did. It's an outdoor grenade.

Q. Exclusively; correct?

A. Yes.

P27 *(exhibits 1 -21. pics of LASD's Relic or their version of a BurnSafe)*

A. No, I don't know anything about these photos that -- that you just provided to me other than I'm just looking at them.

Q. All right. But to be sure, the ones that I provided photos of, that is not the device that you tested?

A. Yes. That's a true statement. We did not test the device in the picture here. We tested a different device that was provided to us by the Covina-Thomas Company.

P28

Q. And the 1072 grenade depicted here on the photos I sent you, that is what the e-mail said should not be used with a lantern?

A. Yes, I believe the e-mail said that they had experienced a flame-up with that grenade.

Q. Okay. And your company took that into consideration; correct?

A. Yes.

P37

Q. And the 1082 states that it is for outdoor use in crowd-control situations; correct?

A. Yes, that's correct.

Q. Okay. And what about the 1072?

A. It states the same thing.

A. Yeah, it's outdoor use for crowd-control situations.
Q. Okay. And is it your testimony that that's the only approved use for those two items?
A. Yes, that's correct.

Q. Okay. And so is it your testimony that, from Safariland's vantage point, that law enforcement is using, is purchasing the 1072 and 1082 strictly for outdoor use only?
A. Yes, that's correct.

Q. And that Safariland has no knowledge of any other use of the 1072 and 1082?
A. Only as I spoke to before, that some agencies have raised the question about using them indoors, which we discourage.

P38
A. I can't speak for what SWAT agencies are doing across the country. What I can tell you is that we do not endorse or recommend using them for indoor applications. I -- if you're asking me to guess, I would say I would guess that there's agencies that use them in indoor applications possibly where lethal force is warranted. But I can't really speculate as to how they're used across the country.

P45
Q. Sure. If either a 1072 grenade or a 1082 grenade were used in a BurnSafe device and that caused a fire and a fatality as a result of the fire, is it Safariland's position that the use of those grenades in a BurnSafe is a use for which the grenades were not intended to be used if they were used indoors?
A. Yes, that's correct.

P48 / 49
Q. What is the specific reason why the 1072 and/or 1082 grenades, the CS grenades cannot be used indoors?
A. They're a pyrotechnic device, and they  generate a significant amount of heat and sparks that can cause a fire if they come in contact with combustible material. We have a number of other products that are non-pyrotechnic that we recommend are used for indoor applications. And so those grenades like the 1072 and the 1082 are better suited for outdoor applications where they wouldn't come in contact with combustibles.

P49
Q. So you have cold gas devices that are specifically designed for indoor use?
A. Yes, there's several products that are either non-pyrotechnic, or we do have one pyrotechnic grenade that is a baffle or a can-within-a-can design that protects it from coming into contact with combustibles, and so it reduces the risk if it's deployed indoors.

Q. And are these equally effective as using the outdoor devices indoors?
A. The outdoor devices tend to produce more smoke, more volume of smoke, and so they might have greater effectiveness, you know, when thrown in an enclosed space. But as I mentioned, they also have greater risk because of the heat generation.

17

3.  **The deposition testimony of Commander Maxwell taken on January 10, 2018:**

P18
A. I have the overall responsibility of the operation.
Q. You're the ultimate command-giver?
A. I'm the ultimate decision-maker in a static situation.

P19
Q. Right. All right. That never happened in this case, correct, meaning the suspect never used deadly force; right?
A. Not that I'm aware of.

P20
A. You know, just ensure -- it's my job to make sure that department policies are followed, that our normal procedures are followed, and just, you know, approve any type of a plan at one point that will be presented to take a suspect into custody.
Q. Did you approve any plans that day?
A. Yes.
Q. What plans did you approve?
A. Just recalling. I would have had to approve of the flashbang being deployed.

A. I would have approved of the AVATAR being deployed. I would have -- I would have -- I would have -- I don't recall everything. I do -- I would have approved the gas plan. And any other type of stimulus that was done to -- to make contact with the suspect, and I don't know if this -- I don't recall if this was done or not. But if we would have broken a window with a beanbag or something like that, I would have approved that.

P23 *(Department Executive Review)*
Q. Okay. In this particular case, was there a debriefing conducted?
A. I don't believe so.

P31
Q. Was there a fire prevention plan?
A. I don't recall in this incident, but we usually have fire staged at the command post.

P32
Q. Okay. But there was no plan for fire extinguishers, for instance?
A. Not that I'm aware of.

P32 / 33
Q. You did not have ultimate responsibility for the entire scene in the entire incident?
A. Yes, I did.
Q. Okay. That would have include a fire prevention plan?
A. If --
Q. Assuming one was ran by you.
A. One wasn't run by me.

18

P33
Q. Okay. You read, I believe, that a CS canister was used inside the BurnSafe device?
A. Yes.
Q. Which CS device was used inside the BurnSafe device?
A. I don't know.

P34
Q. All right. What were the -- what was the commonly used CS canister that went inside a BurnSafe device?
A. I don't know.
Q. Were you the person that authorized the use of CS -- CS agents?
A. I approved the gas plan.

P35
Q. Okay. Were you familiar with this policy on the day of this incident?
A. Yes.
Q. Says, "The use of CS agents may be authorized by the Watch Commander or, if applicable, the Incident Commander, or by a Sergeant." "The person authorizing the use of CS agents shall be held responsible for its use and be fully prepared to justify that decision." That was you. You were the ultimate person; correct?
A. Yes.

P38
Q. Well, whose job was it to make sure that your deputies were using safe devices for the extraction of barricaded suspects?
A. I believe they were.

P41
Q. What -- what certifications do you have in the area of employment of chemical agents?
A I had no certifications.

Q. All right. In that SWAT school that you went to, did they teach you what CS agents were safe to use indoor versus outdoors?
A I don't recall.

P42
Q. Well, on the day of this incident, did you use any type of documentation to help you decide whether you were going to approve the gas plan that was effected on the day of this incident?
A. No, I did not.
Q. What did you base your opinion on that this gas plan was safe to use?
A. Just my training and experience.

P43
Q. Okay. Did you ever use a BurnSafe device?
A. No.

P46
Q. Were you ever trained in the use of a BurnSafe device?
A. To be an operator, no.
Q. Okay. To be an observer, were you ever trained in the use of a BurnSafe device? A. During SWAT school they --
Q. But you testified that during SWAT school a BurnSafe device was never used.
A No, it never was used.

P50
Q. Okay.
Are you aware of anybody from your department -- while you were the commander of the SEB team, are you aware of anyone ever contacting a manufacturer of the CS chemical agents to make sure that it was safe to  introduce an outdoor device into a canister that could be safely used indoors?
A. I have no personal knowledge of that.

P51
Q. Okay. Was that type of device used, to your knowledge, at the incident in question?
A. I do not know what was used.
Q. You have no idea what was used that day –
A. No.
Q. -- or that night?
But you approved the gas plan?
A. Correct.

P53
Q. Okay. If it was inside of a BurnSafe, you would teach or you would allow your SWAT team member to disregard the warnings; correct?
A. I don't know if they saw the warnings.
Q. You don't know if they saw the warnings?
A. I don't know what they saw or didn't see. This is the first time I've seen this document myself.

P53
Q. Okay. So, well, let me ask you this: Are you aware that these chemical agents, that are used by your SWAT team, have manufacturer's warnings on them?
A. No, I don't.

P54 *(exhibit #1-10)*
Q. This emoji here with the guy standing outside with the bright either sun or moon there, what does that mean to you?
A. I really don't know. It just says, "outdoors."
Q. Okay. But it has no significance to you?
A. Not really.
Q. Okay. How about the -- the open flame there, what does that mean to you?
A. Well, it's some type of burning.

20

Q. Okay. Does it have any significance that you can attach in connection with a SWAT operation?
A. I would believe it was hot gas.
Q. Okay. Do any of those emojis tell you that the device may cause a fire?
A. Well, any time you show a flame or the word "pyrotechnic," there's -- that would give you some reason to believe that there could be a flame.

P55 *(Exhibit 2 and 4)*
Q. Were you aware that Sergeant -- Lieutenant Giandomenico was part of The Covina-Thomas Company?
A. No, I wasn't.

P56 *(exhibit 4 – alert / warning)*
Q. All right. As far as you're concerned, Lieutenant Giandomenico never made his SWAT team aware of this alert?
Q. Meaning the SWAT teams he was a member of.
A. I have no knowledge of that.
Q. He never made you aware of it; correct?
A. No.

P60 *(exhibit 3 / actual device used during incident)*
Q. What testing did they undergo prior to being put to use in the SWAT team?
A. I'm not familiar with any testing.

P63 *(exhibit 3 / actual device used during incident)*
Q. Okay. All right. Let me show you what's been depicted or marked -- I'm sorry -- as Exhibit Number 3. Is this the device that you were testifying about you were familiar with was being used by your SWAT team?
A. Yes, that's the one I recall mostly.
Q. Okay. Who manufactured that device?
A. I don't know.
Q. What testing did that device undergo?
A. I'm not aware of any.

P77 *(Not involved ion Department Executive Review)*
Q. Did you ever find out what started the fire?
A. No.
Q. Okay. Why didn't you find out?
A. My role was pretty much over with.

P79
Q. Right. Anything's hypothetical. And you, as the commander on scene, you did not want to determine what caused the fire?
A .That's not my job.
Q. That's not your job. Okay. What if it was a piece of equipment that your SWAT team was using that caused the fire. That wouldn't be your job?
A. No.

21

P81
Q. Okay. Do you recall getting any information from anyone about what caused the fire?
A. I don't recall.

P84 *(prior knowledge)*
Q. It's the same question. Did you ever hear of a fire that was caused by the BurnSafe device?
A. The only one I'm personally familiar with utilized in the BurnSafe device was -- and I don't remember exact date, but it was a barricaded suspect in Norwalk.
Q. Okay.
A. And the BurnSafe was delivered through a window, and the drapes caught on fire.

P86
Q. Okay. Do you know how they train in the use of the BurnSafe device?
A. No, I do not.

P89 *(Fire stage several blocks away)*
Q. Okay. And what was the plan to eliminate those circumstances of failure the day of this incident?
A. Like I said, having fire staged.
Q. Besides that?
A. I'm not familiar with anything.

P93 / 94 *(fire extinguisher in vehicle closets to entry)*
Q. I understand that. In fact, Deputy Geisbauer testified there was not one in there. But it should have been there; correct?
A. Not necessarily.
Q. Not necessarily. Why wouldn't you want a fire extinguisher in the vehicle that's closest to the structure?
A. What are you gonna do with it?
Q. Put out a fire maybe.

P97
Q. Okay. Why did you approve the introduction of hot and cold gas at the same time versus just cold gas to see if that would work?
A. That was the gas plan that the team presented as the best option, and I approved it.
Q. Right. But you had the power to modify it.
A. Correct.

P98
Q. Right. But why? If you -- I mean, at that time were you aware -- well, I think you just testified you were aware that hot gas had the potential of causing fire; right?
A. Yes, there's always that associated --
Q. Okay.
A. -- risk.
Q. But you knew that cold gas did not cause fires; right?
A. I'm not aware of any.

22

P100
Q. I'm talking at the time of the SWAT operation, okay, did he shoot at anybody?
A. No.
Q. Did he threaten anybody with their lives?
A. During the operation, no.

P107
Q. When you -- well, but you're not an expert on FLIR devices; correct?
A. That's correct.
Q. All right. Weren't you supposed to at least attempt to use any other means besides the means that you actually employed?
A. I think, you know, it's – all these are judgment calls based on training and experience.

P110
Q. All right. And up until the time you got -- the SWAT team went in, had anybody heard from the suspect?
A. Not to my knowledge.
Q. All right. After the flashbangs and after the beanbags, did anybody hear from the suspect?
A. Not to my knowledge.
Q. After the robot went into the house, did anybody hear from the suspect?
A. Not to my knowledge.
Q. And you knew that when you authorized the gas; correct?
A. Yes.
Q. Before you authorized the gas to be -- to enter -- to be applied into this house, did it ever cross your mind that this suspect may have been incapacitated?
A. No.

P111
Q. Training, were you ever trained on how to extricate a suspect that may have become incapacitated?
A. No.

P117
A. The main -- the main use of hot gas is when the suspect is up in an attic and we're trying to get gas in there that we're not able to go inside and deliver, hot gas is preferable because of the amount of saturation you can get with hot gas compared to cold gas.

P118 *(Exhibit #5 Chemical Agent worksheet)*
Q. Well, didn't somebody work it out before you approved the gas plan?
A. Worked what out?
Q. The saturation levels of one versus the other?
A. No.
Q. Didn't somebody prepare a worksheet, a gas plan deployment sheet, before you approved the gas plan?
A. What do you mean "worksheet"?

23

Q. Have you ever seen a worksheet that -- here, I'll show you.
A. No. The only time we use a worksheet is for when we do an explosive breach. But we don't use a worksheet for gas.

P123
Q. These circumstances. We're talking about the decedent here in this case.
Could you have waited him out for ten hours?
A. Yeah. I mean, once again, you're asking for a hypothetical, so I would have to say yes.
Q. Okay. Why don't you?
A. Because we utilized all of our resources, and after consulting with our crisis negotiation team, they felt any other attempts would be frivolous and they, basically, couldn't do anything else for us.
Q. You consulted with a crisis negotiation team?
A. Yes.

P124
Q. Well, you had the option of waiting longer; correct?
A. Hypothetically, yes.
Q. Okay. You had the option of waiting until morning, daylight; right?
A. Not really.

P126
Q. You had other people available to you?
A. Another full complement of a SWAT team?
Q. Yeah.
A. I don't know.

P126 / 127 *(predetermined mindset)*
Q .Well, did you look? Did you check to make sure you did or you didn't?
A. No. That wasn't a concern of mine at the time. I didn't need another SWAT team. I had the one there that was gonna resolve the issue.
Q. Okay. So the deputies were getting tired. That was your concern?
A. No. The suspect for approximately five-and-a-half, six hours refused to surrender.

P127
A. Oh, I don't recall. Just one of them had seen a shotgun or a hand- -- I don't know if it was a shotgun or a handgun.
Q. And one of those females said that?
A. Yes.
Q. Okay. But the SWAT team never saw one prior to entry; correct?
A. Not to my knowledge.
Q. And the suspect never threatened anybody prior to entry; correct?
A. Correct. There was no communication with the suspect.

P128
Q. And it never occurred to you that he might have been incapacitated?
A. No.

24

P130
Q. Okay. "Supervisors and managers shall make every effort to maintain the technical and tactical proficiency of their subordinates through training, debriefings, tactical discussions, and engaged supervision." Do you agree with that?
A. Yes.

P131
Q. What if a suspect was incapacitated, what was your contingency plan?
A. That was not -- that was not part of the plan.

4. **The deposition testimony of Captain Ewell (Unit Commander over SEB) was taken on February 23, 2018:**

P10
A. Well we waited until his actions forced us to take some actions. He did things that caused us to do different things in an attempt to safeguard the community.
Q. Okay. Was he verbal with you?
A. No he was not verbal with me.

P13-P14
Q. Was that, when these particles were coming down, before or after the flashbang?
A. That was after the flashbang.
Q. All right. And then you said something to the effect that somebody saw smoke?
A. Yes.
Q. In the attic; right?
A. Coming from the attic vent, yes.
Q. So, okay, somebody said that they saw smoke coming from the attic vent; right?
A. Yes.
Q. But you don't know who said that?
A. No, it was a deputy, but I don't know who said that at the time.
Q. Okay. Is that documented anywhere?
A. I do not know.

P20
Q. What was your job that day?
A. I was in charge of the special enforcement bureau.
Q. What does that mean?
A. That means I'm in command of the special enforcement bureau personnel.

P30-31
Q. And how long have you been in SEB?
A. At the time of this incident?
A. About 27 years.
Q. Okay. Who approves what type of gas grenades are used by the SWAT team? A. That would be approved by the uniform and equipment committee of the department.

P31 *(exhibits 44 the "Relic" and 45 newer device)*
Q. Okay. Would they have approved what we will mark as exhibits 44 and 45 to today's deposition?
A. Well, number 44 (Relic) I'm not sure about because -- because it has been around so long I'm not sure if – if there was the uniform and equipment committee when it came into use.

A. And number 45. I would say is -- well it's newer than the other one but -- but this is just a protective safe. So, no, they -- they -- it's not -- it's not actually a chemical agent or anything. So no they wouldn't have approved that. And they wouldn't -- and if this happened today they wouldn't approve that either  because it's not a chemical agent either.

P32
Q. Okay. So this type of equipment that you have in front of you depicted in exhibits 44 and 45, whose job is it to approve this type of equipment?
A. I'm not sure, because that piece of equipment was -- number 44 was here before I was here. Number 45 I would say would -- would go to the unit commander of – of SEB and possibly special operations division to use that.
Q. You're not sure?
A. I'm not sure.

P32 - P34
Q. You know what I mean when I tell you or I ask you if it's in use today or not; right?
A. It is in use.
Q. Okay. Not a trick question. How about the one in Exhibit 44?
A. Yes.
Q. Okay. Both of them are still in use?
A. Yes.
Q. All right. The one in Exhibit 44, do you know what testing that piece of equipment underwent before being introduced into the SWAT arsenal?
A. No
Q. How about the one in Exhibit 45?
A. I believe it was tested by team personnel on -- during a training before it was actually put into use.
Q. Okay. Are you aware of any documentation regarding that testing?
A. No.
Q. Then how do you know that?
A. That's just what I've been told.
Q. Who told you?
A. I don't recall.
Q. When did this person tell you that?
A. I don't recall that either.
Q. What were the results of the testing?
A. That it safely prevented fires by -- when using chemical agents.
Q. In which circumstances?
A. In all circumstances.
Q. Is that what somebody told you?

26

A. Yes.
Q. Did they give you that in writing?
A. No.

P34
Q. Okay.  And did he describe or she, which gas devices were tested with it?
A. Yes.
Q. Okay.  Which ones?
A. The chemical agents that -- that we use here at SEB.
Q. Which ones are those?
A. In that particular device, 555s, 1072s and 1082s.
Q. Okay.  How about the ones depicted in 44, do you use the same devices?
A. Yes.

P36 *(Exhibit 45)*
A. They tested the device to see if it was safe.
Q. Okay.  But what qualifications do they have to even test them?
A. I do not know.

P37
Q. All right.  Well, as you can see, in Exhibit 45 there's an alert.  Do you see that?
A. Yes, I do.
Q. What does it say.
A. It says effective immediately be advised due to chemical changes defense technologies Spede-Heat number 1072 -- oh we do not recommend defense technology Spede-Heat number 1072 due to prolonged and extreme heat.

P43
A. Yes.  They never told us of any warning on that piece of equipment.
Q. Okay.  Are you a member of the NTOA?
A. Yes I am.

P44 *(exhibit 45 newer device)*
Q. Okay.  Were you aware that lieutenant Giandomenico helped design this particular piece of equipment?
A. No I'm not aware.
Q. Are you aware, as you sit here today, that sergeant or lieutenant Giandomenico, his father is the owner of this Thomas Covina company?
A. Yes.

P45
Q. Okay.  All right. And lieutenant Giandomenico never showed you any warnings or alerts from his father's company regarding that specific piece of equipment?
A. No.
Q. Okay.  All right. But you knew that the sheriff's department, your team was obtaining equipment from that company?
A. Yes.

27

P46
A. Well I would say it's within anyone's authority, if you see a warning, to check on
it, so...
Q. Even Lieutenant Giandomenico's?
A. Yes.
Q. Okay.  Do you think it's his duty to tell you that if he was aware of that?  Would
you expect him to?
A. Yes.

P51 - P52
Q. The item depicted in Exhibit 45, do you see that it has an insert?
A. I do.
Q. Okay.  To this day do you use that insert?
A. No.  I've never seen that insert before other than this picture.
Q. Do you know when that insert was first manufactured to be used with that piece of
equipment?
A. No, I did not.
Q. Do you know why it was manufactured to be used with that piece of equipment?
A. No.

P54 *(exhibit 45)*
Q. Okay. Def Tech 1082 or 1072, do you see that?
A. Yes.
Q. Okay.  You see that where it says not for BurnSafe use?
A. Yes.

P54 - P55 *(SEB chemical agent list, exhibit No. 46)*
A. Yes, that's not a department document.
Q. It's not a department document?
A. No, it is not.
Q. How do you know?
A. I -- I could see by the -- by the way it's typed.  A department document, an official
document, has different type of heading and it has the approval
signature to authenticate it.
Q. Okay all right. And the fact that it says Los Angeles County Sheriff's department
special enforcement bureau chemical agents plus the fact that you believe this
document was given to your lawyer by a deputy, that doesn't tell you
anything at all?
A. No.  Anyone can type that.  That's not an official document.  There's official
department documents that we follow and that's -- I can clearly see that's not
one of them.

P56 - P57 *(Exhibit Number 47)*
Q. And let me show you this document that we will mark as Exhibit Number 47.  I
want to make sure that Lieutenant Giandomenico never made you aware of that.
A. No.
Q. He did not?
A. No he did not.

28

Q. Okay. If Lieutenant Giandomenico had been aware of that particular document, would you have expected him to tell you about it?
A. Yes.
Q. Why?
A. In case there was a safety problem, I would want to look into it. It doesn't necessarily mean that -- that just the information here that I would agree with, but I would want to check it out to see where -- where that information came from.

P61 - P62
Q. Okay. Well, what is the method of dispersion?
A. Pyrotechnic.
Q. Fire correct?
A. Heat, yes.
Q. And they burn at what temperature?
A. I'm not sure.
Q. Well, that's the crux of why we're here today. Did you research that issue?
A. The exact temperature that they burn at?
Q. Do you know the difference between the temperature between the 1072 and the 1082 canister?
A. No, I don't know the exact temperatures of any of them.

P67 *(Exhibit 48, Relic)*
Q. BurnSafe device?
A. Yes.
Q. Okay and you have no idea who manufactured this one?
A. No I do not.
Q. All right. And you said you've used this particular one, Exhibit 48, approximately 30 times?
A. Yes.
Q. Did you yourself deploy it?
A. Yes I have.

P69
Q. What can -- what canisters did you load into it?
A. The 555 family.
Q. All right. And they -- somebody taught you how to do that?
A. Yes.

P70-71
Q. Okay. Nobody ever discussed the fact that this device may be the cause of a fire?
A. No, I don't recall that being said.

P71-72 *(No Department Executive Review / the belief was an accelerant was added)*
Q. Okay. All right. In the case that we're here about today, did you    understand that there was a fire?
A. Yes.
Q. And did you understand that the string burnt off as you put it?
A. Yes.

29

Q. Okay. Was there ever a discussion with anyone that you had that this device may have caused the fire?
A. Not but itself, no.
Q. What do you mean not by itself?
A. Well, it was discussed that there was – that the suspect may have put an accelerant down and the combination of that accelerant with this device could have caused a fire.

P72 - P73
Q. Okay all right. So a deputy sheriff investigated – investigated the origin of this particular fire that we're here about today?
A Yes.
Q And did you ever seek to determine what that origin was?
A Yes.

P73
A. I was briefed by homicide.
Q. And what did they tell you?
A. Basically, what I had stated before, that there's a possibility of an accelerant that was at the location and in combination with this, it could have started the fire, but it was undetermined because of the -- it -- it was that the area where the fire was -- was -- had been filled with water and completely washed down in putting out the fire. So they could not determine either way if there was an accelerant present or not present.

P74 - P75 *(without the benefit of lab results that determined no accelerants detected)*
Q. Okay. So the investigation was complete and somebody from homicide told you that they could not rule out an accelerant being present where this device was came to rest?
A. Correct.

P76 - P77
Q. All right, aside from homicide, did you make any efforts to make sure this device that was used that night did not cause the fire?
A. I also relied on the arson investigation.

P77 - P78
Q. Okay. Do you know who investigated the fire?
A. I believe it was Tania Owen and one other person. I don't recall that name.

P79
Q. All right. What chemical agent was used on the night of the incident?
A. CS.
Q. Which one?
A. I'm not positive.

P80 *(destruction of evidence, even in a death case)*
Q. What do you do with the spent ones?
A. Dispose of them.

Q. Why don't you keep them?
A. They're already used. There's no use for them after they're used up.
Q. Okay. Even if somebody dies during a callout, you dispose of them?
A. Yes.
Q. Do not keep them as evidence?
A. No.

P81 *(more concern about why string burned off as opposed to why fire started)*
Q. Okay. Why did the SWAT team go to a cable versus the string that used to be attached to this?
A. After this incident, we saw that the string burned off, so we wanted to make sure that we -- that we can always retrieve the BurnSafe if something like that ever happened.

P82
Q. After this incident, did you ever have a discussion about the possibility that Exhibit 48 caused the fire?
A. We had arson investigate what the cause of the fire was.
Q. Right. And they told you they couldn't rule out an accelerant; right?
A. Yes.

P82 - P83
Q. Did they tell you they couldn't rule out this side on, Exhibit 48, itself as the cause of the fire?
A. No.
Q. They never said that?
A. No, not that I recall.
Q. Did you seek to find out if this device caused that fire?
A. Yes, that we had an arson investigation done.
Q. And base on that arson investigation, you determined this was not the cause of the fire?
A. I didn't determine. The arson investigation speaks for itself. They -- they wrote a report on that. And I would have to refer to that. I don't have it in front of me in regards to how they determined that.
Q. So based on the arson investigation, you formed the opinion that you could keep using this device, Exhibit Number 48?
A. Yes.

P84
Q. And at some point somebody presents the gas plan to you?
A. Yes, that's correct.
Q. Who presented it to you?
A. In this particular incident, sergeant Burke.

P85 - P86 *(approved gas plan)*
Q. Okay. What was the gas plan?
A. The gas plan was to use Ferrets, TomaHawks and a BurnSafe to introduce chemical agents into the house, again to mitigate the dangers and buy us some time to continue trying to negotiate.

31

Q. Okay. So Ferrets, the BurnSafe and what else?
A. Tomahawk.
Q. TomaHawks, okay. How many of each? Who came up with the numbers?
A. The team came up with the numbers and I believe that it was three TomaHawks and nine cold gas Ferrets and one BurnSafe.

P86 - P87 *(SEB members testified they never heard of square footage consideration)*
Q. Did you ask at the time somebody presented the gas plan to you what the square footage of the structure was?
A. No.
Q. That was important to you; correct?
A. What was important?
Q. That was not important to you at the time; correct?
A. I personally looked at it.
Q. Right.
A. So I knew or I estimated what it was.
Q. Okay. So it was important to you?
A. Yes.
Q. Why?
A. I want to know the size of the house to help evaluate what level of chemical agents would need to be used.
Q. Okay. Is that what you teach your gas – your SWAT members?
A. One of many things, yes.

P88
Q. Okay. So if any SWAT team member testifies that that was not taught and that was not important, they would be incorrect?
A. No.
A. Because they, the size is important. I use – I may estimate square feet.

P88 - P89
Q. What is the actual training? Are you taught square footage in your training or are you taught size in your training?
A. Both. You can use either one. You need to know the size of the house. You could do that various ways.
Q. And is that documented in the materials that you provide them at SWAT school?
A. No. I don't know of any documentation.

P90 (Exhibit 49 *(Dep. Young exhibit 5, gas work sheet)*
Q. Do you require your SWAT team members -- sorry, I didn't mean to pull it -- to document a gas plan in a worksheet such as the one that I just showed you, we do not.
A No.
P92
A. No. There's no exact formula that you could use. There's too many variables involved to turn that into a math formula.

P113
Q. How long were you there total?
A, I think it was about five or 6 hours.
Q. Could you have waited ten hours?
A. We -- we waited to the very end.  We never  stopped waiting.

P118
Q.  Okay.  All right.  Let me ask you, did you or any member of your team ever
contact either Safariland or Def Tech to inquire whether these canisters that you guys
regularly used may be used indoors versus outdoors?
A. I personally have not.
Q. Okay.  Any member of your team that you're aware of?
A. I do not know.

P119
Q. Okay did you ever get any notice from Safariland that those devices are safe to be
used indoors?
A. No, I did not.
Q. So you're basing the fact that they didn't say anything to you, even though they
may be aware that you're using them indoors, you're taking that to mean
that because they didn't tell you anything, it's safe?
A. I am taking it that it's safe based on training and experience and the fact that
Safariland does know that we use them indoors and has not contacted us to say
anything to the contrary.

P120
Q. Okay.  Did you bring it to the attention of Safariland that you were using their
outdoor devices indoors?
A. I didn't bring anything to Safariland's attention personally.
Q. Why?
A. No reason.

P121
Q. Okay.  Did you ever see any literature describe being those devices where it says
they're -- they're only supposed to be used outdoors as opposed to indoors?
A. No.
Q. Nobody made you aware of that?
A. No.

P124 *(Exhibit 53)*
Q. And you brought up a good point.  Anywhere on that document that you have in
front of you, does it say but if you use it in a protective case then you may use    it
indoors?
A. Nothing on this form you handed me.

P124
Q. When this incident occurred, did you ever pull up the literature, such as the one
document you have in front of you, to learn the specifications of those
chemical devices?

33

A. No.  I knew the specifications already from my initial training.  I never pulled up this form that you're showing me today.

P125
Q. And before you allowed your team to use it indoors, with a protective case, did you seek to find out from Safariland whether if you put it in a protective case you may use it indoors?
A. No, I did not.
Q. Did you instruct any of your team members to contact Safariland?
A. No, I did not.

P126 *(Exhibit 54 / NATO tested and recommended)*
Q. Okay.  Let me show you what we will mark as Exhibit Number 54.  Have you ever seen this document before?
A. No I have not seen this document before.
Q. Lieutenant Giandomenico never told you of the existence of that document?
A. No.

5. **The deposition testimony of Lieutenant Giandomenico (Supervisor / Manager in SEB) was taken on January 15, 2018:**

P20
A I teach for the National Tactical Officers Association, so I would have had that on my employment form, yes.
Q You teach for the National Tactical Officers Association?
A Yes, sir.

P22
Q Okay. What's your father's name?
A Thomas Giandomenico.

P24
Q All right. Tell me about the Thomas Covina Company.
A The Covina-Thomas Company.
Q Yes, that one.
A It's a three-generation family business.

P25
Q Do you help your father design SWAT equipment?
A I do not.
Q Did you ever?
A Never

P26 - P27
Q Did you ever give your father any input, based on your experience as a SWAT officer, in any of the equipment he was designing?
A I -- I think I gave him ideas --
Q What does that mean, "gave him ideas"?
A -- of what I think is appropriate. But, again, I'm not a designer or an engineer.

34

Q Okay. So you gave your father ideas on what's appropriate regarding SWAT equipment?
A Yes.
Q Specifically what SWAT equipment?
A I would say the TomaHawk and the lantern Burnsafe.
Q I'm sorry. When did you start giving your father ideas regarding these two pieces of equipment?
A I believe it would have been around 2004.
Q And how did that start? Did he solicit that from you, or did you volunteer that?
A No. I believe I volunteered it.
Q Okay. Why?
A Because I was sick of tying a string around the Burnsafe. Because we didn't have enough of them, so we'd have to retrieve them for different incidents
that we'd use them at.

P27
Q So the ideas you were giving your father was basically how to retrieve the device?
A No. I knew there was a necessity we – we needed for Burnsafes. I knew my father had a machine shop and the capability to make one.
Q Okay.
A So I brought one home and showed it to him and asked if this is something he could do or if he could do it for me.
Q You brought a Burnsafe canister to him?
A No. I brought the Burnsafe housing.
Q Okay. All right. And the one that you brought to him, where did you get it?
A I got it out of our SWAT inventory, which was very limited at the time.

P30
Q What happened to the old way of doing things? Why weren't you using the parachute cord like you did before?
A Because it was burned off.
Q How did it burn off?
A In a fire.
Q Okay. What started that fire?
A I have no idea.
Q Okay. You were part of that SWAT call-out that we're here about today; correct?
A I was.
Q And you did not seek to find out what started that fire?
A I'm not an investigator.

P30 - P31
Q All right. Nevertheless, were you curious as to what started the fire?
A Curious, yes.
Q Okay. And did you try to satisfy that curiosity?
A No.
Q You didn't want to know if it was a piece of SWAT equipment that started the fire?
A That would be part of my curiosity, yes.
Q Okay. And you've been in the SWAT team for how long now?
A For 18 years.

35

Q Okay. And so if according to everybody else's testimony anyway, if it was part of everybody's job to make sure all the equipment is safe, why didn't you seek to find out if it was indeed a piece of equipment that started the fire?
A For 18 years, we had been deploying that specific Burnsafe, that I know of, and potentially another 30 years before that with no incident.

P32 *(believes an accelerant was added)*
A I believed that I would hear from the investigators that there was some type of chemical on the floor or some type of -- designed to affect us by the suspect. Yes.
7 Q "Yes" what?
A That there was potentially something added in that barricade to start a fire.
Q Okay. Did you hear that? Did you actually hear that from anybody?
A No. I believed to hear that -- that I was going to hear that.

Q You thought you were going to hear that?
A Yes.
Q Okay. But you never heard that?
A No.
Q And when you never heard that, didn't your curiosity shift to find out what in fact happened?
A No.

P33 - P34 *(reason for no follow-up)*
A Time had gone by, and we were an extremely busy team.
Q Okay. And didn't that homicide book have a section that indicated how the fire started?
Q If you recall, yeah.
A I believe it was inconclusive, if I recall.
Q Okay. So you did read a portion that indicated some reasons at least?
A Right.
Q And based on your reading, you believe that it was inconclusive?
A I believe that.
Q Okay. Did it give any possibilities?
A It did.
Q What were the possibilities?
A That the introduction of a Burnsafe could have started that fire.
Q Okay. And did you read anywhere in that homicide book whether or not there were any accelerants that started the fire?
A I don't believe.

P34
Q You don't recall. Okay. Well, two weeks ago at least, you read that it was possible perhaps that a Burnsafe device caused the fire; correct?
A Correct.
Q And did you do anything about that?
A I'm not sure what you mean.
Q Well, when you were armed with that knowledge, did you do anything about it?
A No.

36

Q Do you intend to do anything about it?
22 A No.

P35
Q At some point, did you become aware that there was a fire in the structure?
A I did.
Q How long after the entry?
A I -- like I said, when they broke cover, I -- I couldn't see them. But I believe it was maybe a minute or two after the Burnsafe was deployed.

P36
Q You did not know that the Covina-Thomas Company had a website?
A I did not.

P37
Q And you reviewed that for the first time when? Approximately two weeks ago.

Q Two weeks ago. Okay. Did you review the part that said, "After many years pioneering his way through the Aerospace and Medical industries, Thomas has now combined design talents with his son, who happens to be a Sergeant for the Los Angeles County Sheriff's Department Special Enforcement Bureau. Together they developed the popular Burnsafe and TomaHawk"? Is that accurate?
A That's accurate.

P39
Q But nobody ever sought you out and said, hey, can we have permission to post or publish an article that you might have authored on their website?
A I don't recall.

p41 *(Deposition Exhibits 22 and 23 were marked for identification)*
Q Okay. When you reviewed the website, did you review the portion of the website where it says, quote, "Get the bad guy without burning down the neighborhood," closed quote?
A I did.
Q What does that mean?
A I'm not sure.

P42
A Chemical agents deployed unprotected, yes.
Q Okay. That's what you believe that sentence means?
A I believe, yes.
Q Okay. So as you sit here today, you've never heard of any structure fires being caused by, quote, unquote, "protected chemical devices"?
A I have no personal knowledge of that, no.

37

P43

Q So that would include the BurnSafe lantern?

A The Burnsafe lantern didn't exist when I was in SWAT school, no. So it was what we call the relic.

A Because it was old, and it was a proven performer, that we had no idea who had built -- or that I myself or the instructors.

P45

A The indoor portion was done, I believe, at county housing up in Wayside.

Q So when you went to SWAT school, they taught you how to deploy that?

A They did.

Q Okay. Did the county housing that you're describing, did it have carpet?

A It had carpet and concrete.

Q And did you deploy this Burnsafe device on both?

A I did.

Q All right. Did you read the portion of the deposition of Mr. Christopher Young where he said it was only used in concrete?

A I don't recall.

Q Did you read the portion of Mr. Geisbauer's deposition where he said, when he was trained, he was only probably trained on concrete?

A Did I read that portion? Yes.

P50

Q Okay. I'm just talking about the school. What did they cover in the classroom portion of it?

A In the classroom portion, it was just basically a chance to look at the devices. We were told that you don't use CN gas because of the potential harm in people's lungs and the lacrimation it basically creates for people. And then we were told to use CS gas because it is just an irritant and it had never killed anybody.

Q CS gas never killed anybody?

A No.

P55 / 56

Q If there are unsafe chemical munitions that should not be loaded into the lanterns? If you understand, you may answer.

A I only know what I've reviewed in the case file now regarding this case. I would say there's no munition that could be loaded in the Burnsafe that would cause a problem now.

Q Even after you reviewed everything you reviewed; correct?

A Yes.

P56

Q All right. And it doesn't matter when it's loaded into the canister or the lantern? There's no unsafe munitions you can load -- chemical agent munitions that you can load onto a lantern?

A It is my experience that the chemical agents that we use are -- are no issue with us. No.

Q What do you use?

A The Safariland 1072 and Safariland 1082.

38

Q So either one?
A Either one.

*P57 (exhibit 22 page 2)*
Q So did you ever hear of that happening before today?
Q What this document is alerting you to.
A Not to load the BurnSafe.
Q Well, it tells you why; right? In fact, read it out loud.
A Well, I see this document was generated from the Covina-Thomas Company. And I think we've established that they're not police officers and they're not experts in chemical agents. So no, I'm not sure why it says that.
Q Okay. All right. Here. I'll read it. It says, in red, with asterisks, in bold lettering, "It is Imperative that Burnsafes are Never pre-loaded." Do you know why that is?
A No.

*P58 - P59*
A I would argue that that's incorrect.
Q Let me show you what's been previously marked as Exhibit No. 2.
Have you ever seen that document before today? Well, I know you have. You just said you have.
A I learned of this document during my review for this incident, yes.
(Exhibit 2.)
Q All right. Before that, you've never seen this document before --
A No.

*P59*
Q -- correct? So the first time you've ever seen this document was two weeks ago, potentially?
A Probably is.
Q Okay. All right. Do you agree with this document?
Q The alert.
A It -- no, I don't agree with it. But as a son of a father that owns a machine shop
Q You're in a tough spot?
A -- I'm in a tough spot because it makes sense. But in our environment, no, I don't agree with that.
Q And your father never told you about this alert?
A No.

*P60*
Q Well, he's in the business of selling these lanterns to the sheriff's department; correct?
A He sold one time to the sheriff's department, yes.
Q One time?
A Sold the lanterns to the sheriff's department one time, yes.
Q He told you that?
A He did.

39

P61 *(exhibit 2)*
Q Do you know what the purpose of that sleeve is?
A No.
Q Have you ever used that sleeve?
A No. That's -- that would be something that's relatively new, I believe.

P63
Q Based on your training and experience, what do you think that insert is there for?
A I'm not sure.
Q Okay. You do not think, to be clear, that that is there to prevent a fire --
Q -- right?
A Yes and no.

P64
Q Okay. You never trained on the sleeve?
A No.

P66 *(Exhibit No. 4)*
Q Okay. When you saw it two weeks ago, did you think to yourself, I disagree with this?
Q I don't want to argue with you. I'm asking you.
A As administrator, yeah. I actually did say that.
Q See that? And I wasn't even there.
A Because I've used, with great success, and my team have used, with great success, 1072 canisters.

P67 - P68 *(exhibit 4)*
Q Okay. When my client was burned to death, do you know which canister was used?
A No.
Q Could have been the 1072; right?
A Could have been, yes.
Q And you disagree with this exhibit, the warning here?
A Yes.

Q And that's the device you were trained in; correct? *(Exhibit 3.)*
A Yes.
Q All right. Does that device have the sleeve that the previous exhibit, Exhibit No. 2, has?
A No. That sleeve didn't exist then.
A That's not the lantern. That's the Burnsafe --
Q Okay.
A -- that we previously called the relic. But yeah, the pyrotechnician loads through the top of that Burnsafe.

P68
Q Okay. This is just the plain old Burnsafe?
A Yes.

40

Q The one that nobody knows where it came from?
A Yes.
Q But you used it anyway?
A Yes.

P69
Q Official testing.
A I'm sure that was done before my time, because this was long before my service with the SWAT team.
Q You're sure that is tested by some entity?
A I'm not sure, no.

P70
Q Anything regarding testing of the device depicted on Exhibit No. 3.
A I don't believe so, no.
Q Okay. Now, how many times was the device depicted on Exhibit No. 3, how many times was that device used before you went into the SWAT team?
A I have no idea.
Q You have no idea. How many times did the device depicted on Exhibit No. 3 cause a fire before you came into the SWAT team, before you started using it?
A I have no idea.

P72 *(no debrief)*
Q We know there was a fire incident that we're here about today; correct? Did you debrief on that incident?
A No, we did not.

P77 *(Exhibit 6.)*
Q When was the first time you've ever seen that document?
A The first time I've seen it in print was probably two weeks ago with counsel.
Q Okay. Prior to that, did you see it on the website?
A No, 'cause I had not reviewed the website.
Q Okay. So in your entire life, you've only seen it twice, the first time, two weeks ago, and now?
A Right.
Q I didn't ask you for the genesis of the document. I asked you if there were portions of that document that you disagree with as you sit here today?
A Yes, there is.

A That's one of the warnings. And the other warning, it says, don't use the Def-Tech 1072. And like I've said earlier, we've used that with great success, so --

P78
Q Okay. Well, it goes further than that -- farther than that. It says, do not use the Def-Tech Spede-Heat 1072 due to prolonged and extreme heat, we recommend instead the 1082 riot grenade. What do you think prolonged and extreme heat would do to a flammable surface?

41

A Like I said, I'm not a scientist. But it would make sense that prolonged heat could cause a problem.

P79
Q Okay. All right. How long does the 1072 Spede-Heat burn for?
A I can tell you what the manufacturer says.
Q Okay.
A Between 30 to 40 seconds.
Q How about the 1082?
A Approximately, the same time.
Q Okay. Is one hotter than the other?
A I can't tell. Like I said, I'm not a scientist.

Q Did you ever call Safariland or Def-Tech to find out?
A I did not, no.
Q Are you aware of any member of the sheriff's department calling Safariland or Def-Tech to find out if it was safe to use 1072 versus a 1082 or vice versa?
A From the sheriff's department, no.

P80
Q What other entities are you aware of that made those inquiries?
A That would have been the Covina-Thomas Company.
Q And how are you aware that they made those inquiries?
A Because they had set up a meeting with Safariland.
Q Who told you that?
A I -- I believe my father did.

P82 *(Not aware of any Department review)*
Q Did the killing of my client trigger any type of equipment review?
A Not that I know of.
Q If it had, you would have known?
A I would hope I would be briefed on it, yeah.

P84 *(Exhibit 9.)*
Q I got better. Let me show you this exhibit that's been marked as Exhibit No. 9. Have you ever seen that document before today?
A I had seen it before today, yes. (Exhibit 9.)
Q Two weeks ago?
A Yes.
Q Okay. Before two weeks ago and today, have you ever seen that document before?
A I've never seen that document before. It doesn't appear to be an official sheriff's department document.
Q It does not appear to be one. Do you know why your counsel gave it to me with that representation that it was?
A I have no idea.
Q Do you disagree with this document?
A Yes, I do.

42

P92 *(exhibit 10)*
Q Okay. All right. Now I want you to take a minute and read the entire document.
And you tell me, where, within that document, does it say that, if protected, as you
put it, you may safely use this device indoors?
A It doesn't.

P99
Q All right. In 2005, there was testing conducted in the lantern Burnsafe device that
your father developed?
 Yes.
Q By you?
A Like I said, I'm not an engineer or scientist. But I did practical testing, from my
experience, yes.

P100
Q Well, that's fine. But did you prepare a report?
A No.
Q Well, how are we supposed to know what the testing was?
A You'd have to contact the Covina-Thomas Company.
Q Oh, so you conducted the report on behalf -- or the testing on behalf of the Covina-
Thomas Company?
A No. I conducted the testing on behalf of my team, who would potentially be
deploying this device.
Q All right. The question calls for the person most knowledgeable regarding research
conducted by the LA County Sheriff's Department of the lantern Burnsafe device that
your father manufactured.

P101
Q Your answer is that you conducted that testing?
A That research, yes.
Q Okay. How are you conducting testing on a device that your father sells?
A Well, at the time, he wasn't selling it. He was making it -- making it for us.
Q Okay. How were you conducting testing on a device that your father was making
for the sheriff's department?
A Because I, at the time, was immersed in the deployment of chemical agent, and I
was potentially the most knowledgeable individual to see the environment it
would be used in.
Q But there were others?
A Yes. There's six other teams.
Q So you didn't think of a conflict of interest potential there?
A At the time, my father was the only manufacturer making those.

43

6. **The deposition testimony of Thomas Giandomenico (owner of Covina-Thomas Company) was taken on February 21, 2018:**

P9

Q. Why did you see it fit to put an insert in that lantern?

A. Because we heard through sources that Safariland was making more powerful gas systems. So I thought it's best to use our abilities and upgrade to make the sleeve heat safe, to hold the heat in and expel the gas.

Q. To keep the heat in?

A. Yes. We want the heat. The heat is a necessary product for the gases to expel. They need a high heat.

Q. Were you concerned that the heat would cause fires?

P10

A. The whole idea is to do the best we can, although it's not a hundred perfect sure thing by no means. I mean you throw it into anything that's not known could catch fire. So all we did is build a product that could contain the heat and the flame and expel the gas which they didn't have up to this time.

Q. Okay. So to be clear, when you designed the insert that goes into the lantern, you knew that whatever grenade was placed in there caused flames and heat?

Q. The canister that goes in the lantern?

A. Sure.

P11

Q. But you knew that you wanted to contain flames and heat?

A. I knew that, and I knew through my thinking and concepts that we could improve it.

P16

Q. Okay. Did they -- did he your son show you a video?

A. Yes.

Q. Is that the video that you have on your website?

A. Yes.

P18

A. All canisters cause fire. That's why we built this beautiful piece of equipment. Any one of them would cause a fire.

P19

A. No, a hundred percent cannot, but it would stop the fire -- it's designed to stop the fire in a very, very safe way, considering that there's nothing else that    compares to it. In other words it's not a hundred percent, but it's if thrown in a safe place, it will not catch fire.

Q. If it's thrown in a safe place?

A. Yeah. If it's thrown in a house where there's some flammable materials, it would of course catch fire.

Q. What do you consider flammable materials?

A. Loose materials that are loose -- more loose than the paper, something that is near cigarettes, gas, this kind of thing.

44

P25 / 26

Q. Okay. And you are aware that the lantern that you're building now with all of its improvements are not a hundred percent fire proof?

A. Absolutely.

Q. Okay. Now, how about the model that was given to you to copy, did you test that model?

A. No.

Q. Are you testifying today that that model is safer than your model?

A. That unit is not safer than our unit.

Q. Are you saying your unit is safer than the original?

A. Yes.

Q. In what respect?

A. We're talking lantern only?

Q. Yes.

A. When I designed it originally, it had a deflector within the system, and it was superseded by the heat sink or the tube, and that's why it's better.

Q. Okay. The one that was presented to you, was that presented to you for copying or duplication or improvement?

A. Yes.

Q. Was that given to you by your son?

A. Yes.

Q. Do you know where he got it from?

A. I would imagine he got it from their use there at the sheriff's department.

P26

Q. Okay. Do you know if they are still using that unit today?

A. Yes, I think they did use it.

Q. Okay. How did you know? Who told you?

A. Tucker told me *(family name for Lt. Giandomenico)*

Q. When?

A. After the incident happened.

Q. How long after the incident?

P27

A. I would say two days.

Q. So two days after the incident, Tucker talked to you about the unit?

A. Yes.

Q. What did he say?

A. He said, "Dad, we had an incident that was serious. The unit we used was not yours." And I was very thankful.

Q. Okay. Did he tell you that the unit they used caused the fire?

A. No. Let's see, how did he put this? They had no idea how the fire started other than the unit was used.

P32

Q. Okay. So two days after the incident that we're here about today he calls you on the phone and tells you what?

A. That they recovered the Burnsafe that was used, and it isn't yours.

45

P33
Q. Okay. But you were not so confident about the original unit?
Q. The original one that your son brought you to duplicate was not manufactured by you.
A. Oh, yeah, it was a piece of junk.
Q. Why do you call it a piece of junk?
A. Very crudely made and didn't have any value to me, because again as I said, we don't build that stuff. So I didn't pay much attention to it.

P34
A. And the original one has -- has a heat deflector inside where his doesn't have that. In other words when the flame comes out in a fierce motion, it's deflected against this heat sink that I designed inside. That was superseded by the tube.
Q. But the original one, the junk one, didn't have any of that, correct?
A. Correct.
Q. Okay. And were you afraid that man, that could burn down a house?
A. Sure.

P37
Q. Okay. So we'll mark this as Exhibit 34. Regardless here in Exhibit 34, the description says, "It should not be deployed onto rooftops, in crawl spaces or indoors due to its fire-producing capability." Do you agree with that?
A. Absolutely.

P38 / 39
Q. If it can withstand any heat that's put out, why don't you say that your product is a hundred percent safe?
A. Because it depends on what the composites are that it's thrown into. If it's thrown into a lit area like a water heater area or a smoking area, somebody might have a lit cigarette or some gasoline that people leave in their homes, this kind of stuff, there's no chance that it won't catch fire.
Q. What if you throw it on a couch?
A. Couch is a very dangerous place
Q. Okay. But there's a possibility that it will?
A. Oh, absolutely.
Q. Why?
A. Because there's nothing that we can say, depending on the material and what it's made of, there's no way to protect it a hundred percent. All our unit does is help an awful lot.

P43 *(Exhibit 35, Dep. Young exhibit 2)*
Q. I showed you 35, the page from your website has a warning. t says, "Alert." I'm sorry, it says, "lantern Warning, Alert. To all customers that have ordered our lantern Burnsafe, effect immediately, we advised, due to chemical changes, we do not recommend defense technologies Spede Heat 1072 due to prolonged and extreme heat." Where did you get that information?
A. It was bought out by Safariland I understand.

46

P44 *(Relic)*
Q. You inspected the original one your son brought you, correct?
A. I didn't physically look at it.  I put it aside as junk.

P57 - P58
Q. Okay.  Now, did you pass this along to your son or the sheriff's department, the warnings?
Q. You just made him (son) aware?
A. Yes.

P65
Q. Okay. "The Burnsafe and Tomahawk offer a safe alternative for disbursing tear gas while protecting personal property against fire and unnecessary damage."
A. Correct.
Q. So all along you were aware that fire was a risk?
A. Absolutely.
Q. Do you know anything about the history on the junk unit?
A. None whatsoever.  I saw my son once with it.  I said take this piece of junk with you, and that was it.

7.  **The deposition testimony of Deputy Young (designated person most knowledgeable by Sheriff's department) was taken on December 22, 2018:**
P8
Okay. So you are the person most knowledgeable regarding the sheriff's department's chemical agent policies in effect at the time of the incident pertaining to the incident?

A. Yes, sir.

P10
Q. So let me ask you this: Did the policies, in effect at the time of the incident, call for some sort of a work-up plan or sheet to be filled out or prepared before the deployment of chemical agents?
A. Are you referencing a written document on it or is there planning for their use?
Q. Okay. I am referring, specifically, to a written document before the deployment of gas -- or chemical agents. I'm sorry.
A. Not that I'm aware of.

P10 - P11
Q Okay. So there's no requirement, under the sheriff's department's policies, that a written document be prepared delineating exactly the types or the kinds of agents that were to be deployed or how much, for
3 A No, there is not.

P14
Q Yes, it does. Actually, it does. All right. Is there a plan that is documented before the entry incident or the introduction of chemical agents?
A. A written plan?
Q. Yes.
A. Not that I'm aware of.

P19 *(in conflict with Lt. Giandomenico deposition testimony)*
Q. Can you think of any other reason why the size of the location is important?
A. Size of the location?
Q. Yeah, the square footage of the location.
A. No. Just the -- once again, I have never, in my personal experience, gotten square footage from the location
Q. Do you estimate? Do you make it, as the scout, do you -- is it your practice to estimate the house is approximately a thousand square foot? 500? 900? 2500? 16 A. No.

P20
Q. Okay. So do you think the size of the house matters because, based on the size, you know how much gas -- or chemical agents you're gonna introduce?
A. If we are gonna introduce chemical agents, I need to know where I'm gonna introduce the chemical 13 agents. And I usually judge how much chemical agents I'm gonna do. And I use the reasonable officer standard. "Hey, does this look reasonable with this amount of gas in this particular location" --

P21
Q. So -- so we're clear, on the record, when you say the size of the house, you are more referring to how many bedrooms or how many rooms in the residence versus square footage approximation?
A. Yes. I do not do a square footage approximation, but I want to know, for my personal knowledge, so I can begin to put a plan together or when I put plans together

P24
Q. Medium-sized house, okay. All right. Fair enough. Now, the policies regarding chemical agents that you're the person most knowledgeable from the Los Angeles County Sheriff's Department, anywhere in those policies does it mention anything about whether you should take into consideration the square footage of the house so you could determine how much chemical agents are proper in a particular location?
A Not that I'm aware of.

P24 / 25
Q. Okay. Does the Los Angeles County Sheriff's Department require a worksheet or a work-up sheet to be prepared regarding the chemical agents to be introduced at a particular location?
A. To my knowledge, there's no written work-up sheet completed prior to the introduction of chemical agents, the amounts or whatever else, that there is a verbal discussion with it, but not a written document.

P26
Q. All right. And do the policies regarding the intro- -- introduction of chemical agents, do they dictate what the type of plan should be and how it should be documented, anything regarding that pre-entry plan?
A. There -- as I know it, there is no written documentation of amounts and whatever else, prior to their introduction.

48

P31
Q. Did any member of the sheriff's department actually see a weapon prior to making entry into this particular location?
A. Not that I'm aware of.

P33
Q. Okay. What I'm talking about is, did he actively resist apprehension by, for instance, shooting at the SWAT team, throwing objects at the SWAT team, barricading the front door with a couch or anything like that?
A. Not that I'm aware of.

P38
Q. You threw a flashbang before the introduction of chemical agents; right?
A. Yes, we did.
Q. And you got no response?
A. No, we did not.
Q. Okay. So you got five hours worth of callouts and a flashbang, and the guy doesn't respond. Did anybody think that maybe the guy was incapacitated, to your knowledge?
A. I have no idea what they thought at the time.

P40
Q Okay. Regardless, I just want to know if there's any policy that indicates what happens when the suspect may be believed to be incapacitated.
A. There is no policy written that -- regarding a suspect believed -- that I know of, believed to be incapacitated, as far as a barricaded suspect goes.
Q. Okay. And you were not trained on incapacitated, quote/unquote, barricaded suspects?
A. I don't know if I've had specific training on specifically incapacitated, whatever the means were, that that individual becomes incapacitated. But I was trained on a variety of different things that go from a person laying down to violently resistive.

P49 *(all in house training)*
Q Okay. All right. In -- in the school that you went to regarding chemical agents, did you ever see a document titled "work-up sheet" or "worksheet"?
A No, I did not.

P51 *(No external training / all inbred)*
Q. I get you on the basic academy. Okay. An advanced chemical agent school, did you go through that?
A. Yes. I consider an advanced chemical agent school when I was a use of force instructor for the department.
Q. Okay. As part of being a use of force instructor, that's when you went to that school?
A. Yes.

A. There was a portion of both the basic and advanced SWAT school that are -- that SEB puts on, and that was one of the learning domains or objectives covered, was the use of chemical agents.

49

Q. Okay. All right. And that was all put on by your department?
A. Yes, sir.

P52
Q. All right. Did you ever take any outside courses regarding chemical agents?
A. No, I did not. But I'm aware of several people at SEB that have.
Q And in your particular school, there's nothing regarding identifying the -- the size of the location so that you could know how much gas to introduce to that location?
A No.

P58
Q. But you know that, ultimately, it was Maxwell and Ewell that approved it; correct?
A. That's my understanding.

P58 - P59 *(SWAT homemade device / Relic)*
Q. The one that was used that night, who manufactured that? What company, if you know.
A. There is no company that manufactures. My understanding that was fabricated, welded together by personnel, shoot, in the mid-1980s at SEB.
Q. Okay. So to be clear, the device that was used in this particular incident, referred to as a BurnSafe device, was manufactured by some member of the sheriff's department back in the 1996 time frame?
A. That's my understanding with it. I had used it when I was on the SWAT side. That same one I saw in the picture was the same one I had used during my time on the SWAT team.

P71
A Yeah. I don't recall having any discussions with Lieutenant Giandomenico regarding the BurnSafe devices.

P73
Q. As Exhibit Number 2. This was not used?
A. That is not the one I saw in the homicide book.

P76
Q. Okay. Do you know if Exhibit Number 3 has been tested by anyone prior to its use?
Q. Yeah. Prior to it being placed into use by the sheriff's department.
A. I believe that is the same device that I had used when I was on the SWAT team.

P76 / 77
Q. That's the homemade device?
A. I don't know if it was made at somebody's home, but I believe it was fabricated or manufactured at SEB, possibly somewhere else. But that's the one that I had used. As far as testing goes, I don't know if I personally tested it or if it was tested. I have no recollection of it.

50

P77

Q. Okay. All right. What qualifications do you possess to test a device such as that one?

A. I don't believe I possess any qualifications to do testing on that device.

Q. Okay. Do you know of anyone within the sheriff's department that has the qualifications to test that device, Exhibit Number 3?

A. I don't know what those qualifications would be, but I don't know of anybody on the sheriff's department.

Q. While you were on the sheriff's department, in the SWAT team specifically, do you know of devices, such as the one in Exhibit 3, that were sent out to any outside source for testing?

A. I'm not aware of any of these sent to outside testing, whether they were or weren't.

P79

Q. But you know that the sheriff's department, at least back in the day, the '90s, probably manufactured BurnSafe devices?

A. Possibly.

P84 / 85 *(SEB list of chemical agents)*

Q. Okay. All right. So the last page I marked was 6. We'll mark this 7, 8, 9. Let's look at page number 9 of Exhibit 1.

A. Okay.

Q. That -- that is the one that is titled, "Los Angeles County Sheriff's Department Special Enforcement Bureau Chemical Agents." Where did this page come from?

A. I am not aware of where this page came from.

Q. Okay. All right. Let's take the first device depicted in this page, that is the Def Tech 1082 riot control device.

A. Yes, sir.

Q. Is it your understanding that is the device that was used, on the night in question, that was put inside the BurnSafe canister?

A. My understanding, the individual item put inside of the BurnSafe canister was the Spede-Heat 555, which, I believe, is listed here under Def Tech 1072, if that's accurate. I recognize it by the 555.

Q. The Spede hit -- Heat 1072 is what was used on the night in question?

A. Yes. It was that or the 1082. It was one of those. I've seen both, the 1082 listed, and I've seen the 1072 listed.

P85

Q. Is it possible, to your knowledge, that the Def Tech 1072 was used on the night in question?

A. It's possible.

Q. And that was introduced in the BurnSafe device?

A. Yes. It's possible that that could have been used. It's also possible that the 1082 could have been used.

P86 *(exhibit 6. Alert / warning)*
Q. Okay. Well, would you agree with me that this is an alert "To all Customers that have ordered the Lantern BurnSafe." "Effective Immediately" "be advised, due to chemical changes: DO NOT USE THE: Def-Tech/Safariland Spede Heat canister #1072." You've never seen this, put out --
A. No.
Q. -- by The Covina-Thomas Company?
A. I have not seen that.

P88
Q Okay. Can you tell me of any manufacturer documentation, either from Def Tech or from Safariland or anyone in the world, that says, "You may use this riot control device in a BurnSafe canister"?
A. I don't think any of them describe a BurnSafe canister, period, that I know of. Q.
Q. Do you know if the sheriff's department ever contacted either The Covina-Thomas Company, Safariland, or Def Tech to ask them if they may use this grenade, the Def Tech 1082, inside a BurnSafe device?
A. I'm not aware of any contacts made either way, between them or us, regarding that.

P100
Q. Does the sheriff's department in L.A. have any policies regarding when to use cold gas versus hot gas?
A. Not that I'm aware of.

P103 / 104
Q. Do you know if that's the industry standard when deploying gas?
A. I'm not sure what the industry standard is on that. I know within our department I have not seen or I heard of a written document saying exactly how much gas and what gas can be used prior to the use of it. It's always based on reasonable officer standard.

P105 - P106 *(PMK)*
Q. All right. If I understand you correctly, you are the person most knowledgeable of all chemical agent devices used at the incident location; correct?
A. I consider myself -- I can't quantify most or whatever, but I consider myself as knowledgeable as anybody at SEB with the use and benefits/drawbacks of chemical agents.

P117
Q. Oh, I'm gonna go back to page number 9 of Exhibit 1 again.
A. Yes, sir.
Q. All right. If you look at Def Tech 1072 device?
A. Yes, sir.
Q. It says, "Not Burnsafe use" --
A. Yes.
Q. -- "Not for Burnsafe use." When was that determined that the Def Tech 1072 should not be used on a BurnSafe device?
A. I'm not aware when that was introduced on there.

P118
Q. Okay. And do you know why this notation, "Not for Burnsafe Use" was put in here?
A. I don't have personal knowledge of why that was put in there.

P121
Q. Are you aware of any instructions, written document, documented instructions, on the use of the BurnSafe device that was used on the night in question?
A. I'm not aware of written instructions on the use of that BurnSafe.

Q Are you aware of any training material, in the entire sheriff's department of Los Angeles County, documenting or describing how to safely use that BurnSafe device that was used in the night in question?
A. I'm not aware of any written documents regarding –

Q. Okay. What I'm specifically asking is if, within that SWAT school, there's a document, that you are aware of, that describes instructions on how to safely use that device?
A. I don't know if there exists -- that exists or does not exist.

P123
Q. Okay. (warning and further instructions re fire protection) Let me show you what we'll mark as Exhibit 6. Have you ever seen those instructions before today?
A. No, I have not.

P124 *(exhibit #6)*
Q. Okay. All right. You've never seen these instructions before today?
A. I have never seen those instructions before today.
Q. Or anything like these instructions before today?
A. Never seen anything like those instructions before today.

P127 *(fire protection plan)*
Q All right. Does the sheriff's department have any policy whatsoever regarding fire prevention in connection with the use of chemical agents?
A. A written policy regarding fire prevention?
Q. Yep.
A. No, I do not -- I'm not aware of that.

P128
Q. And no documents memorialize what you just said?
A. No. That's how I was trained, and that's how I trained others. There's no document, that I'm aware of, fire prevention using the BurnSafe.

P129
Q. Okay. But nobody carried an actual fire extinguisher when they were introducing the hot gas through the front door; correct?
A. No, not that I know of.

P131
Q. Does the sheriff's department have any policies in connection with a -- an un- --
incapacitated suspect, any policies in effect on how to deal with a barricaded
incapacitated suspect?
A. Not that I'm aware of. I don't know of a policy, specifically, how to deal with an
incapacitated suspect on barricade.
A. I am not aware of a written policy on the removal or handling of an incapacitated
suspect on a barricaded incident.

P135
Q. Okay. Are you aware of any policy of the sheriff's department regarding chemical
agents that dictate what specific BurnSafe devices may be used?
A. I'm not aware of any policy dictating anything with a BurnSafe device by the
department.
Q. Anything at all?
A. Not at all.

## VIII.   Plaintiff's complaint and allegations:

On February 5, 2015 at 9:00 a.m. Deputy Welle initiated surveillance on the property
located at 45335 Gadsden Ave, Lancaster, California. Defendant Welle had information
from various sources that the Decedent Varnedoe had active warrants and possessed
firearms. Defendant Welle passed on information from a confidential source and hearsay
from a bail bond agent to SWAT and Special Enforcement Bureau ("SEB"). It is believed
that this unreliable information far exaggerated and distorted the situation and created a
false narrative as to the situation and status of the Decedent.

At 5:45 pm various LASD deputies responded and surrounded the residence and aided by
aero support used loud speakers to order the occupants to it the house. Three women and
a child exited. All three informed the police that the Decedent was sleeping inside the
residence and further informed LASD that Varnedoe was passed out and described no
danger or agitated state, contrary to the information provided by Defendant Deputy
Welle.

At all times throughout this entire event the Decedent was never seen nor observed by
any law enforcement personnel. There is no evidence to suggest that the Decedent ever
made threats to anyone including law enforcement. There is also no evidence to suggest
that the Decedent engaged in any aggressive actions to anyone, including law
enforcement. Moreover, there is no evidence to suggest that the Decedent barricaded
himself inside the house. The Decedent was incapacitated and nonresponsive as described
by the female witnesses. The only contact LASD had with the Descendent occurred after
the house was burned down. Only then did LASD make contact with a deceased
Varnedoe when his naked, burnt body was located. Varnedoe was unarmed. In
connection with serving the search warrant on 46335 Gadsden Ave., Defendant Captain
Ewell, a high-ranking Captain in the Los Angeles County Sheriff's Department,
determined that the Sheriff's Department SWAT/SEB Team should be deployed to effect
entry into the residence. Defendant Sheriff McDonnell was notified, and presumably
approved, the plan developed by Defendants, to throw fourteen (14) canisters of gas and a
gas bomb 5 into the house where Decedent was residing to "smoke" Decedent out from
inside residence.

54

The LASD SWAT team or SEB surrounded the house where Decedent was staying. LASD sent a robot in the house. The robot did not detect the presence of the Decedent in the house. Despite the lack of evidence that Varnedoe was in the house, the Defendants continued to carry out their highly dangerous plans. Based on the statements of neighbors present at the scene, Defendants reasonably believed Decedent was present inside the residence.

Although Defendants were informed that Decedent might be mentally impaired or intoxicated, they received no indication that Decedent was a threat to himself or anyone else. Decedent did not or was unable to communicate with Defendants. The Defendants never provided a phone or mechanism by which the Decedent could have communicated with law enforcement.

The on-scene leaders of this debacle, Defendants, decided to order that a hot tear gas (euphemistically, somewhat misleadingly, called a "safe burn device") be thrown inside and ignited in the front living where Decedent was residing. The interior of the living room was visible to Defendants through a large window that faced out onto the street. Furniture, including two couches and other flammable items were also visible through the front living room.

The reasoning of the on-scene Defendants for deploying the fourteen canisters of tear gas in the residence was that they had previously employed the gassing in the same manner and it had previously effectively "smoked out" people who had been hiding inside buildings where they deployed this type of firebomb. Thus, based on Defendant County's practice, and written or unwritten policy, Defendants ordered the incendiary gas canister to be thrown inside the residence, near multiple obvious fire hazards, with no immediate means available to extinguish the bomb or fires it might set inside the residence, while reasonably aware that at least one person, not believed to be armed or threatening, was inside the residence, recalcitrant to law enforcement commands to exit the residence, possibly impaired or under the influence, and likely to die should a fire be set inside the residence.

In order to throw the gas inside the residence, Defendant Deputies broke the front living room window, and Defendant Deputies threw the hot gas through the broken window into the front living room, on or near the two obviously flammable sofas. Any visual observation into the window of the front living room would have disclosed obvious fire hazards noted herein. Although there was no indication Decedent or anyone other than law enforcement was armed Defendants used their firearms to provide cover for the team that broke the window and put massive amounts of gas inside the residence then placed the hot incendiary device inside.

The "gas plan" was initiated by LASD at 11:00 pm on February 5, 2015. Massive amounts of gas were fired into the residence. Defendant Deputy Geisbauer tossed a "bum safe" gas. Deputy Salazar deployed a tomahawk gas thrown through the southwest bedroom window and the bathroom window. Deputy Salazar fired other rounds into the attic. Deputy McNamara fired three additional rounds into the attic. Defendant Deputy Rodriguez deployed a tomahawk through the window of the door on the north side of the residence. During this outrageous and unwarranted gas attack, Defendant Sergeant Sean Burke supervised and directed the attack.

55

Defendant Deputy Pratt, Defendant Deputy Stade and Defendant Deputy Wheeler assisted the other named defendants in the tactical operations and carrying out the gas attack of the residence, along with Does 1-10.

Then, the Defendants simply waited. No one forced entry to ensure the device did not set a fire. No one attempted to prevent the hot gas from igniting a fire. No steps were taken in the placement of the hot gas to reduce or eliminate the possibility of a fire being set by the device's ignition.

Defendants waited an extended period of time for the Fire Department arrival. The delay wasn't because the Fire truck was a great distance from the location, but because Defendants had blocked access to the Decedent and the property. By the time the Fire Department had the fire controlled, about an hour later, Decedent was dead from smoke inhalation and other causes related to the actions of the Defendants. He had been hiding in a crawlspace above the kitchen, according to the location of his body. No weapon was found near the Decedent's body.

On the morning of February 6, 2015, Decedent Varnedoe was killed at a house located in Lancaster, California by Defendant Los Angeles County Sheriff's Office personnel. Varnedoe's death was horrific and wholly unnecessary. Varnedoe's death is directly attributed to the actions of the Defendants whereby excessive and unreasonable force "gassing method" was deployed. Defendants used massive and excessive amounts of cold and hot containers of gas in an attempt to flush or smoke Varnedoe out of the house. A safe burn tear gas canister is an incendiary device that functions essentially as a bomb, when the area is saturated with gas and makes contact with materials such furniture. The device was thrown inside the residence and allowed to set fire to a couch and upholstery inside the residence. The fire ultimately engulfed the home located at 45335 Gadsden Ave. in Lancaster, California. Decedent Varnedoe died from smoke-inhalation, burns to his body and ingestion of chemicals.

In fact, it was Defendants' stated intention to use the gas to "smoke" Decedent out of the house. Although Defendants contend that they possessed a warrant authorizing service of a search warrant on the Decedent, the extreme amount of gas in combination with the use of a dangerous hot gas canisters known to start fires when in contact with carpet and furniture, was a departure from accepted law enforcement use of these chemicals. Defendants had or should have had knowledge of the dangerous consequences of their actions.

Plaintiffs allege Defendants grossly violated the training and standards involved in making reasonable searches and seizures of subjects, and especially in using the tomahawk safe burn in the manner described herein, which also violated standard training, established legal precedent, and manufacturer guidelines concerning the use of the massive gassing. These violations by Defendants caused Decedent's death.

Plaintiffs further allege that Decedent's death was the proximate result of Defendant County's failure to reasonably train their peace officers in the proper and reasonable use of force, effecting entries into residences, the proper and reasonable deployment of flash bang grenades, the proper and reasonable apprehension of barricaded subjects, and in responding to mentally impaired or intoxicated subjects.

Plaintiffs further allege that these substantial failures reflect Defendant County's policies implicitly ratifying and/or authorizing the use of excessive force, unreasonable seizures, unreasonable uses of the flash bang grenade, and the failure to render medical care or provide for medical care to subjects placed in emergency medical jeopardy by its peace officer employees.

IX.   **Summary of incident based on LASD's investigation and interviews:** It's important to mention that the following summary is predicated on the investigation and interviews that were conducted by the Los Angeles County Sheriff's Department and later provided to the District Attorney's Office for their review and evaluation. I have not been provided, nor am I aware of, any third party investigation into the incident that resulted in the death of Leroy Gerano Varnedoe.

On February 5, 2015, detectives from the Operation Safe Streets Bureau (O.S.S.) responded to 45335 Gadsden Avenue, in the City of Lancaster, in order to serve a search warrant and arrest warrant for Leroy Varnedoe. Upon the detectives' arrival, they initiated repeated and unsuccessful efforts to get Varnedoe to exit the residence. Deputies from the Los Angeles Sheriff's Department (LASD) Special Enforcement Bureau (SEB) were notified and responded to the location. After arriving at the location, SEB made numerous announcements for Varnedoe to exit the location. After Varnedoe failed to comply with the orders given, nine rounds of *cold gas*[6] and four hot gas canisters were deployed into the location accidentally causing a fire. After the fire was extinguished, deputies entered the location and discovered Varnedoe's deceased body lying under debris in the kitchen area of the residence.

In the hallway ceiling between the bathroom, hall closet, and Varnedoe's southwest bedroom, was a 21½ by 20¾ inch opening that led to the attic of the residence. The attic was an open space supported by joists and beams and provided ample space for an individual to maneuver from the south side of the residence to the north side above the kitchen. Varnedoe was found in the kitchen, lying with his head facing west on the floor below a fallen kitchen cabinet. The ceiling material was missing, and it appeared that Varnedoe fell through the ceiling and landed atop the cabinet causing it to pull away from the wall and ultimately on the kitchen floor. Near the doorway were the remains of a sofa which had been completely burned and leaving only the metal springs.

1.   **According to Deputy Welle**, on February 5, 2015, at approximately 0900 hours, an undercover plan was initiated with surveillance of the residence located at 45335 Gadsden Avenue. Based on the information provided by the confidential informant (CI), Deputy Welle obtained a search warrant for the residence and an arrest warrant for Varnedoe. At approximately 1745 hours, Lancaster OSS, Palmdale OSS, and Lancaster Special Assignment (LANCAP) deputies assisted by Aero Bureau, initiated a containment around the residence and immediate area. Several announcements were made using a patrol unit public announcement (PA) system.

---

[6] **Cold gas canister:** Cold Gas describes non-pyrotechnic liquid chemicals. Cold Gas is deployed via an ARWEN, by a specially designed launcher, which fires 40 mm or 37 mm non-lethal rounds. Upon impact, the nose cone ruptures and instantaneously delivers the chemical agent inside a structure. The rounds are non-burning and suitable for indoor use.

After the first several announcements, Amanda Riley came out with an infant, followed by Ashley Johnson and Anica Smith. Deputies spoke to the females who indicated that Varnedoe was inside the residence, one of which indicated he had a shotgun in his room. Announcements continued with no acknowledgment from Varnedoe. Numerous unsuccessful attempts were made to contact Varnedoe by calling his cell phone.

According to Deputy Welle, at approximately 1815 hours, the Lancaster OSS team supervisor notified SEB that Varnedoe was barricaded (never confirmed by sight and/or sound). While awaiting the arrival of SEB, they continued announcements directing Varnedoe to exit the location. The SEB Armored Response Vehicle (ARV) was placed in front of Varnedoe's location and announcements were continually made from the ARV PA system into the open front door. Because the females who exited the location indicated that Varnedoe may be passed out, at approximately 1900 hours, the southwest bedroom windows were broken out with a *bean bag shotgun*[7] round in order to ensure the announcements being made were not muffled or affected by the closed windows. Additionally, the Aero Bureau's PA system was utilized to make announcements.

According to Deputy Welle, at approximately 1930 hours, additional SEB members arrived on scene and took over control and assumed responsibility over the incident. The announcements continued and at approximately 2245 hours, Deputy Welle spoke to the females in an attempt to confirm Varnedoe's presence in the house. The information provided by all three females indicated Varnedoe was still inside the house.

2. **According to Captain Ewell,** he was the SEB Commander on scene. Captain Ewell indicated that the purpose of SEB SWAT was to safely resolve a situation without the use of deadly force. SEB's goal is to avoid a physical confrontation through the use of technology, less than lethal tools, and tactics. In this case, Captain Ewell was advised by Lancaster OSS that the CI (confidential informant) had indicated that Varnedoe was inside the location and had been chain-smoking meth for several days. Captain Ewell was also advised that Varnedoe had made previous statements that included; he would not go back to prison; he would shoot it out with the police; and that he would rather die before he goes back to prison.

According to Captain Ewell, upon arriving at the location and assuming control of the operation, SEB developed a plan to safely remove Varnedoe from the residence. Meanwhile, SEB personnel continued the PA system announcements for Varnedoe to

---

[7] **Bean bag round:** a shotgun shell used for less lethal apprehension of suspects. The bean bag round consists of a small fabric "pillow" filled with #9 lead shot weighing about 40 grams (1.4 oz.). It is fired from a normal 12-gauge shotgun. When fired, the bag is expelled at around 70 to 90 meters per second (230 to 300 ft./s); it spreads out in flight and distributes its impact over about 6 square centimeters (1 sq. in) o f the target. It is designed to deliver a blow that will cause minimum long-term trauma and no penetration but will result in a muscle spasm or other reaction to briefly render a violent suspect immobile. The shotgun round is inaccurate over about 6 meters (20 ft.) and has a maximum range of around 20 meters (70 ft.). Changes to the bean bag round since its inception in the early 1970s have included a velocity reduction from 120 to 90 meters per second (400 to 300 ft./s) [1] as well as a shift from a square shape to a more rounded sock-shaped projectile.

come out and to surrender. The announcements called Varnedoe by name, told him to surrender, and told him to answer his phone which was repeatedly called by Crisis Negotiation Team (CNT) members.

According to Captain Ewell, SEB initially deployed a ***diversionary device[8]*** to get Varnedoe to negotiate or surrender without incident. When the diversionary device failed to get a response from Varnedoe, there were additional PA system announcements and calls made to Varnedoe's cell phone. The AVATAR tactical robot was then employed into the residence. The robot enabled SEB personnel to visually/virtually enter the location and visually search the interior for Varnedoe by using a real-time camera attached to the robot.

According to Captain Ewell, the robot located an uncovered attic opening with debris on the floor beneath the opening ***(not confirmed)***. The robot was left in place underneath the attic opening in order to watch for any movement. The robot was followed by additional PA system announcements and calls to Varnedoe's cell phone. SEB next deployed chemical munitions (gas - chemical agents) into the residence. Captain Ewell and Commander Maxwell both approved the use of the chemical munitions plan because it was deemed too dangerous for deputies to physically go inside the house. It was Captain Ewell's belief that Varnedoe was inside the home and was armed and very dangerous. The goal of the chemical munitions plan was to force Varnedoe to leave his position cover ***(never confirmed he was ever in a position of cover)*** inside the residence and surrender to deputies outside without injury to Varnedoe or deputy personnel. It was SEB's position that the insertion of chemical munitions would hinder his vision and breathing, causing him to be less of a threat when he exited the location.

According to Captain Ewell, the Chemical munitions plan was initiated at approximately 2259 hours and included the insertion of cold gas by firing rounds from an ***Anti-Riot Weapon Enfield (ARWEN) delivery system[9]***. Shortly thereafter, hot gas was also hand delivered by using a ***BurnSafe device[10]*** and ***Tomahawk devices[11]*** directly inside the residence. The BurnSafe was inserted

---

[8] **Diversionary device:** commonly referred to as "flash bangs", "concussion grenades", "stun grenades", or "flash grenades." These products are generally non-fragmenting grenades or canisters that emit a very loud report, a bright light, and an over-pressure wave designed to produce a physiological or sensory overload that can temporarily stun an individual. Here, a "flash grenade" was deployed by Deputy Edson Salazar outside the base of Varnedoe's bedroom window.

[9] **Anti-Riot Weapon Enfield (ARWEN) delivery system:** The ARWEN 37 is a non-lethal launcher which fires 37 mm non-lethal rounds designed for riot control. It has a 5-round rotary drum magazine. "ARWEN" is an acronym for "Anti-Riot Weapon Enfield". It was designed in 1977 by the British Royal Small Arms Factory (RSAF) Enfield, then part of the Royal Ordnance Factories.

[10] **BurnSafe device:** The BurnSafe is essentially a double walled container constructed of aluminum. It is designed to contain the flames inside the inner chamber thereby reducing the probability of starting a fire. The BurnSafe allows the introduction of significant amounts of pyrotechnic non-lethal chemical agent into the target, which increases the probability of a successful resolution.

[11] **Tomahawk device:** a container constructed and designed to contain the flames inside the inner chamber thereby reducing the probability of starting a fire. The device allows the introduction of significant amounts of pyrotechnic non-lethal chemical agent into the target, which increases the probability of a successful resolution.

59

through the open front door, which discharged a larger volume of vapor gas, intended to saturate the majority of the residence. Because the Tomahawks device deploy smaller volumes of vapor gas, several were deployed into different rooms inside the residence.

According to Captain Ewell, Deputy Geisbauer deployed a BurnSafe inside the location through the open front door while Deputy Salazar deployed a Tomahawk through the southwest bedroom window and through the southeast room's window (bathroom window). Deputy Salazar also fired one round toward the attic vent on the south side of the location and three rounds into the exterior attic vents.

According to Captain Ewell, additional chemical munitions were deployed on the north side of the location. Deputy McNamara fired three rounds into the attic vents on the north side of the location and two rounds through the window near the northwest corner of the location. Lastly, Deputy Rodriguez deployed a Tomahawk, taped to a fireman's pole, through the window of the door on the north side of the attached garage. In total, four hot gas canisters and nine cold gas rounds were deployed inside the residence. The amount of gas deployed in this particular case was common for the size of the location and the circumstances of the situation. Approximately three to five seconds after the gas was deployed, a fire was seen inside the residence.

3. **According to Deputy Geisbauer,** once the chemical munitions plan was approved, he was designated to deploy the BurnSafe. Prior to throwing the BurnSafe inside the residence, Deputy Geisbauer tied a cord to the BurnSafe in case he needed to retrieve it. Deputy Geisbauer then walked up to the front door, pulled the pin on the BurnSafe, waited for it to pop, allowed gas to come out, and threw it through the open front door letting go of the cord. The BurnSafe landed on the floor inside the residence.

According to Deputy Geisbauer, immediately thereafter, he saw a large amount smoke and gas, making it difficult to see inside. Deputy Geisbauer then saw flames just inside the front door. Deputy Lavin then grabbed the cord and attempted to pull the BurnSafe device out; however, the cord had burned off. Several SEBB deputies went inside the residence in an effort to pull a burning sofa through the front door. Because of the fire, the deputies were not able to get the sofa through the front door. Deputy Geisbauer looked for a garden hose to put out the fire; however, he was unable to locate one. Deputy Geisbauer never went inside the location.

4. **According to Deputy Pratt,** after Deputy Geisbauer deployed the BurnSafe devise, he backed away and immediately saw that the BurnSafe device had flamed up and landed next to a couch igniting it into flames. Deputy Lavin tried to retrieve the BurnSafe device; however, he was not able because the cord had burned off. Deputy Pratt and Lavin then went inside the residence (even though they considered Varnedoe armed, dangerous and barricaded) and attempted to extinguish the flames on the couch. They (Deputy Pratt and Lavin) tried to stomp the fire out with their feet; however, they were not successful. Deputy Pratt also tried to remove the couch through the front door but was unsuccessful, so he backed outside.

60

5. **According to Deputy Stade**, once the residence caught fire, he along with Deputy Wheeler and Sergeant Burke, entered in an attempt to remove the BurnSafe devise, rescue Varnedoe *(now it's a rescue as opposed to an apprehension of an armed and dangerous suspect)* and extinguish the fire. The team had placed a fire extinguisher *(no fire protection plan)* at the rear of the location; however, by the time they retrieved it, the fire had grown. Deputy Stade kicked the BurnSafe device out the door and Deputy Lavin tried to stomp it out but was unsuccessful.

   According to Deputy Stade, Deputy Wheeler attempted to push the burning couch out of the front door; however, the couch became wedged in the door igniting the front door into flames while blocking the deputies' exit *(no plan in place to deal with a fire)*. The flames and the fire immediately grew and spread to the front door and the door jamb. Deputy Stade then encountered a wall of smoke and flames in the kitchen and saw the flames spread to the walls and across the ceiling. Deputies Stade and Wheeler, and Sergeant Burke tried to exit through the rear door; however, the door was barred from the outside with a two 2' x 4' piece of lumber *(no plan or scouting report to indicate barred doors)*. Deputy Stade then forced the back door open and they were able to exit the residence.

6. **According to Deputy Wheeler,** he along with Deputy Stade and Sergeant Burke, entered the residence immediately upon noticing the fire. Upon entry, Deputy Wheeler saw that the end of a couch was on fire, so they attempted to put it out. Deputy Wheeler tried to turn the burning couch sideways in order to fit it through the doorway; however, he was unsuccessful due to its size.

   According to Deputy Wheeler, the residence quickly engulfed into flames, so he along with Deputy Stade and Sergeant Burke forced open the rear door in order to get out of the burning residence. After exiting the residence, Deputy Wheeler saw smoke billowing out of the attic vents, so he directed the water flow from the fire hose up into the attic area. Deputy Wheeler focused the water through the kitchen window, one of the bedroom windows, and into the attic space. Deputy Wheeler never heard any noises such as screaming or coughing from Varnedoe while inside or outside the residence.

7. **According to Anica Smith,** she indicated that she was Varnedoe's ex-girlfriend at the time of the incident and that she moved into the residence (45335 Gadsden) approximately one month prior to the incident. Smith became acquainted with Amanda Riley and her sister, Felisha Phillips, through Varnedoe.

   According to Smith, she indicated that she was aware that Varnedoe was out on bail on two separate cases; however, she was led to believe that they had been resolved. On the date of the incident, Smith was asleep with Varnedoe in his bedroom, when deputies arrived and began calling the occupants out of the house. Smith heard the sound of a helicopter over the house. Shortly thereafter, Amanda told her that the police were outside, so she (Smith) walked outside the house.

   According to Smith, the front door was open, and she heard the deputies calling out Varnedoe's name over the loudspeaker while ordering him to come out with his hands up. Smith claims that she did not know if Varnedoe had left the house or was

still inside so she was noncommittal when asked by the deputies. Smith indicated that when she was awoken by the helicopter, Varnedoe was no longer in the bed with her and that's when she walked out of the house. Smith did not see Varnedoe anywhere in the house and claims the last time she saw Varnedoe was when she walked out of the house. This doesn't make sense – Smith said Varnedoe was not in the bed with her and did not see him anywhere in the house but the last time she saw him was when she walked out of the house. Conflicting info.

According to Smith, prior to the announcements, she saw Varnedoe asleep in the bed. Smith believed that this occurred approximately 1 to 1 ½ hours prior to the announcements being made at the house.

8. **According to Amanda Riley**, she had been living at the residence with her eight month old daughter and Ashley Johnson for approximately four months prior to the incident. Riley's sister, Felisha Phillips, owns the home; however, she (Felisha Phillips) was living in Florida at the time. Riley indicated that two to three weeks prior to the incident, Varnedoe had been coming and going out of the residence with Smith.

According to Riley, on the date of the incident, Varnedoe had been asleep all day; however, he had been awake for three straight nights prior, doing drugs. Varnedoe normally smoked methamphetamine all day; however, on the day of the incident he (Varnedoe) was down sleeping all day. At approximately 1600 hours, Tone (friend of Varnedoe), and Tone's girlfriend, came to the residence. Varnedoe did not wake up to greet them, so they left. After they left, two other guys showed up. Riley then left for her mother's house, took her daughter, picked up Johnson, and returned to the house.

According to Riley, a short time later, she heard the police call out her home address and order everyone to go outside. Riley went to Varnedoe's room and knocked on the door announcing that the police were there; however, the door was closed, and no one answered. Riley knew that Varnedoe was in his bedroom asleep with Smith, however, she did not actually see him at the time.

According to Riley, she had been in and out of the house all day and last saw Varnedoe at approximately 0800 hours. Riley was told by Smith that Varnedoe was in the bedroom. About three to four days prior to the incident, Varnedoe brought a "gage" (shotgun) into the house but then took it outside, got into his car and drove away. This was the first time Riley had seen Varnedoe with a gun.

According to Riley, after she walked out of the residence, the deputies asked if Varnedoe was suicidal. Riley informed them that she did not know. Upon hearing the deputies' question, Smith summoned the deputies back and told them that Varnedoe, in fact, was suicidal.

9. **According to Ashley Johnson**, she had been living at the house for about two months prior to the incident. Varnedoe had been living at the house for approximately two weeks prior to the incident. On the date of the incident, Varnedoe had been up for at least two nights smoking methamphetamine.

62

Johnson saw Varnedoe and Smith at approximately 2300 hours when she left for Riley's mother's house. Johnson indicated that she returned to the house approximately two hours later because Tone (Varnedoe's friend) came to the house; however, no one answered the door. Tone and his friend (Talisha) waited at the house for Varnedoe; however, he (Varnedoe) never come out of his room, so they left. Johnson last saw Varnedoe a short time after Tone and Talisha left the residence. Johnson went with Riley to Riley's mother's house and later returned to the house.

According to Johnson, when she returned to the house, she knew that Varnedoe and Smith were still there because Smith's car was at the house. Smith was in the room with Varnedoe when the police arrived and began ordering everyone out of the house. Johnson saw Riley knock on Varnedoe's bedroom door and heard her call out Kaos (Varnedoe) and Anica (Smith), that the police are here. Johnson saw Smith answer the door and because it was dark inside the bedroom she never saw Varnedoe, but knew he was still inside the bedroom with Smith.

According to Johnson, when she walked out of the residence, the police asked her if Varnedoe was inside the house and she told the deputies "Yeah, he's in there," and/or words to that effect. The police also asked her if Varnedoe was suicidal; however, Johnson responded that she did not know. Johnson added that she had overheard people saying that Varnedoe had protection, so she told the police officers that Varnedoe could have a gun.

10. **According to Detective Owen,** on February 5, 2015, at approximately 2350 hours, Detective Owen of the LASD Arson Explosives Detail responded to 45335 Gadsden Avenue to conduct a fire investigation. The residence was a single family residence which contained three bedrooms and two baths. The entry hallway led to a small living room area. Detective Owen observed that the majority of the fire damage was located in the front entryway, living room, and kitchen. These areas sustained major fire, heat, and smoke damage. The remainder of the house sustained moderate fire, heat, and smoke damage.

According to Detective Owen, over half of the interior ceiling and insulation had fallen to the floor. Detective Owen determined that the fire originated from the front hallway by the front door and spread to the surrounding available combustible materials causing the fire damage. Based on char and burn pattern indicators, Detective Owen was unable to eliminate the cause of the fire as the accidental introduction of an open flame via a canister of hot gas which was introduced during a tactical operation. Owen subsequently conducted a follow-up investigation at the residence for the presence of ignitable liquids, but no ignitable liquids were detected inside the location.

11. **Medical Examiner Gutstadt postmortem examination report:** On February 18, 2015, Deputy Medical Examiner Jeffrey Gutstadt performed a postmortem examination of Varnedoe's remains. The medical examiner noted thermal injuries with first and third degree burns and charring over approximately 80 percent of Varnedoe's body. Soot and black debris were observed in Varnedoe's airway, including his larynx, trachea, and major bronchi of his lungs.

63

The medical examiner attributed the cause of death to thermal injuries. Other conditions contributing to but not related to the immediate cause of death were the inhalation of products of combustion and the effects of methamphetamine. The manner of death was classified as accidental. The toxicological examination showed a significant amount of methamphetamine in Varnedoe's body. A substantial amount of *cyanide*[12] and a lethal amount of carbon monoxide were also present in Varnedoe's body.

12. **BurnSafe:** The BurnSafe is essentially a double walled container constructed of aluminum. It is designed to contain the flames inside the inner chamber thereby reducing the probability of starting a fire. The BurnSafe allows the introduction of significant amounts of pyrotechnic non-lethal chemical agent into the target, which increases the probability of a successful resolution.

13. **Training and manufactures safety considerations:** Only personnel who have been trained in a state approved non-lethal chemical agent's course, a manufacturer's non-lethal chemical agent's course and in the proper use of the BurnSafe should be involved in loading, unloading, deployment and maintenance of the BurnSafe.

**Under no circumstances** should the BurnSafe be used in situations where a suspected flammable or combustible atmosphere exists. Questions regarding the combustibility of various flammable atmospheres should be directed to local fire department personnel before deploying with any of our tools.

The best method for deploying the BurnSafe is to conduct an accurate target analysis of the structure for effective and safe deployment. If you cannot determine where the BurnSafe will land, then you must consider the consequences for potential injury or fire.

Do not deploy excessive amounts of non-lethal chemical agents into confined spaces. Pyrotechnic devices can create high levels of toxic smoke if not used properly.

**Deployment:** Have a predetermined approach and retreat plan to and from the target using cover and concealment. Have a predetermined primary and secondary breach point. Have as many cover officers as needed to address threat areas. Utilize ballistic shields or vehicles for cover as necessary. Look to see where the device will land. Avoid deploying it on combustible material if possible. Have a retrieval line attached to the D ring attachment point if necessary.

---

[12] **Cyanide** is a rapidly acting, potentially deadly chemical that can exist as a colorless gas or a crystal form. Cyanide is contained in cigarette smoke and the combustion products of synthetic materials such as plastics. Cyanide prevents the cells of the body from getting oxygen, causing the cells to die. The amount of Cyanide present in Varnedoe's body, although substantial, was not uncommon for a body recovered from a fire. Carbon monoxide (CO) is a deadly, colorless, odorless, and tasteless gas. It is produced by the incomplete burning of various fuels, including coal, wood, charcoal, oil, kerosene, propane, and natural gas. The CO detected in Varnedoe's body was greater than 69 percent concentration which is a lethal level. The high levels of Cyanide and CO indicate that Varnedoe was alive and breathing when the fire started.

**Training:** All users of CMC products must be trained before use. The California Tactical Officer's Association offers a class for chemical agent instructors that teaches officers how to use CMC products. An on-line class is offered at www.CAinstructor.com. Training classes on CMC products can be arranged for your agency by calling (760) 845-8062.

14. **LASD policies and procedures: 5-06/110.05 Barricaded Suspect:** A barricaded suspect is any person armed or reasonably believed to be armed with a weapon, explosives, or other destructive or dangerous device who occupies and/or fortifies a fixed location and violently, or by threat of violence, resists apprehension by law enforcement officers. When a suspect has barricaded himself without a hostage, officers shall attempt all methods consistent with the offense to effect his capture while safeguarding the lives of all persons to the maximum extent possible.

   **5-06/040.50 Authorization for the use of CS chemical agents:** The use of CS agents may be authorized by the Watch Commander or, if applicable, the Incident Commander, or by a Sergeant. The person authorizing the use of CS agents shall be held accountable for its use and be fully prepared to justify that decision.

   **3-10/150.00 Tactical Incidents:** The fundamental duty of all sworn personnel is to protect life and property.

   Members shall be guided by sound tactical principles when involved in any tactical incident. The tactics employed by Department members shall be **governed by applicable Department policies, accepted training practices, the exigency of the circumstances, and the application of sound judgment and common sense.** Adherence to policies, training, and supervision is critical in preventing an unreasonable response to fear and resolving incidents in the safest manner possible. When reasonable under the totality of circumstances, personnel should use de-escalation techniques such as advisements, verbal persuasion, and other force prevention tactics focused on increasing officer and/or public safety. The Department's Core Values, a reverence for human life, and the safety of all parties shall be considered when deciding on a resolution to a tactical incident.

   Following any tactical incident, regardless of significance, the conduct of Department personnel may be evaluated for compliance with established Department policies and stale and federal statutes. A primary consideration in determining sound tactics is whether the actions by personnel increase or decrease officer safety, and/or public safety. All personnel shall be prepared to clearly articulate the circumstances which supported their decisions.

   The concepts commonly referred to as the six "C"s – Command, Contain, Control, Communicate, Coordinate, and Contingency - shall serve as a guide for all personnel involved.

15. **Tomahawk website:** The Covina-Thomas Company is a small family owned business established in 1959. Thomas Giandomenico, the president and founder of The Covina-Thomas Company has worked hard to bring The CTC to the forefront as one of the top aerospace machine shops in the industry.

After many years pioneering his way through the Aerospace and Medical industries, Thomas has now combined design talents with his son, who happens to be a Lieutenant for the Los Angeles County Sheriff's Department Special Enforcement Bureau.   Together they developed the popular BurnSafe and TomaHawk.

**The BurnSafe and TomaHawk offer a safe alternative for dispersing Tear Gas while protecting personal property against fire and unnecessary damage.**
**ALERT** - To all Customers that have ordered our Lantern Burnsafe. Effective Immediately, be advised, due to chemical changes: We do not recommend: DEFENSE TECHNOLOGIES SPEDE-HEAT #1072 DUE TO PROLONGED AND EXTREME HEAT. USE: #1082 RIOT GRENADE INSTEAD

16. **Riot Control Continuous Discharge Grenade** - CS MODEL: 1072 and 1082: The Riot Control CS Grenade is designed specifically for outdoor use in crowd control situations with a high volume continuous burn that expels its payload in approximately 20-40 seconds through four gas ports located on the top of the canister. This grenade can be used to conceal tactical movement or to route a crowd. The volume of smoke and agent is vast and obtrusive. This launchable grenade is 6.0 in. by 2.35 in. and holds approximately 2.7 oz. of active agent.

    Designed specifically for outdoor use in crowd control situations, the Riot Control grenade is a high volume continuous burn canister that expels its payload in approximately 20 - 40 seconds. It has slightly less chemical content than the Specie-Heat™ version but differs mainly in size. The longer burn time may allow for throwback by individuals wearing burn protection such as a welder's mitt. The canisters may be protected from advancing individuals with the use of less lethal impact munitions. The device should be deployed utilizing wing advantages.

    It should NOT be deployed onto rooftops, in crawl spaces, or indoors due to its fire-producing capability. Hand throw or launch use only. Launching of grenades will provide deploying officers additional stand-off distances. This grenade offers coverage for large outdoor areas.

    **Warning:** This product is to be used only by authorized and trained Law Enforcement Corrections, or Military personnel. This product may cause serious injury or death to you and others. This product may cause serious damage to property. Handle, store and use with extreme care and caution. Use only as instructed.

17. **Basic Rules of Force:** Police Officers are trained (P.O.S.T. guidelines) that California law requires that the use of force must meet an "Objectively Reasonable" standard.  The following quotes from Police Officer Standard and training reflect the training: "A reasonable officer is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20, Use of Force, page 1-4.)

    Additionally, an entire chapter in P.O.S.T. Learning Domain #20 is devoted to the "Consequences of Unreasonable Force." Cruelty and malicious assaults are absolutely forbidden:

66

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

"Malicious assaults and batteries committed by peace officers constitute unlawful conduct. When the force used is unreasonable, the officer can face criminal and civil liability, and agency disciplinary action." (Learning Domain #20, page 6-4.)

Further, P.O.S.T. guidelines teach early in the basic curriculum that the legislative and community expectations regarding their powers of arrest and use of force by P.O.S.T. certified police officers: "The criminal justice system gives law enforcement two extraordinary powers:"

- The power of arrest
- The power to use deadly force

The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint. Therefore, it is important to emphasize that police officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, P.O.S.T. specifies that there are a number of key factors that can affect which force option is appropriate and reasonable under the concept of the "totality of circumstances." (Reference: P.O.S.T. LD # 20: "Use of Force." Page 2-5.)

## VII.   Conclusion:

The foregoing opinions are based upon my review of the materials and information received to date concerning the incident that gave rise to this litigation. I understand that there may be depositions not yet conducted in the case and/or additional discovery may be produced by any party. Thus, to that extent, this report should be considered a preliminary report. Should I receive additional information that materially affects any of these opinions, I will submit a supplemental report and/or be prepared to discuss them during future proceedings, as appropriate. I will expect to receive in a timely manner any additional materials or information that might affect my opinions in this matter.

This report is signed on this **12**<u>th</u> of March 2018, in City of Yucaipa, State of California.

**Robert J. Fonzi**

**RJF & Associates, Inc.**
*Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA. 92399
951-312-9679

## *Robert J. Fonzi*
*Undersheriff (retired)*

Curriculum Vitae

**BIOGRAPHY**        (summary)

I am a thirty-two-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department with several years of patrol experience in the Ontario, San Bernardino, and San Diego areas. My experience includes patrol, criminal investigations, internal affairs, civil liabilities, jail operations/management, and personnel management with special emphasis on training.

My expertise lies in the use of force, police procedures, and jail operations/management. I am most recognized in the area of training, with over twenty-five years of experience while training approximately 10,000 law enforcement officers throughout the country. I have qualified and testified as an expert in over three hundred (300) civil, criminal, and civil service trials in both state and federal courts. I have provided deposition testimony in over three hundred (300) related matters in the above related fields.

Based on my training, knowledge, and experience, I was recognized as an expert by the San Bernardino County Sheriff's Department's and primary Use of Force Instructor. My formal education includes an Associate of Arts degree in Criminal Justice and completion of a bachelor's degree program in Vocational Education, Training and Curriculum Design.

I was directly responsible for all use of force training, advanced officer training, in-service, correctional officer training, and FTO (Field Training Officer) programs for the San Bernardino County Sheriff's Training Division for several years. I also served as the training coordinator and supervisor for the Sheriff's K-9 program.

**SPECIALIZED TRAINING**

- Certified instructor - firearms
- Certified instructor - defensive tactics and weaponless defense
- Certified instructor - impact weapons
- Certified instructor - shooting survival techniques
- Certified instructor - crowd control and tactical formations
- Certified instructor - chemical agents
- Certified instructor - electronic control devices (ECD)
- Certified instructor - lateral vascular neck restraint
- Certified instructor - law enforcement incident command system

## CAREER OVERVIEW

Undersheriff, San Bernardino County Sheriff's Department (Retired January 24, 2014)

32 years of Law Enforcement experience

25 years of community college teaching experience

California Community College Teaching Credential

## FORMAL EDUCATION

F.B.I. National Academy, Class #215, December 5, 2003, Quantico, VA

Command College Class #34, November 2003
California Commission on Peace Officers Standards & Training

Bachelor's degree equivalent (completed BA degree program, degree pending) Southern Illinois University, Carbondale, IL - Vocational Education, Training Development, and Curriculum Design.

Associate of Arts Degree, (1986), Administration of Justice, Crafton Hills Community College, Yucaipa, CA

## CALIFORNIA PEACE OFFICER STANDARDS AND TRAINING

| | |
|---|---|
| Deputy Sheriff | 1982 Basic Certificate |
| Senior Deputy | 1987 Intermediate Certificate |
| Sergeant | 1990 Advanced Certificate |
| Sergeant | 1992 Supervisory Certificate |
| Lieutenant | 1999 Management Certificate |

## ASSIGNMENTS, RESPONSIBILITIES, AND EXPERIENCE

**Undersheriff**
March 2012 – January 2014

The County of San Bernardino is the largest county in the continental United States covering approximately 20,000 square miles with a population exceeding 2,000,000. The Sheriff's Department has 41 stations and divisions, including nine county and 14 contract city patrol operations. The Sheriff's department has approximately 3,500 employees and has an annual budget exceeding $450,000,000.

As Undersheriff, I was second in command of the Department and assumed the duties of the Sheriff in his absence. I was responsible for all administrative, operational and legislative concerns within the Sheriff's Department while directing daily operations including budgetary and personnel matters. In the absence of the Sheriff, I acted on his behalf at all internal and external meetings and events. My administrative duties included directing, planning, coordinating, and managing all functions within the Sheriff's Department.

Additional responsibilities included directing and supervising executive and command staff. Coordinated and commanded personnel in the management of administrative support services and criminal operations. Interpreted and anticipated implications of proposed legislative/regulatory changes regarding correctional facilities. Attended and participated in statewide committees. Developed and directed the implementation of policy and procedure changes resulting from changes in legislation, procedures, or departmental philosophy. Represented the Sheriff's Department in liaison with other governmental agencies and community groups and participated in related law enforcement organizations.

Administrative duties included supervising, planning, coordinating, budgeting, and managing all functions within the Sheriff's Department.

- Supervised Human Resources activities for the department including hiring and disciplinary actions.
- Directed department operations through subordinate management and supervisory staff. Assisted with policy direction and formulation; reviewed decisions on all complex or politically sensitive issues.
- Represented the Sheriff by making presentations to civic groups, conventions, and legislative committees for the purpose of promoting goodwill on behalf of the department.
- Maintained a liaison between staff, other law enforcement agencies, judges, District Attorneys, and defense attorneys to insure optimal success in crime prevention and enforcement.
- Wrote comprehensive reports and letters to obtain support and provide information for drafting legislation at the state and local level.
- Supervised the preparation of the annual budget; recommended and reviewed proposed changes with the Sheriff; determined staffing needs and priorities.
- Assisted in the direction of the Office of Public Safety and County Fire Warden's Office.
- Reviewed and recommended the investigative path to be followed regarding major criminal activity.
- Reviewed department objectives and effectiveness of all organizational divisions within the Sheriff's Department; suggested and/or directed changes to improve efficiency.

**Support Operations – Assistant Sheriff**
January 2011 - March 2012

The Assistant Sheriff's position is the administrative command responsible for Support Operations. As an Assistant Sheriff, I acted on behalf of the Sheriff in his absence. Administrative duties included directing and supervising subordinate personnel responsible for the management of four major correctional facilities within San Bernardino County. Coordinated and commanded subordinate personnel in the management of administrative support services and the Frank Bland Regional Training Center. Supervised subordinate personnel responsible for staff development, budget, fiscal matters, personnel, and payroll.

**Detentions and Corrections Bureau - Sheriff's Deputy Chief**
January 2010 – January 2011

As the Bureau Chief, I was responsible for subordinate personnel within four large jail facilities. The Detention and Corrections Bureau is the largest division within the San Bernardino County Sheriff's Department. The Bureau is comprised of more than 1,100 dedicated professional staff that includes both safety and civilian employees. Additionally, the department has five Type-I jails capable of holding 288 arrestees, four court holding facilities and four lock-up facilities.

The Bureau provides services to over 6,000 felony and misdemeanant inmates on a daily basis who are incarcerated. These services include food, hygiene, recreation, medical, dental, mental health, religious, and other support services. The magnitude of these services provided is significant. As an example, the Food Services Division produces and serves over 7,350,000 meals each year while Medical Services provide health care in excess of 6,400 inmates monthly.

The Transportation Unit transports over 500 inmates daily throughout the county and travels an average of 1,000,000 miles per year, transporting nearly 300,000 inmates throughout San Bernardino County and the State of California. Additionally, the United States Marshall transports approximately 13,000 federal inmates from the facility to numerous prisons and court facilities throughout the state.

**Administrative Services Bureau – Sheriff's Deputy Chief**
January 2009 – January 2010

As the Bureau Chief, I was responsible for subordinate personnel over three major divisions, which included the following units: Training, Aviation, Emergency Operations, Volunteer Forces, and Employee Resources. The Training Center (which includes the Basic Academy, Advanced Officer, EVOC and Range/Use of Force Units) provides both basic and continuing professional education to law enforcement officers from agencies throughout the County of San Bernardino and Southern California.

71

The Emergency Operations Division provides operational, logistical, and management support services to field operations during large-scale emergencies. These support services are provided by two units within Emergency Operations; Aviation and Volunteer Forces. The Aviation Unit provides patrol, rescue, and fire operation capabilities. Volunteer Forces provides search and rescue, evacuation, disaster planning, emergency management and Department Operations Center coordination. Volunteer Forces also coordinates all law enforcement mutual aid resources in Mutual Aid Region VI on behalf of the Sheriff.

**Employee Resources Division – Sheriff's Captain**
April 2006 – January 2009

As the commanding officer, I was responsible for all employment/labor issues, grievances, background investigations, hiring, and payroll. The Employee Resources Unit provides a broad range of services for the Sheriff's Department. Under my command, this unit conducted background investigations, participated in state-wide recruiting, and was responsible for the department's payroll and benefits. Additionally, I coordinated hiring and provided a variety of services to department personnel through the Sheriff's Employee Assistance Team (SEAT).

Several categories of business applicants were also required to go through the background process in addition to employment background investigations. Additionally, county residents who want to carry a concealed weapon (CCW) were also required to apply through Employee Resources and pass a background investigation.

**West Valley Detention Center – Sheriff's Captain**
December 2003 – April 2006

As the commanding officer, I was responsible for the largest correctional facility in San Bernardino County with approximately 640 employees. This included the assignment to the West Valley Detention Center as part of the command staff. My direct responsibilities included facility operations and training for the correctional facility. Additional responsibilities included supervision of all correctional staff, personnel matters, grievances, citizen complaints, administrative investigation, use of force, and training.

**Chief of Police for City of Yucaipa – Sheriff's Captain**
May 2000 – December 2003

I served as the Chief of Police for the City of Yucaipa, a contract city with the Sheriff's Department. As the commanding officer, I was responsible for all law enforcement for the unincorporated areas in the county and the City of Yucaipa. This included commanding the Yucaipa Sheriff/Police Station. This dual operation is responsible for law enforcement in the unincorporated areas of Mentone, Forest Falls, Angelus Oaks, and Barton Flats. Additionally, this station serves as the law enforcement agency for the City of Yucaipa.

**Lieutenant -** Yucaipa Sheriff and Police Station in the City of Yucaipa
March 1997 – May 2000

I served as the second in command responsible for all law enforcement for the City of Yucaipa. Additional responsibilities included administrative investigations, use of force, personnel matters, and citizen complaints.

**Lieutenant -** West Valley Detention Center
March 1996 – March 1997

I was responsible for jail operations, management, training, administrative investigations, use of force, personnel matters, and grievances.

**Highland Police Station – Sheriff's Sergeant**
October 1995 – March 1996

I served as a watch commander and patrol supervisor for patrol operations. My duties included watch commander assigned to the Highland Police Station for uniformed patrol personnel. My responsibilities included supervision of all patrol functions, personnel matters, use of force investigations, traffic, training, and administrative duties.

**Advanced Officer/Correctional & Field Training Officer Unit – Sheriff's Sergeant**
October 1990 – October 1995

I supervised the following programs - Basic Academy, Firearms Training Center, Advanced Officer Training, Sheriff's Canine, Correctional Training Officers and Field Training Officers. While assigned to the Training Division, I was responsible for advance, correctional, and field training officer programs. The advance officer training unit provided continuing professional training courses to both safety and reserve employees of the Sheriff's Department, state and federal law enforcement agencies, and California Department of Corrections.

**Firearms Training Center/Use of Force Training Unit – Sheriff's Sergeant**

While assigned to the training division for over 5 years, I developed and supervised the Use of Force Training Unit. The unit was responsible for all use of force training, which included: firearms, defensive tactics, weaponless defense, police baton, chemical agents, electronic devices, and police canine. During this assignment my direct responsibilities included the training and qualification of department personnel in areas concerning the use of force. Training and qualification required proficiency and competency in the taxonomy of educational objectives relating to training issues involving the use of force.

I was also responsible for the supervision, coordination, management, and curriculum design of all firearms, defensive tactics, weaponless defense, police baton, and canine training for the San Bernardino Sheriff's Department. The training facilitated approximately 2000 officers and included basic academy, advance officers, reserve officers, in-service personnel, military, and civilians. The assignment required the direct supervision of eight full-time instructors and staff support that carried out the responsibilities of the Firearms Training Center/Use of Force Training Unit.

73

**Canine Coordinator – Sheriff's Sergeant**

My experience includes being assigned as the Department's canine coordinator for approximately five years. I was responsible for the supervision and management of all canine training and budget issues. The supervision required quarterly evaluation and recertification of approximately ten K-9 Handlers and police canines.

**Tactical Analysis Training Committee – Sheriff's Sergeant**

My experience includes being assigned as a committee member to the Tactical Analysis Training Committee that reviews and evaluates critical incidents involving the use of force. The committee evaluates an officer's actions and reactions against known standards in an effort to improve training offered by the San Bernardino Sheriff's Department.

**San Bernardino Valley College - Program Coordinator – Sheriff's Sergeant**

Responsibilities included coordinating the Extended Basic Law Enforcement Academy at San Bernardino Valley College. The position required direct supervision and coordination of training and student learning during the ten-month program. Additionally, I was responsible for teaching all use of force training within the program. The training included firearms, defensive tactics, weaponless defense, police baton, chemical agents, crowd control/tactical formations, and legal issues concerning the use of force.

**Riverside Community College/Ben Clark Training Center**

My experience includes staff instructor for RCC at the Ben Clark Training Center with assignments teaching firearms, defensive tactics, police baton, use of force, and other related patrol procedures.

**Corporal/Detective** – Yucaipa Sheriff's Station
July1988 – July 1990

I served as Field Training Officer, patrol supervisor, and detective performing criminal investigations.

**Deputy Sheriff -** Professional Standards Division
July1987 – July 1988

My responsibilities included Civil Liabilities and Internal Affairs.

**Deputy Sheriff –** Sheriff's Central Station, San Bernardino
October 1981 – July 1987

Performed a full range of law enforcement duties including, corrections, county and statewide prisoner transport, patrol, criminal investigations. preparation of reports, court testimony, suspect and victim interviews.

**Police Officer** San Diego Police Department, Western Division
October 1982 – April 1983

Performed a full range of law enforcement duties including, patrol, criminal
investigations, preparation of reports, court testimony, suspect and victim interviews.

**Sheriff's Academy**
July1981 – October 1981

Entered the San Bernardino County Sheriff's Department Basic Law Enforcement
Academy, Class of 66, and was elected class president/sergeant.


## TEACHING CREDENTIALS & INSTRUCTOR CERTIFICATES

- Community College Teaching Credential - State of California

- Black Belt - International Association of Kung Fu San Soo Self Defense

- Certified Instructor - F.B.I. Defensive Tactics and Weaponless Defense

- Certified Instructor - F.B.I. Police Baton

- Certified Instructor - Impact Weapons

- Certified Instructor - Verbal Judo/Tactical Communication

- Certified Instructor - F.B.I. Firearms Training

- Certified Instructor - Survival Shooting Techniques

- Certified Instructor - Crowd Control Tactics and Field Formations

- Certified Instructor - Lateral Vascular Neck Restraint

- Certified Instructor - Oleoresin Capsicum

- Certified Instructor - Realistic Assault Confrontations

- Certified Instructor - Chemical Agents

- Certified Instructor - Electronic Device/Taser

- Certified Instructor - ASP/Expandable Baton

- Certified Master Instructor to certify instructors in Defensive Tactics and Weaponless

- Defense, Police Baton and PR-24

75

- Certified Instructor - Controlled Force

## PROFESSIONAL ORGANIZATION AFFILIATIONS

| | |
|---|---|
| N.A.C.P. | National Association of Chiefs of Police |
| I.A.C.P. | International Associates of Chiefs of Police |
| C.S.S.A. | California State Sheriff's Association |
| F.B.I.N.A. | FBI National Academy Associates |
| A.C.A. | American Correctional Association |
| A.J.A. | American Jails Association |
| S.E.B.A. | San Bernardino Safety Employee's Benefit Association |
| A.S.L.E.T. | American Society of Law Enforcement Trainers<br>Appointed as "Regional Director of Western States" |
| F.A.T.S. | Firearms Training System<br>Appointed to National Training Advisory Board |
| P.O.R.A.C. | Police Officers' Research Association of California |
| C.P.O.A. | California Police Officer's Association |
| I.A.L.E.F.I. | International Association Law Enforcement Firearms Instructor |
| Kiwanis | Yucaipa/Calimesa Club |
| Footprinters | Chapter #67, past president |

## CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING AND CORRECTIONS STANDARD AUTHORITY COMMITTEE APPOINTMENTS

2016 – Subject matter expert
Use of Force
San Diego

2012 - Subject matter expert
Crowd Management and Civil Disobedience Guideline Review
Sacramento

76

2011 - C.S.A.
        Adult Titles 24 and 15 Regulations Revision Administrative Workgroup
        Sacramento

1998 - Continuing Professional Training Steering Committee (CPT)
        P.O.S.T. Training
        Sacramento

1997 - Subject matter expert (QNA)
        Controlling Violent Subjects Tele-course
        San Diego

1997 - Subject matter expert
        Vehicle Pullover techniques
        San Diego

1995 - Subject matter expert
        Officer Safety & Field Tactics
        San Luis Obispo

1994 - Subject matter expert
        Illegal Possession of Firearms Tele-course
        San Diego

1994 - Subject matter expert
        Chemical Agents - Training Requirements
        San Diego

1993 - Subject matter expert
        Chemical Agents - Oleoresin Capsicum
        Ontario

1993 - Subject matter expert
        Use of Force Training issues
        Costa Mesa

1992 - Subject matter expert
        Defensive Tactics and Weaponless Defense training issues
        San Diego

1992 - Subject matter expert
        Uniform Canine training and evaluation standards

1992 - Subject matter expert
        Uniform Canine training and evaluation standards
        City of Orange

## CONTINUED PROFESSIONAL LAW ENFORCEMENT TRAINING

| | |
|---|---|
| 1981 | Jail Operations |
| 1981 | Traffic Accident Investigations |
| 1983 | Correctional Officers Update |
| 1983 | Institutional Staff Series I |
| 1984 | Correctional Officers Update |
| 1984 | H & S 11550 (Under the Influence) |
| 1984 | Gang Investigations |
| 1986 | Officer Safety/Field Tactics |
| 1986 | Correctional Officers Update |
| 1986 | IR 3000 Breath Alcohol Analysis |
| 1986 | Drug Influence - 11550 H & S |
| 1986 | Patrol Officer - Vehicle Stops |
| 1986 | Patrol Officer - Auto Theft |
| 1986 | Patrol Officer - Search Warrants |
| 1986 | Patrol Officer - Crimes Against Property |
| 1986 | Patrol Officer - Interview and Interrogation |
| 1986 | Patrol Officer - Collection of Evidence |
| 1987 | Controlled Substance Influence |
| 1987 | 11550 - Under the Influence |
| 1988 | Patrol Officer - Civil Liabilities |
| 1988 | Realistic Assailant Control |
| 1988 | Police Civil Liability |
| 1988 | Patrol Officer - Domestic Violence |

1988   Legal Update Regarding Discovery, Personnel and Liability

1988   Principles of Shooting - Semi-Auto Transition

1989   Legislative Update

1989   Criminal Investigator's Course

1990   Driver Awareness Instructor

1990   Developmentally Disabled and Mentally Ill

1990   Peer Support Counseling Training

1990   Missing Persons

1991   Use of Force Issues

1991   Street Survival - The Tactical Edge

1991   Street Survival - The Win Seminar

1991   Exotic Weapons

1991   Police Supervision

1991   Lethal Force Management for Police

1992   Fifth ASLET International Training Seminar

1992   Supervisor's Training - Mobile Field Force

1992   Realistic Assault Confrontation

1993   CopClass "93" Use of Force & Liability

1993   Simunitions Instructor Development Course

1993   C.P.O.A. - Use of force Update

1994   C.P.O.A. - Use of Force - The Rodney King Incident

1994   C.P.O.A. - Officer Involved Shootings

1994   Assertive Supervision

1994   Lateral Vascular Neck Restraint system - update

1995   Eighth ASLET International Training Seminar, Anchorage, Alaska

1995   ASP Baton Instructor's Course

1996   Use of Force Update - First Trimester

1996   Ninth ASLET International Training Seminar, Grapevine, Texas

1996   Use of Force Update - Second Trimester

1996   Search Manager's Course

1996   Use of Force Update - Third Trimester

1996   P.O.S.T. Manager's Course

1997   Use of Force Update - First Trimester

1997   STC Correctional Facility Pre-Inspection Training.

1997   Use of Force Update - Second Trimester

1997   ASLET Use-of-Force Seminar

1997   Sexual Harassment / Gender Bias

1997   Use of Force Update - Third Trimester

1997   L.E.I.C.S. Train the Trainer

1998   Use of Force Update - Jan

1998   Use of Force Update - April

1998   CPT Steering Committee Training

1998   Use of Force Update - July

1998   Firearms / Deadly Force / Use of Force Symposium

1998   Use of Force Update - Oct

1999   Cycle of Violence

1999   Civil Rights - Color of Law FBI

1999   Use of Force - February

1999   Controlled Force

1999   Advanced Police Management

80

| 1999 | The Challenges of Ethical Leadership |
| 1999 | Use of Force Update - June |
| 1999 | Use of Force Update - August |
| 2000 | Use of Force Update - February |
| 2000 | Supervisor Development Course |
| 2000 | Use of Force Update - June |
| 2000 | Use of Force Update - October |
| 2001 | Role of the Police Chief |
| 2001 | Use of Force Update - February |
| 2001 | Executive Leadership Symposium |
| 2001 | Executive Law Enforcement Ethics Symposium |
| 2001 | Executive Development Training |
| 2001 | Management and Investigations of Hostile Work Environment |
| 2001 | Use of Force Update - June |
| 2001 | Leadership Development Training |
| 2001 | Responses to School Violence |
| 2001 | Leadership Development - Target Excellence |
| 2001 | Use of Force Update - October |
| 2002 | Executive Leadership Symposium |
| 2002 | Use of Force Update - February |
| 2002 | Faith & Justice Summit |
| 2002 | Use of Force Update - June |
| 2002 | Use of force Update - October |
| 2003 | Use of Force Update - February |
| 2003 | Racial Profiling - March |

81

2003    Use of Force Update - September

2004    Use of Force Update - February

2004    Use of Force Update - June

2004    Use of Force Update - June

2004    C.S.S.A. - Correctional Facilities Administrator Seminar

2005    Use of force Update - February

2005    Employment Law

2005    Use of Force Update - June

2005    Southern California Jail Managers Association Training (Orn Co.)

2005    Use of Force Update - October

2005    C.S.S.A. Correctional Facilities Administrator Seminar

2006    Use of Force Update – February

2006    Use of Force Update – May

2006    Use of Force Update – September

2007    Use of Force Update – February

2007    Traumas in Law Enforcement – C.O.P.S.

2007    AELE Lethal and Less Lethal Force

2007    Employment & Labor Law Conference

2007    ICS 300 /400 Training Course

2007    Terrorism Early Warning Group Conference

2008    Use of force Update – February

2008    Use of force Update - May

2008    Use of force Update - September

2008    Use of force Update – January

2009    Use of force Update – May

82

| 2010 | A.J.A. National Conference – Portland Oregon |
| 2010 | First Aid and CPR update – August |
| 2010 | Succession Planning |
| 2011 | Use of force update - January |
| 2011 | Corrections legal updated with Carrie Hill, Esq |
| 2011 | Taser use of force update seminar |
| 2011 | Taser (ECD X-26/X2) instructor certification |
| 2011 | Use of Force, ECD`s, and ICDS |
| 2012 | CSSA Second in commands conference |
| 2012 | Use of force update - June |

## ACCOMPLISHMENTS      (summary)

While assigned to the Training Division, I took the initiative to research and review an alternate chemical agent for department use. The research included the review of various products and delivery systems. I wrote the proposal and made numerous presentations for the approval and authorization to implement pepper spray for the San Bernardino County Sheriff's Department. The proposal included cost analysis for purchasing and training approximately 2000 department personnel. The training program has proven to be one of the most effective in the state of California.

I have demonstrated my management skills in the supervision of the Department's Use of Force Training program. The program required a working knowledge of the materials along with staff assignments of personnel to appropriate positions. The scheduling included approximately 2000 sworn personnel and off site training to various locations within the county. The County of San Bernardino is approximately 22,000 square miles. The scheduling and logistics experienced many problems and conflicts. I was able to resolve many of the problems and issues with appropriate solutions.

I have confronted personnel matters that have resulted in written reprimands and work performance contracts. Additionally, I have developed and administered work performance contracts to individuals who failed to meet the primary proficiency requirements and essential job functions for a deputy sheriff.

I have received numerous requests to lecture on various topics which include: use of force training, chemical agents, and crowd control. Additionally, I have given several proposals to the Office of the Sheriff and the Executive Staff of the San Bernardino County Sheriff's Department. The proposals include Use of Force Training Program, Hobble Restraint, ASP Baton, Cap-Stun, and Canine Operations Manual.

I have demonstrated the ability to provide expert witness testimony in numerous civil litigations involving the San Bernardino County Sheriff's Department and Law Enforcement agencies throughout the State of California. My testimony has earned expert recognition in both state and federal court relating specifically to police procedures and the use of force.

I have participated on several P.O.S.T. committees due to my experience, training, and ability to interact with various agencies on a number of issues.

**Rev: 9/18/16**

## Expert Testimony

| Case: | Court / Hearing / Deposition |
|---|---|
| **2011** | |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | Deposition |
| Nash vs. City of San Bernardino<br>CV 09-08671-RGK (FFMx) | U.S. District Court – Los Angeles |
| Bernat vs. California City<br>Not available | U.S. District Court - Fresno |
| Rivera vs. City of Santa Ana<br>Not available | U.S. District Court – Santa Ana |
| A.K.C. vs. City of Santa Ana<br>SACV-09-01153 CJC (ANx) | Deposition |
| Radwan vs. County of Orange<br>Not available | U.S. District Court – Santa Ana |
| Deats vs. County of Orange<br>CV09-6322 PSG (PJWx) | U.S. District Court – Los Angeles |
| AKC vs. City Santa Ana<br>SACV-09-01153 CJC (ANx) | U.S. District Court – Santa Ana |
| Allen vs. County of Riverside<br>RIC 498184 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Hachett vs. City of Calexico<br>Not available | Deposition |
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | Deposition |
| Rodriguez vs. City of Lon Beach<br>SACV10-00271DOC (ANx) | Deposition |
| Nava vs. City of Santa Clara<br>Not available | U.S. District Court – San Jose |

85

| | |
|---|---|
| Ballard vs. City of San Bernardino<br>CV10-02769DMG (AJWx) | U.S. District Court – Los Angeles |
| Williams vs. County of Los Angeles<br>CV08-7958JVS (FMOx) | Deposition |
| Patino vs. L.A. Unified School Police<br>BC430225 | State Superior Court – Los Angeles |
| Rodriguez vs. City of Long Beach<br>SACV10-00271DOC (ANx) | U.S. District Court – Santa Ana |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | Deposition |
| Johnston/Codd vs. County of Riverside<br>CV 10-08101 RSWL (JEMx) | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | Deposition |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court – Los Angeles |

**2012**

| | |
|---|---|
| Debellis vs. Abdulla<br>CIVBS 900069 | Deposition |
| Moore vs. City of Desert Hot Springs<br>INC 060070 | State Superior Court – Indio |
| Contreras vs. City of San Jose<br>CV-10-00953 RMW | Deposition |
| Mirzaeyan vs., City of Glendale<br>CV11-01747VBF (JCx) | Deposition |
| Samatua vs. City of San Bernardino<br>CIVDS917832 | Deposition |
| Dubose vs. County of Los Angeles<br>CV09-07832 CAS (AJWx) | U.S. District Court – Los Angeles |
| Day vs. People of the State<br>Not available | State Superior Court – San Bernardino |
| Bowen vs. County of Riverside<br>RIC516303 | Deposition |
| Briones vs. City of San Bernardino<br>Not available | Deposition |

Arredondo vs. Co. of Santa Barbra
1370977

Deposition

Mirzeayan vs. City of Glendale
CV11-01747VBF (JCx)

U.S. District Court – Los Angeles

Williams vs. People of the State
Not available

State Superior Court – Victorville

Riley vs. County of Orange
SACV11-00773 JST (ANx)

Deposition

R.Z. vs. City of Long Beach
SACV-1100536 AG (RNBx)
c/w CV11-06379 AG (RNBx)

Deposition

Del Castillo vs. City of Santa Ana
30-2010-00383134

Deposition

Rosenthal vs. County of Riverside
RIC 523816

Deposition

Grobeson vs. City of Los Angeles
BC 150151

Deposition

**2013**
Nida vs. City of Downey
CV12-01382 SJO (JEMx)

Deposition

Manni vs. City of San Diego
11cv0435 W (DHB)

Deposition

Williams vs. City of Pasadena
BC477905

Deposition

R.Z. vs. City of Long Beach
SACV-1100536 AG (RNBx)
c/w CV11-06379 AG (RNBx)

U.S. District Court – Santa Ana

Lucas vs. City of Visalia
09-CV-01015-AWI-JLT

Deposition

Muswasua vs. COR
RIC 1113335

State Superior Court – Riverside

Chiaese vs. County of Riverside
RIC 10012874

Deposition

Rosenthal vs. County of Riverside
RIC 523816

State Superior Court - Murrieta

Velasquez vs. City of Santa Clara
5:11-CV-03588 PSG

Deposition

87

| | |
|---|---|
| Johnson vs. County of Sonoma<br>CV 11-5811-CRB | Deposition |

**2014**

| | |
|---|---|
| MH vs. County of Alameda<br>C11-2868 JST (MEJ) | Deposition |
| Chiease vs. County of Riverside<br>RIC 10012874 | State Superior Court - Temecula |
| Ledezma vs. City of Riverside<br>ED CV 12-01524 VAP (SP) | U.S. District Court – Riverside |
| Ramirez vs. City of Alhambra<br>GC046887 | State Superior Court – Pasadena |
| Nelson vs. County of Riverside<br>RIC 10011174 | Deposition |
| Williams vs. City of Pasadena<br>BC477905 | State Superior Court - Los Angeles |
| McDade vs. City of Pasadena<br>CV12-02892 DMG (JCGx) | Deposition |
| Velasquez vs. City Santa Clara<br>5:11-CV-03588 PSG | U.S. District Court - San Jose |
| Krechman vs. County of Riverside<br>CV10-08705 ODW (DTBx) | U.S. District Court - Los Angeles |
| Bosch vs. County of Riverside<br>EDCV 13-02352-SVW (FFMx) | Deposition |
| Solorzano vs. City of Fontana<br>CIVDS 909991 | State Superior Court - San Bernardino |
| Howard vs. County of Riverside<br>ED CV 12-00700 VAP(OPX) | U.S. District Court – Riverside |
| Rendon vs. City of Indio<br>ED CV 13-00667 VAP (OPx) | U.S. District Court – Riverside |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | Deposition |
| Katz vs. County of Riverside<br>RIV 1213947 | State Superior Court - Riverside |
| Rivera vs. City of Azusa<br>2:13-CV-01510-DMG (VBKx) | Deposition |
| Kahsay vs. City of San Diego<br>37-2013-00031271-CU-PA-CTL | State Superior Court - San Diego |

88

| | |
|---|---|
| Ford vs. City of Beaumont<br>AI #13-13 | Binding Arbitration Hearing |
| Coronado vs. CHP<br>CV11-03560 DMG (JCx) | Deposition |
| Guinn vs. County of San Bernardino<br>DA-2014-0212-06-G1713 | Deposition for Civil Service Hearing |
| Cordero vs. Hemet<br>EDCV 10-01935-JAK-PJW | Deposition |
| RZ vs. COR<br>13-01251 FMO (DTBX) | Deposition |
| Compton vs. COR<br>CV 10-07490 BRO (DTBx) | Deposition |
| Gomez vs. People of the State<br>Not available | State Superior Court – San Bernardino |

**2015**

| | |
|---|---|
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | Deposition |
| Nelson vs. City of Riverside<br>Case No. EDCV13-01665 | U.S. District Court – Riverside |
| Bondaug vs. City of Santa Clara<br>Case No. 1-12-CV-238152 | State Superior Court – San Jose |
| Doe (Clinton) vs. PathPoint<br>CASE NO. PC052205 | Deposition |
| Rivera vs. City of Oakland<br>Not available | Arbitration Hearing |
| Larson vs. City of Glendale<br>EC055649 | State Superior Court – Burbank |
| Henriquez vs. City of Bell<br>2:14-CV-00196-GW (SSx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | Deposition |
| Dunbar vs. City of Riverside<br>EDCV 13-00847 JGB (SPx) | Deposition |
| Salib vs. City of Riverside<br>ED CV 13-1682 MWF (OPx) | U.S. District Court - Los Angeles |

| | |
|---|---|
| Morguita- Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | Deposition |
| C. Williams vs. City of Colton<br>No. 14-CV-01426 | Deposition |
| Moradian vs. City of Glendale<br>Case No. CV 14-01178 GW (VBKX) | Deposition |
| Morguita- Johnson vs. City of Fresno<br>1:14-CV000127 LJO-SKO | U.S. District Court - Fresno |
| Moradian vs. City of Glendale<br>Case No. CV 14-01178 GW (VBKX | U.S. District Court – Los Angeles |
| Van Audenhove vs. COR<br>CASE NO. EDCV 14-00944 FMO (Ex) | Deposition |
| Thomas vs. City of Fullerton<br>No. 30-2012-00581299 | Deposition |
| W. Espinoza vs. County of Riverside<br>CASE NO. EDCV 14-00085-JGB (SPx) | U.S. District Court – Los Angeles |
| Cicineli vs. City of Fullerton | Arbitration Hearing |
| Ferdinand vs. City of Los Angeles<br>NO. CV-14-7056FMO (JPRx) | Deposition |
| Rodriguez vs. City of Los Angeles<br>NO. CV11-01135 DMG (JEMx) | Deposition |
| Wolfe vs. City of Fullerton | Arbitration Hearing |
| People vs. Lang | State Superior Court - Banning |
| James vs. Granger (DOJ BOF)<br>CASE NO: 1:13-CV-00983-AWI-SKO | Deposition |
| Jordan vs. City of Hawthorne<br>Case No. CV14-07554 ODW (JPRx) | Deposition |
| **2016**<br>Stanfill vs. City of Indio | Administrative Appeals Hearing |
| Aguilar vs. City of Azusa<br>Case No: 2:14-CV-09183-GW (JPRx) | Deposition |
| Dolak vs. Torrance<br>Case No. CV 14 07463 BRO-MRW | Deposition |

| | |
|---|---|
| Alarcon vs. City of Calexico | Administrative Hearing - Arbitration |
| Hoffman vs. County of Los Angeles<br>CASE NO.: CV 15-03724 FMO (ASx) | Deposition |
| Dolak vs. Torrance<br>Case No. CV 14 07463 BRO-MRW | U.S. District Court – Los Angeles |
| N.W. / Woods vs. City of Long Beach<br>Case No. EDCV14-01569-VAP (SP) | Deposition |
| Easley vs. City of Riverside<br>Case No. EDCV14-0117 THJ (SPx) | U.S. District Court – Los Angeles |
| Perez vs. Diaz. Nelson, USA<br>Case No. 3:13-cv-01417 – WQH (BGS) | Deposition |
| Jackson vs. County of San Bernardino<br>Case No.: 5:13-CV-01650-JGB-DTB | Deposition |
| Jones vs. County of San Bernardino<br>Case No.: 5:15-cv-00080-DTB | U.S. District Court – Riverside |
| NW Woods vs. City of Long Beach<br>Case No.: EDCV 14-01569-VAP (SPx) | U.S. District Court – Los Angeles |
| Chang vs. County of Santa Clara<br>Case No.: 15-CV-02502 RMW (NC) | Deposition |
| Palmer vs. City of Santa Monica<br>Case No. 15-CV-06183 | Deposition |
| Jackson vs. County of San Bernardino<br>Case No. 5:13-CV-01650-JGB-DTB | U.S. District Court – Riverside |
| Wyatt vs. County of Riverside<br>Case No. 5:15-cv-586-CBM - FFM | Deposition |
| Del Real vs. City of Long Beach<br>Case No.: CV14-02831 MWF | Deposition |
| Cobb vs. City of San Diego<br>Case No. 3:13-cv-01353-BEN(JMA) | US District Court – San Diego |
| Del Real vs. City of Long, et al.<br>Case No.: CV14-02831 MWF | U.S. District Court – Los Angeles |
| Dorsey vs. City of San Diego, et al<br>Case No. 15-cv-1441-L-vs- (WVG) | Deposition |
| Palmer vs. City of Santa Monica<br>Case No. 15-CV-06183 | U.S. District Court – Los Angeles |

| | |
|---|---|
| Herrera vs. City of Ontario, et al.<br>Case No. EDCV 15-1370 JGB (SPx) | Deposition |
| Scott vs. City of San Diego<br>Case No.: 37-2015-00001940-CU-OE-CTL | Deposition |
| Arellano vs. City of Santa Ana, et al.<br>Case No. SACV14-1886 N S (DFMx)<br>(consolidated with SACV15-0432) | Deposition |
| Ramos vs. City of Fullerton<br>No case reference | Arbitration Hearing |
| Lopez vs. City of Santa Clara<br>Case No. CV13-3870 CRB (PR) | Deposition |
| Herrera, et al., vs. City of Ontario<br>Case No. EDCV 15-1370 JGB (SPx) | U.S. District Court – Riverside |
| Lopez vs. City of Santa Clara, et al.<br>Case No.: CV13-3870 CRB (NJV) | U.S. District Court –San Francisco |
| Wyatt vs. County of Riverside, et al.<br>Case No: 15-cv-586-CMB (FFMx) | U.S. District Court – Los Angeles |
| Kirsch vs. County of Santa Barbara | Civil Service Commission |
| Maurer vs. People of the State | Superior Court – West Covina |
| Torres vs. County of San Bernardino<br>Case No.: CV 16-00992 PA (DTB) | Deposition |

**2017**

| | |
|---|---|
| Donaldson vs. USA<br>Case No. 15cv0908-BAS-KSC | Deposition |
| Scott vs. City of San Diego<br>Case No. 37-2015-00001940-CU-OE-CTL | State Superior Court – San Diego |
| Oppenheimer vs. City of La Habra<br>Case No: 8:16-CV-00018-JVS-DFM | Deposition |
| Hoffman vs. County of Los Angeles<br>Case No.: CV 15-03724 FMO (ASx) | U.S. District Court – Los Angeles |
| Monica vs. City of Santa Clara, et al.<br>Case No.: 5:15-CV-04857 BFL | U.S. District Court – San Jose |
| Arias vs. COLA<br>Case NO.: 2-15-cv-02170 AB (ASx) | U.S. District Court – Los Angeles |
| People vs. Downy | State Superior Court – San Bernardino |

| | |
|---|---|
| Ketron v. City of Santa Monica<br>Case No. 2:16-CV-01478 MWF (PJWx) | Deposition |
| Oppenheimer vs. City of La Habra, et al.<br>Case No.: 8:16-CV-00018-JVS-DFM | U.S. District Court – Santa Ana |
| Garcia v. City of Santa Clara<br>Case No.: CV10-02424 SI (pr) | Deposition |
| Centeno vs. City of Fresno, et al.<br>Case NO. 1:16-CV-00653-DAD-SAB | Deposition |
| Avila vs. Co. of Madera & State of Ca.<br>Case No. 1:15-cv-00996 JAM-EPG | Deposition |
| Finger vs. County of Riverside, et al.<br>Case No: 14-cv-01585 JGB (KKx) | U.S. District Court – Riverside |
| Moody vs. County of San Bernardino | Civil Service Commission |
| Garcia v. City of Santa Clara<br>Case No.: CV10-02424 SI (pr) | U.S. District Court – San Francisco |
| Holmes vs. County of Orange<br>Case No.: 8:16-CV-00867-JLS-JCG | Deposition |
| Sandra Salazar vs. COSB<br>Case No.: 5:16-CV-01103-JFW-KK | Deposition |
| Curtin v. County of Orange<br>Case No.: 8:16-cv-00591-SVW-PLA | Deposition |
| Alexis Yancy, et al. v. State of Ca (CHP)<br>Case No. 15-cv-0580 JM (PCL) | Deposition |
| Curtin v. County of Orange<br>Case No.: 8:16-cv-00591-SVW-PLA | U.S. District Court – Los Angeles |
| Grant vs. County of Orange<br>Case No.: 30-2015-00786861 | Deposition |
| Wyman vs. County of Orange<br>Case No.: CV-15-0152-3 AG (KESx) | U.S. District Court – Santa Ana |
| Grant vs. County of Orange<br>CASE NO: 30-2015-00786861 | State Superior Court – Santa Ana |
| Saycon vs. City of Long Beach, et al.<br>Case No. 2:16-cv-05614 | Deposition |
| Cook vs. City of San Diego<br>Case No. 37-2015- 00022471-CU-OE-CTL | Deposition |

93

Donaldson vs. USA, et al.                        U.S. District Court – San Diego
Case NO. 15cv0908-BAS-KSC

Conan vs. City of Fontana                        U.S. District Court – Riverside
Case No.: EDCV 16-1261-KK

Foster vs. County of San Bernardino              Civil Service Hearing
Case No.: DA-2016-0608-06-C9497

Miguel & Chavez, et al. vs. USA                  Deposition
D. AZ. Case No. CV-15-592-TUC-DCB

Bridges & Moore vs. COLA                         Deposition
Case No.: TC028303

Bridges & Moore vs. COLA                         State Superior Court – Long Beach
Case No.: TC028303

Herrera vs. City of Ontario, et al.              Deposition
Case No.: 5:17-cv-82 SP

**2018**
Yancy vs. State of California (CHP)  U.S.        District Court – San Diego
Case No. 15-cv-0580 JM (PCL)

Tucker vs. County of Riverside                   Deposition
Case NO.: 5:16-CV-02275-JGB (DTBx)

Note: There may be some discrepancy in the number of cases contained within this list. The list is only as accurate as records and memory can reflect. There may be other cases not identified, which is due to errors in record keeping.

Rev: 03/01/18

94

## RJF & Associates, Inc.
### Robert Fonzi
### *Training and Consulting*
robert.fonzi@yahoo.com

P.O. Box 1154, Yucaipa, CA. 92399
951-312-9679

## Fee Schedule Agreement

**Case Review, Consultation, & Retainer**                    **$6000.00**

This fee is charged upon initiating a case file with the agreement/retainer for consulting. It includes the preliminary case assessment, research materials, fixed office expenses and operating costs. Fees are applied to all activities and professional services performed, i.e., case review, analysis, research, trial preparation, production of exhibits, site visits, and court testimony. (NON-REFUNDABLE)

**Case Review and Preparation**                    **$300.00**

This fee is the hourly rate applied to all professional services associated with case review, analysis, research, trial preparation, production of exhibits, site visits, and is applied to the retainer fee as worked is performed.

**Deposition Fee / Court Testimony   (30 day or more notice)   $2000.00**

This basic fee applies to all hearings and/or court appearances and is in compliance with the Federal and State rules governing "expert witnesses". There is a 4-hour minimum with each hour following to be billed at a rate of five hundred ($500) dollars an hour and any part of an hour will be billed as a whole.

**Deposition Fee / Court Testimony   (Less than 30-day notice)   $3000.00**

There is a four-hour minimum with each hour following to be billed at a rate of seven hundred fifty ($750.00) dollars an hour and any part of an hour will be billed as 1 hour.

**Travel time for Deposition, Trial Testimony and/or standby time: Portal to Portal**

Local cost for Southern California. Out of state or extended travel will be billed based on time and travel arrangements.

|  |  |
|---|---|
| **Half Day** | **$1000.00** |
| **Full Day** | **$2000.00** |

**Travel Expenses**                    **Direct cost billing**

All travel related expenses, including transportation, insurance, and lodging will be billed at actual cost. Meals and incidentals will be billed on a daily basis at $100 per day.

**Statement of Account**                    **Interest**

Itemized billings (Statement of Professional Services) will be prepared and submitted on a periodic basis consistent with the activities of the account. Payment is due upon receipt of the billing (within 30 days). Late charges may be assessed on overdue accounts.

**Rev: 01/04/18**

# Exhibit 3



# Los Angeles County Sheriff's Department
## Special Enforcement Bureau
### Chemical Agents

| MGG | PART# | TYPE/NAME DEVICE | VISUAL | AGENT | GRAMS | BURN TIME | COMMENTS |
|---|---|---|---|---|---|---|---|
| Def Tech | 1082 | Riot Control | | CS | 77.0 g. | 20-40 sec | Pyro/Burning |
| Def Tech | 517 | Flameless Grenade | | CS | 27.0g | 20-40 sec | Pyro/Burning Contained in outer container |
| Def Tech | 1016 | Pocket Tactical 509A | | CS | 25.2 | 20-40 sec | Pyro/Burning |
| Def Tech | 1072 | Spede Heat Continuous Discharge 555 | | CS | 81.2 g. | 30-40 sec | Pyro/Burning Shotgun Launch Not for Burnsafe Use |
| CTS | 4330 | 40 mm Barricade Projectile-Liquid | | CS | 7.0 g. | Instant | Liquid, Non-Pyro, Launchable Munition One time Delivery 50 yard effective range |
| Def Tech | 1262 | 40 mm Ferret Projectile-Liquid | | CS | 8.0 g | Instant | Liquid, Non-Pyro, Launchable Munition One time Delivery 50-200 yard effective range |
| Aerko Int. | AI-0002 | Clear Out | | CS/OC | 6.0 oz | 28-30 sec | Aerosol Dispersion Non-Flammable |
| CTS | 5230 | Riot CS Smoke | | CS | 77.0 g. | 30-40 sec | Outdoor use |



# EXHIBIT 4

Chemical Agents Instructor Handbook                                                    **Appendices**

# Sample Deployment Worksheet

### CHEMICAL AGENT DEPLOYMENT WORKSHEET
*San Diego Police Department*

Location Address: _____
(Diagram on Back)

Location Size          a. _____ sq. ft.        a. Estimate the square footage of the structure (LxW)

Location Volume        b. _____ cu.ft.         b. Estimate the volume in cubic feet, by multiplying the square footage by the known eiling height or the average ceiling height (8') (value "a"x8).

Structure Constant     c. _____                c. Divide the volume (cu.ft.) by 1000.(value "b"/1000).

Reference Concentration  d. _____ g/1000 cu.ft.   d. Note the concentration desired. (recommend "12" for two volley plan and "24" for one volley plan.

Grams for reference    e. _____ grams           e. Multiply value "c" by the desired grams per cu.ft. concentration, value "d", to determine the grams needed to reach the desired concentration. (values"c"x"d").

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Volley #1
Grams Used          _____      Actual Concentration   _____ g/1000 cu.ft.
                    (Grams to be used in volley)                   (grams to be used / value "c")

Munitions (type & number)   _____

LCT$^{50}$ after first volley =   _____
                                  (LCT$^{50}$ from total concentration above & chart, or formula)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Volley #2
Grams Used          _____      Actual Concentration   _____ g/1000 cu.ft.
                    (Grams to be used in volley)                   (grams to be used / value "c")

Munitions (type & number)   _____

LCT$^{50}$ after first volley =   _____
                                  (LCT$^{50}$ from total concentration above & chart, or formula)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Total Grams         _____      Total Concentration   _____
                    (add grams used in both volleys)               (Divide total grams by value "c")

LCT$^{50}$ after 2nd volley =   _____
                                (LCT$^{50}$ from total concentration above & chart, or formula)

LCT$^{50}$ (minutes) =   $\dfrac{\text{structure volume (cubic feet)}}{\text{total agent used (grams)}}$   X   Constant (.71 for CS agent)

EXHIBIT NO. 5
Young
LACSD 4mk
12/22/17

Copyright © Cardiff Pines Corporation                                                      **8-25**