1  HAROLD G. BECKS, State Bar No. 59126
   hbecks@beckslaw.com
2  DOUGLAS L. DAY, State Bar No. 92581
   dougday@beckslaw.com
3  RONALD S. HOUSMAN, State Bar No. 117884
   rhousman@beckslaw.com
4  HAROLD G. BECKS & ASSOCIATES
   3250 Wilshire Boulevard Suite 708
5  Los Angeles, California 90010
   Telephone: (213) 385-9852
6  Fax: (213) 385-1370

7  Attorneys for Defendants

8  COUNTY OF LOS ANGELES; SHERIFF JIM MCDONNELL; COMMANDER
   PATRICK MAXWELL; CAPTAIN JACK EWELL; SERGEANT SEAN BURKE;
9  DEPUTY ANTHONY GEISBAEUER; DEPUTY JUAN RODRIGUEZ; DEPUTY
   EDSON SALAZAR; DEPUTY DONALD MCNAMARA; DEPUTY STEVEN
10 PRATT; DEPUTY IAN STADE; DEPUTY DANIEL WELLE; AND DEPUTY
   JAMES WHEELER

11

                  **UNITED STATES DISTRICT COURT**
12
                  **CENTRAL DISTRICT OF CALIFORNIA**
13

14

15 | DAWN SOARES, TIFFANY          |  **CASE NO.:  2:17-cv-00924 RGK-AS**
   SOARES, ALISSA VARNEDOE,
16 JAYDA MACCASKIE AS MOTHER      |  **[Assigned to Hon. R. Gary Klausner]**
   AND NATURAL GUARDIAN FOR
17 MINOR CHILDREN "J.V." AND
   "S.V.", CHILDREN OF DECEDENT,  |  **DEFENDANTS' OPPOSITION TO**
18 AND SUCCESSORS OF INTEREST;    |  **PLAINTIFFS' MOTION IN LIMINE**
   HEIRS.                         |  **NO. 3 TO EXCLUDE EVIDENCE OF**
19                                |  **THE COUNTY OF LOS ANGELES'**
                Plaintiffs,       |  **FINDINGS THAT THE USE OF**
20                                |  **FORCE WAS NOT CRIMINAL,**
          v.                      |  **WAS REASONABLE, JUSTIFIED,**
21                                |  **AND/OR WAS WITHIN POLICY;**
   COUNTY OF LOS ANGELES,         |  **DECLARATION OF DOUGLAS L.**
22 SHERIFF JIM McDONNELL,         |  **DAY**
   CAPTAIN JACK EWELL,
23 SERGEANT SEAN BURKE, DEPUTY
   ANTHONY GEISBAUER, DEPUTY      |  **Pre-Trial Conference**
24 JUAN RODRIGUEZ, DEPUTY
   EDSON SALAZAR, DEPUTY          |  **Date:**    May 14, 2018
25 DONALD MCNAMARA, DEPUTY        |  **Time:**    9:00 a.m.
   STEVEN PRATT, DEPUTY IAN       |  **Crtrm:**   850
26 STADE, DEPUTY DANIEL WELLE,
   DEPUTY WHEELER; and DOES 1 -
27 10,

28                Defendants.

**Trial:**

**Date:**     May 29, 2018
**Time:**     9:00 a.m.
**Crtrm**:    850

## I.   PLAINTIFF'S MOTION TO EXCLUDE THE REVIEW AND FINDINGS OF LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE INTO THE FEBRUARY 5, 2015 INCIDENT IS OVERBROAD AND PREMATURE

Plaintiffs seek to exclude any conclusions, or findings by the Los Angeles County District Attorney's Office, and those of "any of the County's internal investigations" concerning the incident…". Motion, 3:4-11. Plaintiffs further seek to exclude the District Attorney's decision not to press criminal charges against four of the Defendants named in this action (Deputies Anthony Geisbauer, Donald McNamara, Juan Rodriquez and Edson Salazar) and the findings as to use of force.

Defendants do not intend to inform the jury that the District Attorney's Office made the decision not to bring criminal charges against any individual or concluded, as part of its criminal investigation, that the use of force was reasonable.

However, Defendants may wish to examine or cross-examine witnesses about information contained in the District Attorney's review of the February 5, 2015 incident. Since the review by the District Attorney's office consisted of interviews with percipient witnesses and review of the evidence, this information is relevant and Defendants should be able to inquire of witnesses about these facts at trial.

A true and correct copy of the January 6, 2016 letter from the Los Angeles County District Attorney's Office, Bureau of Fraud and Corruption Prosecutions, Justice System Integrity Division to Captain Steven D. Katz of the Los Angeles Sheriff's Department, Homicide Bureau is attached to the accompanying Declaration of Douglas L. Day as Exhibit "A" and is incorporated herein by this reference as though set forth in full.

**II.** **EXPERTS MAY RELY UPON THE REVIEW OF THE LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE**

The Review prepared by the Los Angeles County District Attorney's Office was part of the "Homicide Book" in this case as it was provided to defense counsel and produced to Plaintiffs as part of Defendants' Initial Disclosures. *See* Day Decl. ¶¶ 3-4. Defendants sent the Homicide Book, among other materials, to each of its retained experts. *See* Day Decl. ¶ 5.

Defendants' experts who plan to testify in respective areas pertaining to police practices and tactics, Clarence Chapman and Chester Lee McMillion, have received and reviewed the Homicide Book containing the District Attorney Office's Review.

Experts may rely on the opinions of "other" experts in informing their conclusions. This principle was addressed succinctly in the case of *In re Wright Medical Technology Inc., Conserve Hip Implant Products Liability Litigation,* 127 F. Supp.3d 1306, 1320 (2015) when the Court stated:

> "The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings. *See United States v. Winston,* 372 Fed. Appx. 17, 20 (11th Cir.2010) (allowing an expert witness's testimony that was based in part on an opinion of a non-testifying expert, noting that "an expert witness may base his testimony on inadmissible information so long as such information is 'regularly relied upon by experts in his field.'") (internal citations omitted.)

(Emphasis added)

This principle applies to Defendants' experts use of any reports generated by others in this case. For Plaintiffs to attempt to pre-emptively eliminate the ability of Defendants and their experts to utilize reports such as the Review of the District

3

1  Attorney's Office by way of this Motion in Limine is premature and overbroad.

2  **III.  THE REVIEW BY THE DISTRICT ATTORNEY'S OFFICE MAY BE**

3  **TESTIFIED TO BY DEFENDANTS' EXPERTS UPON PROPER**

4  **FOUNDATION**

5  The Review of the February 5, 2015 Incident by the District Attorney's Office

6  may be properly reviewed, and addressed, by Defendants' experts in forming their

7  opinions, even if it contains hearsay. *See* FRE Rule 703; *See also In re Agent*

8  *Orange Product Liability Litigation,* 611 F. Supp. 1223, 1245 (1985).

9  Those portions that are admissible at the time of trial will be subject to the

10  proper foundation being laid by counsel. An indiscriminate exclusion order by way

11  of Plaintiffs' Motion in limine is overbroad and premature.

12  **IV.  CONCLUSION**

13  For the reasons set forth herein, Defendants request the Court deny Plaintiff's

14  Motion in Limine No. 5 in its entirety.

15  Dated:  May 4, 2018          **HAROLD G. BECKS & ASSOCIATES**

16

17

18                    By: ___/s/ Douglas L. Day_____

19                       HAROLD G. BECKS

20                       DOUGLAS L. DAY

21                       RONALD S. HOUSMAN
                        Attorneys for Defendants

22                       COUNTY OF LOS ANGELES, *et al.*

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE OF THE COUNTY OF LOS
ANGELES' FINDINGS THAT THE USE OF FORCE WAS NOT CRIMINAL, WAS REASONABLE, JUSTIFIED

## DECLARATION OF DOUGLAS L. DAY

I, Douglas L. Day, declare:

1.     I am an attorney at law duly licensed and entitled to practice in the State of California, and have been admitted to practice before this United District Court for the Central District of California since 1980, as well as before the Southern, Northern and Eastern Districts of California, the Ninth Circuit Court of Appeal, and the United States Supreme Court.  I am an associate in the Law Offices of Harold G. Becks & Associates and am one of the attorneys with primary responsibility for the handling of this case on behalf of the Defendants herein.  In that capacity, I am personally familiar with the facts set forth herein and if called as a witness in this case, I could and would competently testify hereto.

2.     The January 6, 2016 letter from the Los Angeles County District Attorney's Office, Bureau of Fraud and Corruption Prosecutions, Justice System Integrity Division to Captain Steven D. Katz of the Los Angeles Sheriff's Department, Homicide Bureau is attached hereto as Exhibit "A" and incorporated herein as though set forth in full.

3.     Our office received the "Homicide Book" containing the complete investigation into the February 5, 2015 incident by the Los Angeles County Sheriff's Department Homicide Bureau from the Sheriff's Department.  Contained within the Homicide Book was the January 6, 2016 Review from the Los Angeles County District Attorney's Office.

4.     The Homicide Book in its entirety was produced to Plaintiffs' prior counsel as part of Defendants' Initial Disclosures on October 5, 2017.

5.     I directed that the complete Homicide Book, and other materials, be sent to each of Defendants' retained experts, including Defendants' police practices experts Clarence Chapman and Chester Lee McMillion, for their review.

I declare under penalty of perjury, under the laws of the United States,

5

1   that the foregoing is true and correct.

2        Executed this 4th day of May 2018, at Los Angeles, California.

3

4

5                                    ___/s/ Douglas L. Day_____
                                     Douglas L. Day
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE OF THE COUNTY OF LOS
ANGELES' FINDINGS THAT THE USE OF FORCE WAS NOT CRIMINAL, WAS REASONABLE, JUSTIFIED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

7



## LOS ANGELES COUNTY DISTRICT ATTORNEY'S OFFICE
### BUREAU OF FRAUD AND CORRUPTION PROSECUTIONS
### JUSTICE SYSTEM INTEGRITY DIVISION

JACKIE LACEY • District Attorney
JOHN K. SPILLANE • Chief Deputy District Attorney
JOSEPH P. ESPOSITO • Assistant District Attorney

SCOTT K. GOODWIN • Director

January 6, 2016

Captain Steven D. Katz
Homicide Bureau
Los Angeles Sheriff's Department
5747 Rickenbacker Road
Commerce, California 90040

Re:   J.S.I.D. File #15-0079
      L.A.S.D. File #015-02254-1121-151

Dear Captain Katz:

The Justice System Integrity Division of the Los Angeles County District Attorney's Office has completed its review of the February 5, 2015, in-custody death of Leroy Varnedoe. It is the conclusion of this office that Los Angeles Sheriff's Department (LASD) Deputies Anthony Geisbauer, Donald McNamara, Juan Rodriguez, and Edson Salazar used legally justified force in attempting to arrest Varnedoe.

The District Attorney's Command Center was notified of this in-custody death on February 6, 2015 at approximately 12:24 a.m. The District Attorney Response Team, comprised of Deputy District Attorney Geoffrey Rendon and District Attorney Senior Investigator Richard McIntosh, responded to the scene and was given a walk-through at the location.

The following analysis is based on investigative reports and witness statements taken during the investigation by the LASD and submitted to this office by Homicide Bureau Detective Ron Duval. The reports also include photographs, video, and an autopsy report generated by the Los Angeles County Coroner.

## FACTUAL ANALYSIS

On February 5, 2015, detectives from the Operation Safe Streets Bureau (O.S.S.) responded to 45335 Gadsden Avenue in the City of Lancaster in order to serve a search warrant and an arrest warrant for Leroy Varnedoe. Upon the detectives' arrival, Varnedoe barricaded himself inside the residence.

After repeated and unsuccessful efforts to get Varnedoe to exit the residence, deputies from the LASD Special Enforcement Bureau (SEB) were notified and responded to the location. After arriving at the location, SEB also made numerous announcements for Varnedoe to exit the location.



Hall of Justice
211 West Temple Street, Suite 1200
Los Angeles, CA 90012
(213) 974-3888
Fax: (213) 626-5125
WEBSITE: http://da.co.la.ca.us

DEF 0174

Captain Steven D. Katz
January 6, 2016
Page 2 of 12

After Varnedoe failed to comply with the orders given, nine rounds of "Cold Gas" and four "Hot Gas" canisters were deployed into the location which accidentally caused a fire.[1] After the fire was extinguished, deputies entered the location and discovered Varnedoe's deceased body lying under debris in the kitchen area of the residence.[2]

In the hallway ceiling between the bathroom, hall closet, and Varnedoe's southwest bedroom was a 21 ½ by 20 ¾ inch opening that led to the attic of the residence. The attic was an open space supported by joists and beams and provided ample space for an individual to maneuver from the south side of the residence to the north side above the kitchen. Varnedoe was found in the kitchen, lying with his head facing west on the floor below a fallen kitchen cabinet. The ceiling material was missing and it appeared that Varnedoe fell through the ceiling and landed atop the cabinet causing it to pull away from the wall, and ultimately came to rest on the kitchen floor. Near the doorway were the remains of a sofa. The sofa had been completely burned leaving only the metal springs.

## Statement of Deputy Daniel Welle

On January 30, 2015, Deputy Daniel Welle received information from a confidential informant (CI) that a male he knew as "Kaos" (Varnedoe) was absconding from court.[3] Welle was familiar with Varnedoe from a previous case and knew him to be a "Watergate Crip" gang member.[4]

On February 2, 2015, Welle was again contacted by the same confidential informant who informed him that Varnedoe was staying at 45335 Gadsden Avenue and provided him with Varnedoe's cell number. The CI informed Welle that Varnedoe possibly had a stolen Toyota Camry at the location, was selling narcotics, and was armed with a black revolver with a brown grip, a black semiautomatic pistol, and a pump action shotgun.

Believing Varnedoe was a gang member carrying a loaded firearm, in violation of Penal Code section 25850(c)(3), and a felon in possession of a firearm, in violation of Penal Code section 29800(a), Welle initiated an investigation.

On February 4, 2015, bail agent Otto Carchi contacted Welle to provide him with information on Varnedoe. Carchi informed Welle that an informant said Varnedoe was threatening to assault police or bail agents who try to arrest him for his warrants. Based on Carchi's information, Welle contacted his CI to inquire if Varnedoe had been saying anything odd. The CI informed Welle that Varnedoe was bragging about his new "big gun" and that if anyone tried to stop him, "It was on."

---

[1] A thorough description of "Cold Gas" and "Hot Gas" follows on page 5, footnotes 12 and 13, of this memorandum.
[2] It is unclear exactly how long it took for the fire department to extinguish the fire. Per Deputy Juan Rodriguez, the fire was extinguished within 5-10 minutes of the fire department's arrival. Per Deputy James Wheeler, it took about 10-15 minutes, and per Deputy Donald McNamara, it took between 30-60 minutes to extinguish the fire.
[3] Welle verified that Varnedoe had failed to appear in court on two felony cases on January 21, 2015 and two warrants had been issued for his arrest on that date. A bench warrant was issued for Michael Leroy Soares (Varnedoe) in case number MA064931 on charges of Penal Code section 459, Vehicle Code sections 10851, 23152, 28002, and 12500. A second bench warrant was also issued for Leroy Genaro Varnedoe (Varnedoe) in case number MA064850 on a Health and Safety Code section 11359 charge.
[4] Varnedoe had six prior felony convictions, two for drug possession, two for possession of drugs for sale, a felony child abuse conviction, and one for being a felon in possession of a firearm.



Captain Steven D. Katz
January 6, 2016
Page 3 of 12

The CI also informed Welle that Varnedoe smoked methamphetamine "like a chain smoker smokes cigarettes."

On February 5, 2015 at 9:00 a.m., undercover surveillance at 45335 Gadsden Avenue began. Based on the CI information, Welle obtained a search warrant for the residence and an arrest warrant for Varnedoe.

At 5:45 p.m., Lancaster OSS, Palmdale OSS, and Lancaster Special Assignment (LANCAP) deputies assisted by Aero Bureau contained the location. Call out announcements were done via the radio car public announcement (PA) system. After the first several announcements, Amanda Riley came out with an infant, followed by Ashley Johnson, and Anica Smith. Deputies spoke to the females who all confirmed that Varnedoe was inside the residence and one indicated he had a shotgun in his room. Announcements continued with no acknowledgment from Varnedoe. Numerous unsuccessful attempts were made to contact Varnedoe via his cell phone.

At 6:15 p.m., the Lancaster OSS team supervisor notified SEB that Varnedoe was barricaded. While awaiting the arrival of SEB, regular announcements continued directing Varnedoe to exit the location. The SEB Armored Response Vehicle (ARV) was placed in front of Varnedoe's location and announcements were continually made from the ARV PA system into the open front door as well. Because the females who exited the location indicated that Varnedoe may be "passed out", at about 7:00 p.m., the southwest bedroom windows were broken with a bean bag shotgun round in order to ensure the announcements being made were not muffled by the windows. Additionally, the Aero Bureau's PA system was utilized to make announcements.

At approximately 7:30 p.m., SEB arrived on scene and assumed control. The announcements continued and at 10:45 p.m., Welle spoke to the females in an attempt to confirm Varnedoe's presence in the house. The information provided by all three females indicated Varnedoe was still inside the house.

**Captain Jack Ewell**

Captain Jack Ewell was the SEB Commander at the scene. The purpose of SEB SWAT is to safely resolve a situation without the use of deadly force. SEB's goal is to avoid a physical confrontation through the use of technology, less than lethal tools, and tactics.

In this case, Ewell was advised by Lancaster OSS that an informant had indicated that Varnedoe was inside the location and had been "chain-smoking meth" for several days. Ewell was also advised that Varnedoe had said he "wouldn't go back to prison", he "would shoot it out with the police", and he "would die before he goes back to prison." Ewell learned that Varnedoe had a violent criminal past and he currently had an open charge for being an ex-felon with a firearm, and had active felony arrest warrants.

Upon arriving at the location and assuming control of the operation, SEB developed a plan to safely get Varnedoe out of the location. Meanwhile, SEB personnel continued the PA system announcements directed at Varnedoe. The announcements called Varnedoe by name, told him to



Captain Steven D. Katz
January 6, 2016
Page 4 of 12

surrender, and told him to answer his phone which was repeatedly called by Crisis Negotiation Team (CNT) members.

SEB initially deployed a "diversionary device" to get Varnedoe to negotiate or surrender without incident.[5] When the diversionary device failed to get a response from Varnedoe, there were more PA system announcements and calls to Varnedoe's cell phone.[6]

The AVATAR tactical robot was next employed. The robot enabled SEB personnel to virtually enter the location and visually search the interior for Varnedoe via a real-time camera.[7] The robot located an uncovered attic opening with debris on the floor beneath the opening. The robot was left in place underneath the attic opening watching for any movement.

The robot was followed by more PA system announcements and calls to Varnedoe's cell phone. SEB next deployed chemical munitions, i.e. gas, into the location. Ewell and Commander Maxwell approved the use of the gas plan because it was deemed too dangerous for deputies to physically go inside the house. Ewell had reason to believe that Varnedoe was inside the home and was armed and very dangerous. The goal of the gas plan was to force Varnedoe to leave his cover inside the location and surrender to deputies outside without injury to him or deputy personnel. Insertion of gas would hinder his vision and breathing making him less of a threat when he exited the location.

The gas plan was initiated at 10:59 p.m. and included insertion of "Cold Gas" via rounds fired from an Anti-Riot Weapon Enfield (ARWEN) into the attic space.[8] "Hot Gas" was also hand delivered via a Burn Safe device and Tomahawk devices, directly inside the location.[9] The Burn Safe was inserted via the open front door and discharged a larger volume of vapor gas, which was designed to saturate the majority of the location. The Tomahawks discharge a smaller volume of vapor gas, so several were deployed into different rooms inside the location.[10]

---

[5] "Diversionary devices" are commonly referred to as "flash bangs", "concussion grenades", "stun grenades", or "flash grenades." These products are generally non-fragmenting grenades or canisters that emit a very loud report, a bright light, and an over-pressure wave designed to produce a physiological or sensory overload that can temporarily stun an individual. Here, a "flash grenade" was deployed by Deputy Edson Salazar outside the base of Varnedoe's bedroom window.

[6] The announcements loudly and repeatedly ordered Varnedoe to surrender, that deputies had a search warrant for the house, that deputies were not leaving, and to answer his cell phone.

[7] The robot is radio controlled, equipped with a two-way audio, and a non-recording camera.

[8] Gas is a chemical munition which includes products that contain synthetic or organic types of chemical irritants. These products come in the form of powders, liquids, or pyrotechnic penetrators. Gas comes in two forms, Cold Gas and Hot Gas. Cold Gas describes non-pyrotnic liquid chemicals. Cold Gas is deployed via an ARWEN, by a specially designed launcher, which fires 40 mm or 37 mm non-lethal rounds. Upon impact, the nose cone ruptures and instantaneously delivers the chemical agent inside a structure. The rounds are non-burning and suitable for indoor use.

[9] Hot Gas describes the pyrotechnic activation of solid chemicals which are dispersed as an aerosol. Hot Gas is deployed via a hot gas deployment device, such as a Burn Safe or Tomahawk. The Burn Safe allows for the introduction of a significant amount of pyrotechnic non-lethal chemical agent into the target space, while the Tomahawk is smaller and is designed to be easily tossed by hand into a specific location from behind cover. There is an internal spark in the protective case, but there is no external spark. The spark burns inside the case, just the gas comes out. The heat remains inside the deployment device. However, there is a small possibility that if the device lands on material which can be easily ignited, it could start a fire.

[10] SEB deployed gas into the location simultaneously from different positions.



Captain Steven D. Katz
January 6, 2016
Page 5 of 12

Deputy Anthony Geisbauer deployed a Burn Safe inside the location via the open front door while Deputy Edson Salazar deployed a Tomahawk through the southwest bedroom window and through the southeast room's window (bathroom window). Salazar also fired one round toward the attic vent on the south side of the location and three rounds into the exterior attic vents.

Additional gas was deployed on the north side of the location. Deputy Donald McNamara fired three rounds into the attic vents on the north side of the location and two rounds through the window near the northwest corner of the location. Lastly, Deputy Juan Rodriguez deployed a Tomahawk, taped to a fireman's pole, through the window of the door on the north side of the attached garage.

In total, four Hot Gas canisters and nine Cold Gas rounds were deployed inside the location. The amount of gas deployed in this particular case was common for the size of the location and the circumstances of the situation. Approximately three to five seconds after the gas was deployed, fire was seen inside the location.

### Deputy Anthony Geisbauer

Once the gas plan was approved, Deputy Geisbauer was designated to deploy the Burn Safe. Deputy Peter Lavin provided cover with a rifle while Deputy Steven Pratt provided cover with a shield for Geisbauer as he deployed the device. Prior to throwing the Burn Safe inside the location, Geisbauer tied a cord to the Burn Safe in case he needed to retrieve it. Geisbauer then walked up to the front door, pulled the pin on the Burn Safe, waited for it to pop, allowed gas to come out, and threw it through the open front door letting go of the cord. The Burn Safe landed on the floor inside the location. Geisbauer, Lavin, and Pratt then backed away from the location.

Immediately after, Geisbauer saw a lot of smoke and gas and it was difficult to see inside the location. Geisbauer saw flames just inside the front door. Lavin grabbed the cord to pull out the Burn Safe, but the cord had burned off.[11] SEB deputies went into the location and tried to pull a burning sofa through the front door. The deputies were not able to get the sofa through the front door. Geisbauer looked for a garden hose to put out the fire but he was unable to locate one. Geisbauer never went inside the location.

### Deputy Steven Pratt

After providing cover for Geisbauer, Deputy Pratt backed away and immediately observed that the Burn Safe had flamed up and landed next to a couch igniting it. Lavin tried to retrieve the Burn Safe but was unable to because the cord had burned off. Pratt and Lavin went in and tried to extinguish the flames on the couch. They tried to stomp the fire out with their feet but were unsuccessful. Pratt also tried to remove the couch through the front door but was unsuccessful, so he backed outside. Pratt and Lavin were able to quickly exit through the front door but other deputies had to go out through the back door.

---

[11] The cord had apparently become entangled around the device when originally tossed inside the location, causing it to be burned by the flames.

(75)

Captain Steven D. Katz
January 6, 2016
Page 5 of 12

### Deputy Ian Stade

Deputy Stade, Deputy Wheeler, and Sergeant Sean Burke entered the house in an attempt to remove the Burn Safe, rescue Varnedoe, and extinguish the fire. The team had placed a fire extinguisher at the rear of the location but by the time they retrieved it, the fire had grown. Stade kicked the Burn Safe out the door. Lavin tried to stomp out the fire but was unsuccessful. Burke extinguished a small fire. Wheeler attempted to push the burning couch out the front door, but the couch became wedged in the door igniting the door frame and blocking the deputies' exit. The fire grew quickly and spread to the front door and the door jamb. Stade encountered a wall of smoke and flames in the kitchen and observed the flames spread to the walls and across the ceiling. Stade, Wheeler, and Burke tried to exit via the rear door but the door was barred from the outside with a 2 feet by 4 feet piece of lumber. Stade forced open the back door and they were able to exit the location.

### Deputy James Wheeler

Deputy Wheeler, along with Stade and Burke, entered the location immediately upon noticing the fire. Upon entry, Wheeler observed the end of a couch was on fire and they attempted to put it out. Wheeler tried to turn the burning couch sideways to fit it through the doorway but it still did not fit. The location quickly engulfed in flames and Wheeler, Stade, and Burke forced open the rear door to exit. After exiting the location, Wheeler observed smoke billowing out of the attic vents, so he directed the water flow from the fire hose up into the attic area of the location.[12] Wheeler focused the water through the kitchen window, one of the bedroom windows, and into the attic space.

Wheeler never heard any noises such as screaming or coughing from Varnedoe either while Wheeler was inside the location, nor outside the location.

### Statement of Anica Smith

Anica Smith was Varnedoe's ex-girlfriend at the time of the incident and had moved into the residence at 45335 Gadsden approximately one month prior to the incident. Smith had become acquainted with Amanda Riley and her sister, Felisha Phillips, through Varnedoe. Smith knew Varnedoe by his nickname, "Kaos."

Smith was aware that Varnedoe was out on bail on two separate cases but thought everything was taken care of. Smith had attended some of the court proceedings.

On the date of the incident, Smith was asleep with Varnedoe in his bedroom when deputies arrived and began calling the occupants out of the house. Smith heard the sound of a helicopter over the house and a short time later, Amanda told her that the police were outside. Smith exited the house.

The front door was open and Smith heard the deputies calling out Varnedoe's name over the loudspeaker ordering him to come out with his hands up. Smith was evasive about Varnedoe's presence in the house. Smith claimed she did not know if Varnedoe had left or was still inside the

---

[12] The fire department responded five minutes after being called to the location. However, deputy personnel took control of the fire hoses because the location was not yet secure and the fire department would not deploy their firemen because of the potential danger from an armed suspect.

(176)

DEF 0179

Captain Steven D. Katz
January 6, 2016
Page 7 of 12

house. Smith stated that when she was awoken by the helicopter, Varnedoe was no longer in the bed with her and that when she walked out of the house, she did not see Varnedoe anywhere in the house. Smith claimed that the last time she saw Varnedoe was when she exited the house to look for someone and then went back inside a short time later. Smith saw Varnedoe asleep in the bed when she went back to sleep at that time, but Varnedoe was getting up and she fell back asleep. Smith believed that this occurred approximately 1 to 1 ½ hours prior to the announcements being made at the house.

### Statement of Amanda Riley

Amanda Riley had been living at the location with her eight month old daughter and Ashley Johnson for approximately four months prior to the incident. Riley's sister, Felisha Phillips, owned the home but was living in Florida. Riley stated that she placed an ad on Craig's List to rent a room and Varnedoe answered the ad.[13] Varnedoe's girlfriend, Smith, stayed overnight on some occasions.[14] Two to three weeks prior to the incident, Varnedoe had been coming and going out of the location with Smith.

Riley observed that Varnedoe always had an "entourage" and she suspected that he may have been selling drugs out of his bedroom because there was always a lot of traffic coming in and out of the house. Riley suspected Varnedoe was dealing a significant amount of drugs, not just small ounces, because she observed people going in and out of Varnedoe's room with backpacks. Varnedoe smoked methamphetamine like a person smokes cigarettes. Varnedoe had admitted to Riley that he was "on the run" from the police.

On the date of the incident, Varnedoe had been asleep all day but had been awake for three straight nights prior doing drugs. Varnedoe normally smoked methamphetamine all day, but the day of the incident was his "down" day, so he was sleeping all day. At approximately 4:00 p.m., "Tone", a friend of Varnedoe, and Tone's girlfriend, came to the residence. Varnedoe did not wake up to greet them, so they left. After they left, two other guys showed up and Riley thought they were going to do something to Varnedoe. Riley then left to her mother's house, took her daughter, picked up Johnson, and returned to the location.

A short time later, she heard the police call out her home address and order everyone to come outside. Riley went to Varnedoe's room and knocked on the door announcing that the police were there but the door was closed and no one answered. Riley knew that Varnedoe was in the house asleep in his bedroom with Smith, but she did not actually see him at the time.[15] Riley added that she had been in and out of the house all day and last saw Varnedoe at approximately 8:00 a.m. Riley stated that Smith told her that Varnedoe was in the bedroom.

---

[13] Riley knew Varnedoe by his nickname "Kaos." Riley added that she had met Varnedoe six months prior to the incident in Palmdale and that he had a reputation as a "shot caller" and "the baddest".
[14] Riley observed that Varnedoe and Smith were very close and "Anica does whatever he tells her to do."
[15] While they were detained jointly in the back seat of a patrol car following their exit from the location, Smith told Riley that she woke Varnedoe up when the police came. However, Smith did not say whether Varnedoe got up.

Captain Steven D. Katz
January 6, 2016
Page 8 of 12

About three to four days prior to the incident, Varnedoe brought a "gage" (shotgun) into the house. Varnedoe brought the shotgun inside the house but then took it outside, got into his car and drove away. This was the first time Riley had seen Varnedoe with a gun.

After she exited the location, the deputies asked Riley if Varnedoe was suicidal and Riley informed them that she did not know. Upon hearing the deputies' question, Smith summoned the deputies back and told them that Varnedoe, in fact, was suicidal.

**Statement of Ashley Johnson**

Ashley Johnson had been living at the house for about two months prior to the incident. Varnedoe had been living at the house for approximately two weeks prior to the incident but Johnson had known Varnedoe for about one year.

Johnson did not know what Varnedoe's occupation was, but she suspected he sold "weed" because he seemed like the "boss" of people he hung out with and always traveled with an entourage. Varnedoe was always very busy, came home late, and Johnson saw lots of people come to the house.

On the date of the incident, Varnedoe had been up for at least two nights smoking methamphetamine. Johnson saw Varnedoe and Smith at approximately 11:00 a.m. when she left to Riley's mother's house and had seen Varnedoe throughout the morning. She returned to the house approximately two hours later because "Tone", Varnedoe's friend, came to the house but no one answered the door. Tone and his friend "Talisha" waited at the house for Varnedoe, but Varnedoe did not come out of his room, so they left. Johnson last saw Varnedoe a short time after Tone and Talisha left the location. Johnson went with Riley to Riley's mother's house, but they later returned to the location.

When she returned to the house, Johnson knew Varnedoe and Smith were still there because Smith's car was there. Smith was in the room with Varnedoe when the police arrived and began ordering everyone out of the house. Johnson saw Riley knock on Varnedoe's bedroom door and heard her say "Kaos and Anica, the police are here." Johnson saw Smith answer the door. It was dark inside the bedroom so Johnson could not see Varnedoe, but she knew he was still inside the room with Smith.

When Johnson exited the residence, the police asked her if Varnedoe was inside the house and she told the deputies "Yeah, he's in there." The police also asked her if Varnedoe was suicidal but Johnson responded that she did not know. Johnson added that she had overheard people saying that Varnedoe had "protection", so she told the police officers that Varnedoe "could have a gun."

**Statement of Detective Tania Owen**

On February 5, 2015 at approximately 11:50 p.m., Detective Tania Owen of the LASD Arson Explosives Detail responded to 45335 Gadsden Avenue to conduct a fire investigation. The residence was a single family residence which contained three bedrooms and two baths. The entry hallway led to a small living room area. Owen observed that the majority of the fire damage was



Captain Steven D. Katz
January 6, 2016
Page 9 of 12

located in the front entryway, living room, and kitchen. These areas sustained major fire, heat, and smoke damage. The remainder of the house sustained moderate fire, heat, and smoke damage. Over half of the interior ceiling and insulation had fallen to the floor.

Owen determined that the fire originated from the front hallway by the front door. Fire spread to the surrounding available combustible material causing the fire damage. Based on char and burn pattern indicators, Owen was unable to eliminate as a cause for the fire the accidental introduction of an open flame via a canister of hot gas which was introduced during a tactical operation.

Owen subsequently conducted a follow-up investigation at the location for the presence of ignitable liquids but no ignitable liquids were detected inside the location.

## Physical Evidence

At the scene, investigators located a pump action 12 gauge shotgun in Varnedoe's bedroom. The shotgun was leaning against the vanity, the barrel of the gun was down, and the pistol grip was resting against the wall. A shotgun shell was recovered from the chamber of the shotgun and another 6 shot shotgun shell was recovered the floor at the base of the shotgun.

A methamphetamine pipe was recovered on a coffee table located in the same southwest bedroom. Another methamphetamine pipe was recovered from the hallway floor in front of a water heater located on the south wall.

## Postmortem Examination

On February 18, 2015, Deputy Medical Examiner Jeffrey Gutstadt performed a postmortem examination of Varnedoe's remains.

The medical examiner noted thermal injuries with first and third degree burns and charring over approximately 80 percent of Varnedoe's body. Soot and black debris were observed in Varnedoe's airway, including his larynx, trachea, and major bronchi of his lungs.

The medical examiner attributed the cause of death to thermal injuries. Other conditions contributing to but not related to the immediate cause of death were the inhalation of products of combustion and the effects of methamphetamine.

The manner of death was classified as accidental.

The toxicological examination showed a significant amount of methamphetamine in Varnedoe's body.[16] A substantial amount of cyanide and a lethal amount of carbon monoxide were also present in Varnedoe's body.[17]

---

[16] The toxicology result for methamphetamine was 1.4 ug/mL (microgram per milliliter). According to analyst Oscar Pleitez, who conducted the toxicology analysis, the result is considered a "significant amount" because a person is considered "overdosed" at a 2.0 ug/mL level.

[17] Cyanide is a rapidly acting, potentially deadly chemical that can exist as a colorless gas or a crystal form. Cyanide is contained in cigarette smoke and the combustion products of synthetic materials such as plastics.



Captain Steven D. Katz
January 6, 2016
Page 10 of 12

## LEGAL ANALYSIS

A peace officer may legally arrest someone if he has probable cause to make the arrest. Penal Code section 836a; CALCRIM No. 2670.

A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense. Penal Code section 835a; CALCRIM No. 2670.

A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect an arrest or to prevent escape or to overcome resistance. Penal Code section 835a.

In *Graham v. Connor* (1989) 490 U.S. 386, 396-397, the Court held that use of force cases are to be reviewed using an objective standard of the reasonable officer:

> "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation] . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [Citation] violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."

Pursuant to *Graham*, the reasonableness of the force used "requires careful attention to the facts and circumstances" of this particular incident "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others. *Id.* at 396.

To make an arrest, a peace officer may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired. Penal Code section 844. Similarly, when necessary, a peace officer may break open any outer or inner door or window of a house or any part of a house or anything therein to execute a search warrant. Penal Code section 1531.

---

Cyanide prevents the cells of the body from getting oxygen, causing the cells to die. The amount of Cyanide present in Varnedoe's body, although substantial, was not uncommon for a body recovered from a fire. Carbon monoxide (CO) is a deadly, colorless, odorless, and tasteless gas. It is produced by the incomplete burning of various fuels, including coal, wood, charcoal, oil, kerosene, propane, and natural gas. The CO detected in Varnedoe's body was greater than 69 percent concentration which is a lethal level. The high levels of Cyanide and CO indicate that Varnedoe was alive and breathing when the fire started.

Captain Steven D. Katz
January 6, 2016
Page 11 of 12

Where after all reasonable means have failed to induce a person to submit to peaceable arrest and where that person has manifested a belligerent attitude, the arresting officers, as reasonable men, in the circumstances of the situation, are justified in using as much force as appears reasonably necessary to enable them in safety to themselves to compel submission to the law's process.  *People v. Brite* (1937) 9 Cal.2d 666.

Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, if feasible.  *Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1285.

"The unintentional killing of a human being is excusable and not unlawful when (1) committed by accident and misfortune in the performance of a lawful act by lawful means and (2) where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances."  Penal Code section 195(1); CALCRIM No. 510.

When a person does an act through misfortune or by accident under circumstances that show no evil purpose, intent or culpable negligence, no crime is committed.  Penal Code section 26; CALCRIM No. 3404.

The evidence examined in this investigation shows that when deputies responded to Leroy Varnedoe's residence to serve a valid search warrant and arrest warrant, they had every reason to believe that Varnedoe was armed and dangerous and would resort to any means to avoid capture. Two separate confidential informants had alerted Deputy Welle that Varnedoe was in possession of numerous weapons, including a revolver, a black semi-automatic pistol, and a pump action shotgun. Varnedoe was described as bragging about his "new gun" and that if anyone tried to stop him, "It was on."  In addition, Varnedoe was a known gang member, with numerous prior felony convictions, including one for possession of a firearm.  Hence, in attempting to serve the search warrant and arrest Varnedoe, arresting deputies knew that physically confronting Varnedoe would likely lead to a violent confrontation; so they reasonably resorted to less lethal tools and tactics which included the gas plan ultimately employed in this case.

The deputies made loud and repeated announcements for Varnedoe to exit the house and surrender. Three of the residents complied and exited the house. Two of the three residents confirmed to the deputies that Varnedoe was inside the house and one alerted deputies that Varnedoe may have a gun.[18]

The initial surround and call out efforts went on for approximately two hours with no response from Varnedoe.  Deputies went to great lengths to ensure Varnedoe heard the announcements, including breaking a window with a bean bag round to ensure the announcements were being heard. Receiving no acknowledgement from Varnedoe, deputies employed diversionary devices and made entry into the location via a remote controlled robot.

---

[18] Although Smith was evasive as to whether Varnedoe was inside the house, Riley informed investigators that Smith told her that Varnedoe was in the bedroom.

Captain Steven D. Katz
January 6, 2016
Page 12 of 12

SEB arrived and continued with the call out announcements to Varnedoe for more than three hours without success. The gas plan, employed as a last resort, was reasonable in light of the fact that three other methods had failed to get Varnedoe to surrender. Most importantly, the deputies were aware that Varnedoe was armed and had made threats that he would shoot it out with police if anyone tried to capture him. Employing gas to force Varnedoe out of the location was reasonable in light of all the information the deputies' possessed at the time about Varnedoe's possession of arms and his violent mental state. Further, the employment of gas was reasonable in light of the warnings that had gone on for more than five hours with no acknowledgement from Varnedoe.

Unfortunately, one of the Hot Gas devices caught fire, landed near a couch, and resulted in a fire inside the location. Varnedoe's actions in barricading himself in the attic and refusing to come out to surrender, made it impossible to rescue him from the fire prior to his death. Three deputies narrowly escaped from the rapidly engulfing fire. Varnedoe's death was accidental and unintentional, and resulted during the deputies' lawful attempt to apprehend Varnedoe and bring him to justice in the most peaceful way possible.

CONCLUSION

Based upon the evidence in this case, we find that Deputy Geisbauer's deployment of Hot Gas to assist in the arrest of Varnedoe was reasonable under these circumstances. We further find that Deputies Donald McNamara, Juan Rodriguez, and Edson Salazar acted reasonably in deploying other gases into the location in an effort to force Varnedoe out of the location, and are not criminally responsible for his death.

We are closing our file and will take no further action in this matter.

Very truly yours,

JACKIE LACEY
District Attorney

By

MARTHA CARRILLO
Deputy District Attorney
(213) 974-3888

c:   Deputy Anthony Geisbauer, #411266
     Deputy Juan Rodriguez, #487906
     Deputy Edson Salazar, #488652
     Deputy Donald McNamara, #472744

**PROOF OF SERVICE**

*Soares v. County of Los Angeles, et al.*
*USDC Case No.: 2:17-cv-00924*

I am employed in the City of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 3250 Wilshire Boulevard, Suite 708, Los Angeles, California 90010.

On **May 4, 2018**, I served the foregoing document described as: **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE OF THE COUNTY OF LOS ANGELES' FINDINGS THAT THE USE OF FORCE WAS NOT CRIMINAL, WAS REASONABLE, JUSTIFIED, AND/OR WAS WITHIN POLICY; DECLARATION OF DOUGLAS L. DAY,** to all interested parties in this action by a true and accurate copy thereof, enclosed in sealed envelopes, addressed as follows:

Tristan G. Pelayes, Esq.
Amanda J. Parker, Esq.
WAGNER & PELAYES, LLP
1325 Spruce Street, Suite 200
Riverside, CA 92507
Tel: (951) 686-4800
Fax: (951) 686-4081

*Attorney for Plaintiffs*

[X]  **BY ELECTRONIC E-FILING:** (IN COMPLIANCE WITH L.R.5-3-2.1) on **May 4, 2018**, at my place of business.

[X]  **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **May 4, 2018,** at Los Angeles, California.

_____/s/ Sara Justice_____
Sara Justice

8